THE ROSEN LAW FIRM, P.A.
Laurence M. Rosen, Esq.
One Gateway Center, Suite 2600
Newark, NJ 07102
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

GLANCY PRONGAY & MURRAY LLP
Kara Wolke, Esq. (admitted *pro hac vice*)
1925 Century Park East
Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: kwolke@glancylaw.com

*Co-Lead Counsel for Lead Plaintiffs and the Putative Class*

*Co-Lead Counsel for Lead Plaintiffs and the Putative Class*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| TRAVIS ITO-STONE, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>DBV TECHNOLOGIES S.A., DANIEL TASSÉ, PIERRE-HENRI BENHAMOU, DAVID SCHILANSKY, and SUSANNA MESA,<br><br>Defendants. | Case No. 2:19-cv-00525-MCA-LDW<br><br><br>CLASS ACTION<br><br>Motion Date: August 3, 2020 |

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DBV TECHNOLOGIES, S.A., DANIEL TASSÉ, PIERRE-HENRI BENHAMOU, DAVID SCHILANSKY, AND SUSANNA MESA'S MOTION <u>TO RE-NOTICE THE SECOND AMENDED COMPLAINT</u>**

# TABLE OF CONTENTS

INTRODUCTION .............................................................................................1

FACTUAL BACKGROUND..............................................................................2

    1.    The Initial Complaint and Lead Plaintiff Appointment Process...........2

    2.    The First Amended Complaint............................................................4

    3.    The Second Amended Complaint ........................................................8

ARGUMENT ..................................................................................................11

    1.    Re-Notice is Not Required Based on the SAC's Expansion of the
        FAC Class Period ..............................................................................12

    2.    The Additional Claims in the SAC Are Sufficiently Similar to
        the FAC's Claims that the Amendments Do Not Require New
        Notice ...............................................................................................15

    3.    Defendants' Cited Cases Do Not Support Re-Notice .........................18

CONCLUSION............................................................................................2020

# TABLE OF AUTHORITIES

Page(s)

Cases

*Blake Partners, Inc. v. Orbcomm, Inc.*,
   No. CIV.A. 07-4517 (WHW), 2008 WL 2277117 (D.N.J. June 2, 2008) ...........4

*Cheney v. Cyberguard Corp.*,
   211 F.R.D. 478 (S.D. Fla. 2002) .......................................................................12

*Dube v. Signet Jewelers Ltd.*,
   No. 16-CV-6728 (JMF), 2017 WL 1379385 (S.D.N.Y. Apr. 14, 2017) ............12

*Hachem v. Gen. Elec. Inc.*,
   No. 17-CV-8457 (JMF), 2018 WL 1779345 (S.D.N.Y. Apr. 12, 2018) ............19

*In re Cyberonics Inc. Sec. Litig.*,
   468 F. Supp. 2d 936 (S.D. Tex. 2006) ........................................................ 17, 18

*In re Leapfrog Enterprises, Inc. Sec. Litig.*,
   No. C 03 05421 RMW, 2005 WL 5327775 (N.D. Cal. July 5, 2005) ................18

*In re Lucent Techs. Inc. Sec. Litig.*,
   221 F. Supp. 2d 472 (D.N.J. 2001) .....................................................................4

*In re Rite-Aid Corp. Sec. Litig.*,
   No. 99 Civ. 1349, 1999 WL 34077183 (E.D. Pa. Dec. 20, 1999) ......................12

*In re Thornburg Mortg., Inc. Sec. Litig.*,
   629 F. Supp. 2d 1233 (D.N.M. 2009) ........................................................ passim

*Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*,
   No. 3:17-CV-558 (SRU), 2020 WL 1181366 (D. Conn. Mar. 10, 2020) ... 13, 14, 17, 18

*Rauch v. Vale S.A.*,
   378 F. Supp. 3d 198 (E.D.N.Y. 2019) ................................................... 11, 12, 17

ii

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
No. 05 CIV. 1898 (SAS), 2005 WL 1322721 (S.D.N.Y. June 1, 2005) ...... 13, 18

*Thomas v. Magnachip Semiconductor Corp.*,
No. 14-CV-01160-JST, 2015 WL 3749784 (N.D. Cal. June 15, 2015) ..............16

*Turner v. ShengdaTech, Inc.*,
No. 11 CIV. 1918 TPG, 2011 WL 6110438 (S.D.N.Y. Dec. 6, 2011)................12

*Waldman v. Wachovia Corp.*,
No. 08 CIV. 2913(SAS), 2009 WL 2950362 (S.D.N.Y. Sept. 14, 2009) .......1, 11

Lead Plaintiffs Ruth Pruitt and Asdrubal Delgado ("Lead Plaintiffs" or "Plaintiffs") submit this memorandum of law in opposition to DBV Technologies S.A. ("DBV" or the "Company"), Daniel Tassé, Pierre-Henri Benhamou, David Schilansky, and Susanna Mesa (collectively, the "Individual Defendants," and together with DBV, "Defendants") motion to re-notice the Second Amended Class Action Complaint ("Re-Notice Motion" or "Motion").  (Dkt. No. 39).

## INTRODUCTION

Renoticing is inappropriate here.  The PSLRA requires publication of one single notice at the outset of the litigation and cautions against requiring republication in "all but unusual situations."[1]  For this reason, and others, courts disfavor republication unless the amended complaint *substantially* alters the claims or class members.[2]  Here, the First Amended Complaint and Second Amended Complaint assert:  (i) the *same claims* (violations of the Securities Exchange Act of 1934); (ii) the *same theory of fraud* (that Defendants issued false and misleading statements concerning FDA approval of the Viaskin Peanut patch); (iii) involve the *same securities* (DBV American Depository Shares); and (iv) name the *same defendants*.  Thus, Plaintiffs need not publish notice. Additionally, each Lead

---

[1] *In re Thornburg Mortg., Inc. Sec. Litig.*, 629 F. Supp. 2d 1233, 1239–42 (D.N.M. 2009).

[2] *Waldman v. Wachovia Corp.*, No. 08 CIV. 2913(SAS), 2009 WL 2950362, at *1 (S.D.N.Y. Sept. 14, 2009).

Plaintiff purchased DBV shares during the First Amended Complaint's Class Period, *and then again* during the Second Amended Complaint's extended Class Period, assuring they are adequate and typical class representatives. (*See* Dkt. No. 38 at 109, 112).

Defendants' Re-Notice Motion serves no purpose other than to delay the litigation.[3] Re-noticing under these circumstances would be legally improper and would only disadvantage the putative class. As detailed herein, Courts across the country have confirmed that republishing notice in these circumstances is not warranted.

Accordingly, the Court should deny Defendants' Motion.

## FACTUAL BACKGROUND

### 1. *The Initial Complaint and Lead Plaintiff Appointment Process*

On January 15, 2019, Travis Ito-Stone filed an initial complaint against Defendants DBV, Daniel Tassé, Pierre-Henri Benhamou and David Schilansky alleging violations of the federal securities laws under the Securities Exchange Act of 1934. (Dkt. No. 38). The initial complaint alleged that Defendants made false

---

[3] This is not Defendants' first attempt to complicate this litigation. Defendants previously opposed Lead Plaintiffs' appointment as co-lead plaintiffs despite the fact that no other DBV shareholder sought appointment, and that federal courts across the country have routinely, and without controversy, been appointing co-lead plaintiffs since the PSLRA was enacted.

and misleading statements concerning DBV's Biologics License Application ("BLA") with the FDA for the Company's key product candidate, the Viaskin Peanut patch. The initial complaint alleges that when Defendants withdrew their BLA for the Viaskin Peanut patch the price of DBV stock declined, damaging investors.

Also on January 15, 2019, the Rosen Law Firm published a notice announcing that "it has filed a class action lawsuit on behalf of purchasers of the securities of DBV Technologies S.A. (NASDAQ: DBVT) from February 14, 2018 through December 19, 2018, inclusive" (the "Notice"). The Notice stated that the lawsuit "seeks to recover damages for DBV Technologies investors under the federal securities laws." The Notice apprised DBV investors that action concerned whether defendants made false and/or misleading statements and/or failed to disclose that DBV's BLA for Viaskin Peanut did not provide the FDA with sufficient data on manufacturing and quality controls, and that when DBV withdrew its BLA for the Viaskin Peanut, DBV's investors suffered damages.

On March 18, 2019, Ruth Pruitt and Asdrubal Delgado filed a motion for appointment as co-lead plaintiffs and approval of their selected counsel, the Rosen Law Firm P.A., and Glancy Prongay & Murray LLP as co-lead counsel. No other competing movants filed motions for appointment as lead plaintiff and approval of lead counsel. On March 26, 2019, DBV's counsel filed a letter with the court stating

3

that "[w]hile DBV has no interest in which plaintiff is appointed as lead plaintiff, DBV believes that considerations of fairness and economy weigh in favor of the appointment of a single lead plaintiff." (Dkt. No. 10). DBV did so despite having no standing to oppose the appointment of movants as lead plaintiffs, because as this Court has previously held, "Defendants do not have the best interest of the members of the class as heart." *Blake Partners, Inc. v. Orbcomm, Inc.*, No. CIV.A. 07-4517 (WHW), 2008 WL 2277117, at *3 (D.N.J. June 2, 2008). DBV's opposition was especially surprising given that courts routinely appoint co-lead plaintiffs to ensure that all class members are properly represented, and that the potential recovery for all class members is maximized.[4] Over Defendants' opposition, the Court granted Lead Plaintiffs' motion on October 3, 2019. (Dkt. No. 14).

### 2. The First Amended Complaint

On June 5, 2020, Plaintiffs filed the First Amended Complaint ("FAC"). The FAC is brought on behalf of a class of investors who purchased publicly traded DBV American Depository Shares ("ADS") during the period from February 14, 2018 through December 19, 2018 ("FAC Class Period"). (FAC at ¶1). The FAC seeks to

---

[4] *See, e.g., In re Lucent Techs. Inc. Sec. Litig.*, 221 F. Supp. 2d 472, 483 (D.N.J. 2001) (finding that appointing a co-lead plaintiff would provide "additional representation [that] may benefit the class and provide flexibility, if needed, in the future").

recover damages caused by Defendants' violations of Sections 10(b) and 20(a) of the Exchange Act. *Id.*

The FAC alleges that Defendants were in a race to become the first company to develop an FDA approved peanut allergy treatment. (*Id.* at ¶3). DBV's lead product candidate, Viaskin Peanut, is a patch to be worn on the skin, and is intended to treat peanut allergies in children, adolescents and adults. (*Id.*) DBV manufactured the patch using its proprietary electrospray technology, which was intended to spray homogenous, thin, dry protein layers onto the Viaskin patch. (*Id.* at ¶8). The electrospray technology is vital to the patch's function: the process sprays a liquid solution of electrically charged proteins onto the patch's backing that is then turned into a dry solid charged particle that remains stuck into the patch's backing. It deposits very small and precise quantities of the active substance. When the Viaskin Peanut patch is applied on intact skin it forms a condensation chamber that hydrates the skin and solubilizes (dissolves) the antigen, allowing it to penetrate the epidermis, where it is captured by cells. This mechanism is designed to generate an immune response that results in allergen desensitization. (*Id.* at ¶36).

The FAC further explains that the FDA must approve a Biologics License Application ("BLA") for Viaskin Peanut patch before DBV may legally market and sell it to the public. (*Id.* at ¶4). The FAC describes the FDA approval process in detail. (*Id.* at ¶¶38-47). After the FDA accepts the BLA for filing, the FDA reviews

the BLA to determine, among other things, whether the proposed product candidate is safe and effective for its intended use, and whether the product is being manufactured in accordance with "Current Good Manufacturing Practice" or "cGMP" to assure and preserve the product candidate's identity, strength, quality, purity and potency. (*Id.* at ¶70). The FAC also sets forth the FDA's requirements for Current Good Manufacturing Practice for Finished Pharmaceuticals ("cGMP") and Chemistry, Manufacturing and Controls ("CMC"). (*Id.* at ¶¶48-52). The FAC explains that these requirements exist to ensure that the drug sold to the public is produced consistently and that it has the same quality attributes of the drug demonstrated to be safe and effective. (*Id.* at ¶51).

On the first day of the FAC's Class Period, DBV announced that the FDA agreed that the available safety and efficacy data for Viaskin Peanut was sufficient to support a BLA submission. (*Id.* at ¶5). DBV based its BLA submission on the results from the PEPITES and REALISE studies. (*Id.* at ¶¶56-57, 59, 94). During the FAC's Class Period, Defendants made a series of statements assuring investors that DBV was on track to receive clinical approval for Viaskin Peanut. (*Id.* at ¶¶10, 74, 84, 88, 92).

The FAC alleges, based in part on interviews with confidential witnesses ("CWs"), who are former DBV employees, that DBV could not produce the Viaskin Peanut patch consistently, and was having trouble controlling the exact dose sprayed

6

onto each Viaskin patch. The electrospray machine's jets became clogged when running at full production. (*Id.* at ¶10). Without a consistent dose on each Patch, DBV would never obtain FDA approval.

The FAC additionally alleges that DBV was also experiencing a significant problem with the stability of the Viaskin Peanut patch such that it would fall off of patients' arms during clinical trials. According to CW1, this may have reflected a poor product design: a flat patch would have limited condensation between the under-layer of the patch and the skin, but the patch DBV used was ring shaped, and created condensation when the substrate and the peanut protein went into action, causing the patch to fall off patients. (*Id.* at ¶66).

DBV continued to experience serious manufacturing complications threatening its BLA after DBV submitted it to the FDA. (*Id.* at ¶13). Consistent with CW1's account, CW2 reported that DBV had problems scaling up its electrospray technology, and that the Viaskin Peanut patch had adhesion problems and fell off patients' skin during clinical trials. (*Id.* at ¶69).

The FAC alleges that Defendants' Class Period statements assuring investors that DBV was on track to submit to submit its BLA and to receive clinical approval for the Viaskin Peanut patch were false and misleading because Defendants knew the Company suffered from serious CMC shortcomings, and DBV lacked adequate

7

manufacturing procedures and quality controls to support FDA approval of its BLA. (*Id.* at ¶¶75, 85, 89, 93).

The FAC alleges that on December 19, 2018, DBV announced that it withdrew the BLA from FDA consideration after it received FDA feedback that the BLA lacked sufficient details on manufacturing procedures and quality controls. (*Id.* at ¶96). Defendant Tassé confirmed that the FDA had identified "many elements of CMC" that were deficient. (*Id.* at ¶100). On this news, DBV shares fell nearly 60% on December 20, 2018, damaging investors. (*Id.* at ¶97). Despite this news, DBV stated that it would work with the FDA to pursue BLA resubmission as quickly as possible. (*Id.* at ¶96).

### 3. The Second Amended Complaint

On June 5, 2020, Plaintiffs filed the Second Amended Complaint ("SAC"). The SAC picks up exactly where the FAC left off. Like the FAC, the SAC is brought on behalf of a class consisting of investors who purchased publicly traded DBV ADS. (SAC at ¶1). The SAC alleges a Class Period of February 14, 2018 through March 16, 2020 ("SAC Class Period"). (*Id.*). Like the FAC, the SAC seeks to recover damages caused by Defendants' violations of Sections 10(b) and 20(a) of the Exchange Act. (*Id.*). The SAC does not allege additional legal claims or name additional defendants. The SAC contains updated PSLRA certifications from Lead Plaintiffs, which demonstrate that both purchased additional DBV ADS during the

8

SAC's Class Period. Like the FAC, the SAC alleges that Defendants made a series of false and misleading statements regarding the prospects for FDA approval of Viaskin Peanut. (*Id.* at, *e.g.* ¶¶124, 128, 130, 132, 134, 135, 139, 141,143, 157, 160, 169, 171).

The SAC expands upon the FAC's allegations regarding the Viaskin Peanut patch's failure to stay adhered to the skin during clinical trials. The SAC relies upon the same CW's as the FAC, and in the SAC, those CWs elaborate on how manufacturing issues prevented DBV from fixing the Viaskin Peanut patch's adhesion problems. (*Id.* at ¶¶106-122).

DBV's BLA resubmission was based upon the same clinical trial as the initial submission on which the FAC was based–the PEPITES Study. (*Id.* at ¶¶59, 72, 193-94). The SAC explains how the PEPITES study's Statistical Analysis Plan ("SAP") sets forth the FDA's prespecified adhesion requirements for the Viaskin Peanut patch. (*Id.* at ¶¶98-103). The SAC alleges that during the Class Period, Defendants had the results from the PEPITES Study, and were aware that it failed the FDA's prespecified adhesion requirements. (*Id.* at ¶¶194-95. In fact, Defendants knew the study failed to meet the FDA's requirements *at the beginning of the FAC Class Period*. (*Id.* at ¶194).

The SAC incorporates the expert opinion of Dr. Philip Lavin, who reviewed the published PEPITES trial data, upon which DBV based both its initial BLA

submission (submitted during the FAC Class Period) and its BLA resubmission (submitted during the SAC Class Period). (*Id.* at ¶¶58-63). Dr. Lavin explains that the Viaskin Peanut patch's ability to consistently be effective requires the patch to reliably adhere to the skin. (*Id.* at ¶82). When a patch does not maintain consistent and uniform adhesion, the user experiences detachment, which undermines the patch's efficacy. (*Id.* at ¶83). The SAC alleges that Patch adhesion relates **both** to CMC and cGMP and safety and efficacy. (*Id.* at ¶86).

The SAC alleges that during the *FAC* Class Period Defendants made numerous false and misleading statements because they knew that:  1) DBV was incapable of manufacturing reproducible and consistent Viaskin Peanut patches because of problems with DBV's electrospray technology, and therefore DBV had serious CMC and cGMP problems, i.e., DBV lacked adequate manufacturing procedures and controls to support a BLA and; 2) **relatedly**, DBV could not produce a patch that adhered to the user's skin, and it failed to meet the FDA's prespecified adhesion criteria, casting doubt on Viaskin Peanut patch's efficacy, and making it unlikely that FDA would approve the BLA. (*Id.* at *e.g.,* ¶122). The SAC further alleges that after the Company withdrew its BLA (at the end of the FAC's Class Period), Defendants **continued to** mislead investors about the likelihood that the FDA would approve a BLA for Viaskin Peanut, as Defendants were aware that the Company was unable to manufacture a patch that sufficiently adhered to the patient's skin. (*Id.* at

10

¶33). Again, the SAC alleges that this problem concerns both CMC *and* efficacy. (*Id.* at ¶86).[5]

On March 16, 2020, the last day of the SAC Class Period, DBV revealed that the FDA identified questions when reviewing the BLA resubmission regarding efficacy, "including the impact of patch site-adhesion on efficacy." (*Id.* at ¶192). DBV further advised investors that it may have to submit additional information to the FDA that will extend the target action date for FDA approval. (*Id.* at ¶190). On this news, DBV ADS fell nearly 52%, damaging investors. (*Id.* at ¶191).

## ARGUMENT

The PSLRA contemplates a single notice as the general rule. "Notably, the statute makes no mention of 'complaints' of 'a complaint,' of 'subsequent complaints,' of 'amendments,' or any other similar language that might evidence intent that the notice provision would come into play multiple times in a single lawsuit. . . Instead, the PSLRA seems to view the notice as being a threshold issue that comes up at the beginning of the filing of a lawsuit. . . While the PSLRA does not foreclose the possibility of republication and additional notices, *the language of*

---

[5] If DBV is unable to manufacture a patch that consistently and reliably sticks to the user's skin because of CMC deficiencies that, in turn, will cause uncertainty about the resulting drug delivery and the rate and extent of drug absorption, undermining the patch's efficacy. (*Id.* at ¶83).

11

*the statue cautions against imposing such requirements in all but unusual situations*." *Thornburg,* 629 F. Supp. 2d at 1239–42 (emphasis added). "[C]ourts typically disfavor republication when a complaint is amended" unless "the amended complaint *substantially* alters the claims or class members." *Waldman*, 2009 WL 2950362, at *1 (emphasis added).

The FAC and the SAC differ only insofar as the SAC: 1) extends the Class Period and; 2) continues where the FAC left off, alleging that after DBV resubmitted its BLA for the Viaskin Peanut patch, Defendants continued to mislead investors about the patch's prospects for FDA approval, as Defendants knew Viaskin Peanut failed to properly adhere to patients' skin and put in serious doubt its efficacy. As noted in detail above, the SAC expands upon the FAC's allegations regarding patch-site adhesion failure. The SAC explains that adhesion failure stems from CMC issues and, in turn, impacts efficacy. Because the SAC does not substantially alter the FAC's claims, it is clear that no new notice is required.

### 1. Re-Notice is Not Required Based on the SAC's Expansion of the FAC Class Period

The SAC's expanded Class Period does not require re-publication. In cases involving the same claims and the same securities, but different class periods, courts have "generally found that the efficiency cost of republication outweighs the marginal fairness gains of notifying class members of an extended class period." *Rauch v. Vale S.A.*, 378 F. Supp. 3d 198, 206–07 (E.D.N.Y. 2019). This is so

because most potential lead plaintiffs are likely eligible under either class period and "have been alerted to the pendency of a case involving the same securities they hold, if not the exact period in which they held them." *Id.* As one Court stated, expanded class periods "have not given the courts much pause, and they have been willing to not require republication when an amended complaint expands the class period." *Thornburg*, 629 F. Supp. 2d at 1239–42.

Indeed, "the weight of the case law" suggests that no new notice is required upon extension of the class period. *In re Synovis Life Techs., Inc. Sec. Litig.*, No. 04-3008 ADM/AJB, 2005 U.S. WL2063870 , at *3 n.3 (D. Minn. Aug. 25, 2005) (collecting cases); *see also Dube v. Signet Jewelers Ltd.,* No. 16-CV-6728 (JMF), 2017 WL 1379385, at *2 (S.D.N.Y. Apr. 14, 2017) (new notice publication and the reopening of the lead plaintiff process is required only when later-filed complaints "dramatically alters the contours of the lawsuit."); *Cheney v. Cyberguard Corp.*, 211 F.R.D. 478, 498 (S.D. Fla. 2002) (despite 11 month expansion to class period, "additional notice is not required where the original complaint is amended to include, in part, an *extension of the class period*") (emphasis added); *In re Rite-Aid Corp. Sec. Litig.*, No. 99 Civ. 1349, 1999 WL 34077183, at *4 (E.D. Pa. Dec. 20, 1999) (despite 13 month expansion to class period filing of complaint similar to previously-filed complaint, but encompassing an earlier class period, did not warrant republication or relitigation of lead plaintiff and counsel issues); *Turner v.*

13

*ShengdaTech, Inc.*, No. 11 CIV. 1918 TPG, 2011 WL 6110438, at *141695, at *3 (S.D.N.Y. Dec. 6, 2011) (recognizing courts "disfavor republication of notice under PSLRA when a class period is extended beyond the period contained in the first-filed securities class action."); *Thornburg*, 629 F. Supp. 2d at 1241 (despite longer class period and new claims, original notice "fulfilled its purpose" of adequately "alert[ing] prospective lead plaintiffs of the pendency of an action.").

Here, the SAC expands the Class Period through March 16, 2020, an additional 15 months. Defendants' argument that this length of time requires re-notice is meritless. Recent case law explains why. The court in *Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, held that renotice was not required despite a two-year expansion of the class period. No. 3:17-CV-558 (SRU), 2020 WL 1181366, at *10–12 (D. Conn. Mar. 10, 2020). The court rejected the notion that the length of expansion governs in favor or republication stating that "the PSLRA republication inquiry is 'more qualitative' than quantitative; thus a class period multiplication exercise is a less important consideration than a qualitative comparison of the two complaints." *Id.* at *12. Here, both Lead Plaintiffs purchased DBV ADS in the initial as well as the extended class periods. Unlike in the few cases where courts have required renotice, no new classes of securities have been added, and thus "entire classes of potential lead plaintiffs" have *not* been left out of the notice procedure. *Cf Teamsters Local 445 Freight Div. Pension Fund v.*

14

*Bombardier Inc.*, No. 05 CIV. 1898 (SAS), 2005 WL 1322721, at \*2 (S.D.N.Y. June 1, 2005) (requiring re-notice where amended complaint included Series 2000-A Securities and initial complaint included only 1998-C securities). Because the Notice here alerted all potential lead plaintiffs to the pendency of a case involving the securities they hold—DBV ADS—renotice is not required.

### 2. The Additional Claims in the SAC Are Sufficiently Similar to the FAC's Claims that the Amendments Do Not Require New Notice

"When the legal claims are the same and the factual scenarios are substantially similar between the original an amended complaints no republication is necessary under the PSLRA." *Teva Pharm*, 2020 WL 1181366, at \*10–12. In assessing whether renotice is required courts focus on a "qualitative comparison of the two complaints." *Id.*

Here, a qualitative comparison between the FAC and SAC shows that the amendments are "sufficiently related to the initial claims." The SAC is a clear continuation of the misconduct Lead Plaintiffs allege in the FAC. At the end of the FAC Class Period, Defendants stated that they would resubmit their BLA for the Viaskin Peanut patch to the FDA as soon as possible. (FAC at ¶96). The SAC continues where the FAC leaves off.

On the first day of the SAC Class Period, Defendants announced plans to resubmit DBV's BLA for the Viaskin Peanut patch to the FDA. (SAC at ¶158). DBV's resubmitted BLA is the *same* BLA for the *same* product. Further, DBV

15

supported its resubmitted BLA with the *same* clinical trial at issue in the FAC. The SAC alleges that Defendants continued to mislead investors about the prospects for FDA approval of the Viaskin Peanut patch, as they did in the FAC Class Period.

As one court held in the context of finding republication unnecessary, "litigation is an ongoing process, and it is not surprising that new time periods might come under the umbrella of a particular case as time passes." *Thornburg,* 629 F. Supp. 2d at 1239–42. Likewise, Lead Plaintiffs' amendments are unsurprising. They are a continuation of the same misconduct the FAC alleges under the same legal theory pursuant to the same Securities Exchange Act provisions against the same defendants.

Defendants' assertion that renotice is necessary because the SAC alleges that Defendants made false and misleading statements about the efficacy of Viaskin Peanut and adhesion—as opposed to just manufacturing capabilities—(Motion at 7-8) distorts Lead Plaintiffs' theory of the case. First, Defendants omit that the FAC alleges that they were aware of patch-site adhesion problems since the beginning of the Class Period. (FAC at ¶66). The problems related to patch-site adhesion stem from CMC deficiencies that *also* affect efficacy. As Defendant Tassé stated, it was the *impact* of adhesion on efficacy that prompted the FDA to call off the APAC meeting. (SAC at ¶192). Because of CMC deficiencies, DBV was unable to manufacture a patch that consistently and reliably adhered to user's skin. Of course,

16

if the patch does not adhere to the skin, the drug cannot be delivered, thereby undermining efficacy.  The CMC deficiencies alleged in the FAC *are the cause of* the efficacy problems the SAC alleges, which in turn caused the FDA to reject the Viaskin Peanut patch for a second time. This demonstrates the interconnectedness between the FAC and SAC and the unified theory of the case between the FAC Class Period and the SAC Class Period.

Second, the core theory in both the FAC and the SAC is that Defendants mispresented the Viaskin Peanut patch's prospects for FDA approval.  The precise reasons why DBV's BLA was deficient is secondary to the overarching theory of both the FAC and SAC that Defendants misled investors about the prospects for FDA approval of the Viaskin Peanut patch.

Courts faced with amended complaints under analogous circumstances have held that renotice is not required.  *See, e.g., Thomas v. Magnachip Semiconductor Corp.*, No. 14-CV-01160-JST, 2015 WL 3749784, at *4–5 (N.D. Cal. June 15, 2015) (renotice unnecessary where "SAC still centers on the same factual scenario concerning MagnaChip's financial statements that was presented in Hayes's original complaint. The new Securities Act claims and additional defendants in the . . .complaint relate to the same misrepresentations. No new classes of securities or groups of plaintiffs have been added"); *Thornburg,* 629 F. Supp. 2d at 1239–42 ("The theme pervading the Consolidated Complaint, including the most recent

17

additions, is the allegation that Thornburg failed to disclose its substantial involvement with the sub-prime mortgage market and the associated risks of that involvement as the sub-prime market collapsed. The new claims are largely allegations that Thornburg continued to do after the original class period what the Lead Plaintiffs allege Thornburg was doing during that initial period."); *Rauch*, 378 F. Supp. 3d at 207 (no renotice where amended complaint "does make additional factual allegations pertaining to documents filed with the SEC and news articles that allegedly caused Vale stock to drop in price" but "reflect[s] substantially the same misconduct as the original Complaint for which notice was issued, just for different years corresponding with the expanded class period because "additions certainly do not assert "entirely new factual and legal allegations""); *Teva Pharm.*, 2020 WL 1181366, at *10–12 (renotice not required where second amended complaint alleges "clear continuation of conduct" alleged in first amended complaint).

### 3. Defendants' Cited Cases Do Not Support Re-Notice

Defendants have not pointed to a single case requiring republication where plaintiffs filed a subsequent complaint alleging a subsequent stock drop based upon the *same misconduct* as the original complaint for which the notice was issued.

The *Cyberonics* case (Motion at 5-7), involved a dramatic shift in factual theories. *In re Cyberonics Inc. Sec. Litig.*, 468 F. Supp. 2d 936, 937-40 (S.D. Tex. 2006). There, the original complaint alleged misrepresentations involving the

18

marketing of a medical device. *Id.* at 937. An amended complaint significantly expanded the class period, and substantially expanded the types of misrepresentations alleged to encompass executive compensation, internal controls and expense accounting. *Id.* at 939. And, unlike here, an institutional investor affirmatively sought to intervene. *Id.* Here, all of the alleged misrepresentations involve FDA approval of the Viaskin Peanut patch.

The *Bombardier* case is also inapposite (Motion at 6). *Bombardier*, 2005 U.S. Dist. LEXIS 10780, at *2. *Bombardier* involved an amendment expanding the scope of the litigation from a single security (Series 2000-A Certificates) to numerous additional classes and vintages of securities never mentioned in the PSLRA notice or original complaint (Series 1998-A, 1998-B, 1998-C, 1999-A, 1999-B and 2001-A Certificates). *Bombardier* explained that the decision hinged on "whether adding new classes of securities to the ambit of the class requires republication." *Id.* at *6. By contrast, DBV ADS are the only securities at issue both the FAC and SAC.

In the *Leapfrog* case (Motion at 5-7), the 21-page original complaint "alleged that defendants made rosy statements about [the defendant's] financial outlook." *In re Leapfrog Enterprises, Inc. Sec. Litig.*, No. C 03 05421 RMW, 2005 WL 5327775, at *3 (N.D. Cal. July 5, 2005). Then, the 135-page amended complaint "include[d] new allegations about [the defendant's] distribution and supply chain," which the district court concluded "dramatically alter[ed] the contours of the lawsuit" and

19

necessitated republication of notice. *Id.* The SAC contains no such dramatic alterations. And, finally, in the *Hachem* case (Motion at 5-6), the court "reluctantly concluded" that republication was warranted because the amended complaint included allegations about a new segment of the defendant's business and alleged additional stock drops related to that new segment. *Hachem v. Gen. Elec. Inc.*, No. 17-CV-8457 (JMF), 2018 WL 1779345, at *1–2 (S.D.N.Y. Apr. 12, 2018).

Defendants, do not, and cannot, cite any case requiring republication under analogous circumstances. Defendants only speculatively assert that more appropriate lead plaintiffs might exist. Defendants' Motion, therefore, is a bald attempt to delay the litigation at the expense of all putative class members.

Because the salient facts and the nature of the case in the FAC remain the same in the SAC, the Court should deny the motion for republication of the PSLRA notice.

## CONCLUSION

For the foregoing reasons, Lead Plaintiffs respectfully request that the Court deny Defendants' Motion.

Dated: July 3, 2020                      Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: */s/Laurence M. Rosen*
Laurence M. Rosen
One Gateway Center, Suite 2600
Newark, NJ 07102

20

Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

Sara Fuks (*admitted pro hac vice*)
275 Madison Avenue, 40th Floor
New York, NY 10016
Tel: (212) 686-1060
Email: sfuks@rosenlegal.com

**GLANCY PRONGAY & MURRAY LLP**

Kara Wolke, Esq. (*admitted pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Email: kwolke@glancylaw.com

*Co-Lead Counsel for Lead Plaintiffs and the
Putative Class*

21