THE ROSEN LAW FIRM, P.A.
Laurence M. Rosen, Esq.
One Gateway Center, Suite 2600
Newark, NJ 07102
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

GLANCY PRONGAY & MURRAY LLP
Kara Wolke, Esq. (admitted *pro hac vice*)
1925 Century Park East
Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: kwolke@glancylaw.com

*Co-Lead Counsel for Lead Plaintiffs and the Putative Class*

*Co-Lead Counsel for Lead Plaintiffs and the Putative Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| TRAVIS ITO-STONE, Individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>     v.<br><br>DBV TECHNOLOGIES S.A., DANIEL TASSÉ, PIERRE-HENRI BENHAMOU, DAVID SCHILANSKY, and SUSANNA MESA<br><br>     Defendants. | Case No. 2:19-cv-00525-MCA-LDW<br><br>Motion Date: March 15, 2021<br><br>Document Filed Electronically<br><br><u>CLASS ACTION</u> |

### PLAINTIFFS' OPPOSITION TO DBV TECHNOLOGIES S.A., DANIEL TASSE, PIERRE-HENRI BENHAMOU, DAVID SCHILANSKY AND SUSANNA MESA'S <u>MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT</u>

**TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT .................................................................................. 1

II.   FACTUAL BACKGROUND...................................................................................... 5

      A.    DBV and Its Main Product Candidate, Viaskin Peanut........................................... 5

      B.    Viaskin Peanut Clinical Trials and Topline Results Announced in 2017............... 6

      C.    Former Employees Corroborate Viaskin Peanut's Adhesion and Manufacturing Failures Prior to and During the Class Period ........................................................ 7

      D.    The First BLA Submission And Withdrawal.......................................................... 8

      E.    Defendants Announce Plans to Resubmit the BLA and Publish Final Results From the PEPITES Study ................................................................................................. 9

      F.    Defendants Again Announce Serious FDA Concerns With The BLA.................. 10

      G.    Post-Class Period Developments: the FDA Issues a Complete Response Letter . 10

III.  LEGAL STANDARDS ........................................................................................... 11

IV.   ARGUMENT .......................................................................................................... 11

      A.    The SAC Sufficiently Alleges Falsity.................................................................. 11

            1.    Defendants Made Materially Misleading Statements Regarding Viaskin Peanut and the BLA ................................................................................. 12

            2.    Defendants Misleadingly Concealed that Viaskin Peanut Failed to Demonstrate the FDA's Prespecified Adhesion Rate .............................. 15

            3.    The Confidential Witness Accounts Should Be Credited......................... 19

            4.    The SAC Does Not Plead Fraud By Hindsight....................................... 21

            5.    Defendants' Statements Are Not Inactionable Opinions .......................... 22

      B.    THE SAFE HARBOR DOES NOT APPLY ........................................................ 23

            1.    Omissions Of Present Fact Are Not Forward-Looking Statements Protected By The Safe Harbor ................................................................................. 23

            2.    Defendants' Statements Were Made With Actual Knowledge Of Falsity 24

            3.    Defendants' Purported Cautionary Language Was Neither Meaningful Nor Adequate ................................................................................................. 24

i

C.    THE SAC ALLEGES A STRONG INFERENCE OF SCIENTER ..................... 27

    1.    Defendants Were, At *Minimum*, Deliberately Reckless In Failing To Disclose Known Facts Contrary To Their Public Statements .................. 27

    2.    Viaskin Peanut's Success Was Vital To DBV's Operations .................... 28

    3.    Defendants' Motive Supports Scienter ........................................................ 29

    4.    DBV's Top Executives' Resignations Bolster Scienter Inference ........... 30

    5.    Viewed Holistically, The SAC Alleges A Strong Inference Of Scienter . 31

D.    THE SAC ALLEGES CORPORATE SCIENTER ............................................. 34

V.    THE SAC ALLEGES CONTROL PERSONS CLAIMS ...................................................... 34

VI.    BENHAMOU AND SCHILANSKY HAVE WAIVED SERVICE ARGUMENTS ........... 35

VII.    CONCLUSION .......................................................................................................... 35

ii

# TABLE OF AUTHORITIES

## CASES

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002) ................................................................................................ 27

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................................................... 11

*Bauer v. Eagle Pharm., Inc.*,
2017 WL 2213147 (D.N.J. May 19, 2017) .......................................................................... 22

*Bing Li v. Aeterna Zentaris, Inc.*,
2016 WL 827256 (D.N.J. Mar. 2, 2016) ............................................................................. 16

*Christine Asia Co. v. Ma*,
718 F. App'x 20 (2d Cir. 2017) .......................................................................................... 34

*Curran v. Freshpet, Inc.*,
2018 WL 394878 (D.N.J. Jan. 12, 2018) ............................................................... 11, 23, 24

*Employees Ret. Sys. of Puerto Rico Elec. Power Auth. v. Conduent Inc.*,
2020 WL 3026536 (D.N.J. June 5, 2020) ........................................................................... 34

*Government of the Virgin Islands v. Sun Island Car Rentals, Inc.*,
819 F.2d 430 (3d Cir.1987) ................................................................................................ 35

*GSC Partners CDO Fund v. Washington*,
368 F.3d 228 (3d Cir. 2004) ........................................................................................ 24, 25

*Frater v. Hemispherx Biopharma, Inc.*,
996 F. Supp. 2d 335, (E.D. Pa. 2014) ................................................................................ 26

*In re Alpharma, Inc. Sec. Litig.*,
372 F.3d 137 (3d Cir. 2004) ............................................................................................... 11

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997) ............................................................................................. 17

*In re Campbell Soup Co. Sec. Litig.*,
145 F. Supp. 2d 574 (D.N.J. 2001) ..................................................................................... 27

*In re Discovery Labs. Sec. Litig.*,
2007 WL 789432 (E.D. Pa. Mar. 15, 2007) ........................................................................ 22

*In re Hertz Glob. Holdings Inc.*,
905 F.3d 106 (3d Cir. 2018) .................................................................... 34

*In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*,
2020 WL 1479128 (E.D. Pa. Mar. 25, 2020) .................................... 25, 27, 28

*In re NAHC, Inc. Sec. Litig.*,
306 F.3d 1314 (3d Cir.2002) .................................................................... 10

*In re Par Pharm. Sec. Litig.*,
2009 WL 3234273 (D.N.J. Sep. 30, 2009) ................................................ 31

*In re PTC Therapeutics, Inc. Sec. Litig.*,
2017 WL 3705801 (D.N.J. Aug. 28, 2017) ................................... 22, 23, 33

*In re Tellium Inc., Sec. Litig.*,
2005 WL 1677467 (D.N.J. June 30, 2005) ................................................ 26

*In re Veritas Software Corp. Sec. Litig.*,
2006 WL 1431209 (D. Del. May 23, 2006) ............................................... 24

*In re Vicuron Pharm., Inc. Sec. Litig.*,
2005 WL 2989674 (E.D. Pa. July 1, 2005) ................................................ 10

*In re Viropharma, Inc. Sec. Litig.*,
2003 WL 1824914 (E.D. Pa. Apr. 7, 2003) ......................................... 21, 22, 28, 29

*In re Viropharma, Inc., Sec. Litig.*,
21 F. Supp. 3d 458 (E.D. Pa. 2014) .................................................. *passim*

*In re Westinghouse Sec. Litig.*,
90 F.3d 696 (3d Cir. 1996) ...................................................................... 26

*Indiana Public Retirement System v. SAIC, Inc.*,
818 F.3d 85 (2d Cir. 2016) ...................................................................... 33

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009) ............................................................. *passim*

*Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*,
363 F. Supp. 3d 476 (D. Del. 2019) .......................................................... 20

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
513 F.3d 702 (7th Cir. 2008) .................................................................... 33

*Matrixx Initiatives, Inc. v. Siracusano,*
    131 S. Ct. 1309 (2011) ............................................................................... 11, 18

*McCurdy v. Am. Bd. of Plastic Surgery,*
    157 F.3d 191 (3d Cir. 1998) ................................................................................ 35

*Nguyen v. Radient Pharm. Corp.,*
    2011 WL 5041959 (C.D. Cal. Oct. 20, 2011) ...................................................... 29

*Odeh v. Immunomedics, Inc.,*
    2020 WL 4381924 (D.N.J. July 31, 2020) ................................................... *passim*

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,*
    135 S. Ct. 1318 (2015) ........................................................................................ 23

*P. Stolz Family P'ship L.P. v. Daum,*
    355 F.3d 92 (2d Cir. 2004) ................................................................................. 26

*Phillips v. Cty. of Allegheny,*
    515 F.3d 224 (3d Cir. 2008) ................................................................................ 11

*Reid v. Hemispherx Biopharma, Inc.,*
    2010 WL 11710594 (E.D. Pa. Apr. 20, 2010) .................................................... 24

*Rihn v. Acadia Pharm. Inc.,*
    2016 WL 5076147 (S.D. Cal. Sept. 19, 2016) .................................................... 13

*Roofer's Pension Fund v. Papa,*
    2018 WL 3601229 (D.N.J. July 27, 2018) .................................................. *passim*

*Rubinstein v. Collins,*
    20 F.3d 160 (5th Cir. 1994) ............................................................................... 26

*Schueneman v. Arena Pharm., Inc.,*
    840 F.3d 698 (9th Cir. 2016) ............................................................................. 22

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC,*
    351 F. Supp. 3d 874 (E.D. Pa. 2018) ...................................................... 15, 28, 29

*Shah v. Zimmer Biomet Holdings, Inc.,*
    2018 WL 4637247 (N.D. Ind. Sept. 26, 2018) ................................................... 32

*Skiadas v. Acer Therapeutics Inc.,*
    2020 WL 3268495 (S.D.N.Y. June 16, 2020) .................................................... 29

*Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital Inc.*,
531 F.3d 190 (2d Cir. 2008)..................................................................................... 34

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)............................................................................. 17, 27, 31

*Todd v. STAAR Surgical Co.*,
2016 WL 6699284 (C.D. Cal. Apr. 12, 2016) ........................................................ 15

*Tomaszewski v. Trevena, Inc.*,
2020 WL 5095865 (E.D. Pa. Aug. 28, 2020) ............................................. 29, 32, 33

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
2015 WL 3755218 (E.D. Pa. June 16, 2015).......................................................... 30

*Walsingham v. Biocontrol Tech., Inc.*,
66 F. Supp. 2d 669 (W.D. Pa. 1998)...................................................................... 24

*Yanek v. Staar Surgical Co.*,
388 F. Supp. 2d 1110 (C.D. Cal. 2005) ................................................................. 25

**STATUTES**

15 U.S.C. § 77z–2 .................................................................................................... 23

15 U.S.C. § 78u-4(b)(1) ........................................................................................... 11

**RULES**

Fed. R. Civ. P. 9(b) .................................................................................................. 11

Fed. R. Civ. P. 15(a) (2)........................................................................................... 35

Fed. R. Evid. 201 ..................................................................................................... 10

Lead Plaintiffs Ruth Pruitt and Asdrubal Delgado ("Plaintiffs") respectfully submit this opposition to Defendants' motion to dismiss (ECF No. 51; the "Motion") the Second Amended Class Action Complaint (ECF No. 38; the "SAC" or "Complaint"). [1] For the reasons stated herein, Defendants' Motion should be denied in its entirety.

## I.   **PRELIMINARY STATEMENT**

Defendants made material misrepresentations and omissions about DBV's Biologics License Application ("BLA") for its lead product candidate, Viaskin Peanut, during the Class Period.[2] Viaskin Peanut is an adhesive patch intended to treat peanut allergies in children. DBV produces Viaskin Peanut by spraying the active ingredient on the patch using a proprietary electrospray technology. Because the patch delivers its active ingredients through the skin, it must adhere to the patient's skin for 24 hours for the treatment to be effective.

In December 2015, DBV began a Phase III clinical trial for Viaskin Peanut, called PEPITES, the data from which would be used to support the BLA. DBV and the FDA agreed to a statistical analysis plan ("SAP") effective September 28, 2016.[3] The SAP set forth numerous criteria for the trial, including the FDA's prespecified standard for patch adhesion, known as a compliance endpoint. Specifically, the SAP required that the patch demonstrate a 90% adhesion rate at the time of patch removal (*i.e.* at end of the 24-hour period). The adhesion requirement related directly to the product's efficacy: if the patch failed to sufficiently stick to the skin for the duration of required use, the skin may not absorb the full dose. FDA-regulated Chemistry,

---

[1] Defendants are DBV Technologies S.A. ("DBV" or "the Company"), Daniel Tasse ("Tasse"), Pierre-Henri Benhamou ("Benhamou"), David Schilansky ("Schilansky"), and Susanna Mesa ("Mesa") (Tasse, Benhamou, Schilansky and Mesa are collectively referred to herein as the "Individual Defendants" and together with DBV, "Defendants").

[2] The Class Period is February 14, 2018 to March 16, 2020 Class Period, inclusive.

[3] Baumstein Declaration, Ex. 8 (ECF No. 51-11).

Manufacturing, and Controls ("CMC") and current Good Manufacturing Practices ("cGMP"), required that DBV be able to consistently manufacture a patch that sufficiently adhered to the skin. Indeed, the FDA specifically requires patches that deliver drugs via the skin (called transdermal delivery systems or "TDS"), such as Viaskin Peanut, to undergo compliance and performance testing as a part of the CMC submission required for BLA review and approval.

DBV completed the PEPITES trial in August 2017 and announced the results in October 2017. Defendants thus had the trial data in hand well prior to the start of the Class Period. And Defendants knew from this trial data, but did not tell investors, that the patch failed to meet the 90% prespecified adhesion rate set forth in the SAP. Despite Defendants' awareness of this failure, on February 14, 2018, they told investors that "the available efficacy and safety data for Viaskin Peanut supports the submission" of the BLA (¶123), misleading investors to believe that DBV had satisfied the FDA's requirements for the BLA.

However, as Plaintiffs' expert explains, the patch's failure to meet the 90% prespecified adhesion rate was a major impediment to FDA approval. While the FDA initially permitted DBV to use "Tegaderm" (akin to medical tape) to tape the patch to users' skin, it revoked this permission on February 2, 2017. In order to actually *fix* the adhesion problem, DBV would have had to find a better adhesive (or TDS), while use of a different TDS would in turn require (1) additional testing of the new TDS, resulting in significant delay and expense, and (2) the new TDS would still need to meet the FDA adhesion compliance endpoint. Former DBV employees corroborate that it was well known within DBV that the patch's failure to consistently adhere to the skin was a major problem in the PEPITES clinical trial. A former employee explained that despite knowing about the adhesion problem, DBV would not consider using a different adhesive because Defendants knew DBV would have to formally document such changes in the clinical trial, and the FDA would

2

have to approve the change, thus delaying the BLA submission—which DBV, reliant on serial stock offerings to fund its operations, was loath to do.  Former DBV employees also detail additional CMC problems DBV faced prior to and during the Class Period.  Specifically, DBV was unable to scale its electrospray technology for commercial production and unable to produce the patch consistently because the electrospray technology failed to control the exact 250mg dose required to be sprayed onto each patch.

Despite these undisclosed material defects in the patch and its manufacturing process, Defendants decided to roll the dice and move forward, submitting the Viaskin Peanut BLA on October 18, 2018.  Unsurprisingly, the FDA immediately raised questions and concerns about the BLA through verbal and written correspondence with Defendants.  Thus, on December 19, 2018, just two months after the BLA was submitted, Defendants revealed that the FDA stated that the BLA lacked sufficient data on manufacturing and quality, prompting DBV to withdraw the BLA.  DBV's stock price plummeted in response to the news, falling $8.39 per share (nearly 60%) to close at $5.76 per share on December 20, 2018.  Thereafter, Defendant Tasse assured investors "we're going to use the opportunity [of BLA withdrawal] since we have to invest time in answering the CMC questions, also, take a look at the whole – the clinical trial. . . .  But we're just giving it a once-over to be certain here that there's nothing else that we may want to round off or to add to it.  At this point in time, nothing has been identified."  ¶159.  In truth, Defendants had been aware of major efficacy-related and manufacturing-related problems since at least October 2017.

In August 2019, Defendants announced that they resubmitted the BLA.  The resubmitted BLA again relied on the PEPITES data, which, unbeknownst to investors, still failed to meet the FDA's prespecified compliance endpoint for adhesion.  During the Class Period, and while in

possession of material undisclosed information undermining DBV's BLA, Defendants raised over half a billion dollars—*$532.2 million*—in a series of stock offerings.

Then, on March 16, 2020, Defendants announced that the FDA had again identified problems with the BLA, including "the impact of patch-site adhesion on efficacy," and admitted that "the submission of additional information to the FDA may constitute a major amendment to the BLA and could extend the target action date." ¶192. In a conference call held the same day, Defendant Tasse finally admitted to investors what Defendants knew since at least October 2017: that Viaskin Peanut had failed to meet the FDA's prespecified adhesion rate in the PEPITES study. On this news, DBV's shares fell nearly 52%, from $5.26 to $2.54.

In their Motion, Defendants argue that they did not mislead investors about Viaskin Peanut because, according to Defendants, meeting the SAP's prespecified adhesion rate was not a "requirement for approval." Mot. at 15-17. Defendants further claim that their concealment of the failure to meet the compliance endpoint for adhesion is excusable because the FDA purportedly did not raise concerns about efficacy as related to patch-site adhesion until March 2020. First, the Complaint alleges, and the Defendants have admitted, that the SAP prespecified that the PEPITES trial must demonstrate a 90% adhesion rate to show efficacy. ¶¶12, 87, 100, 193-94. Having set forth the 90% adhesion rate requirement in the SAP, it is highly unlikely that the FDA would later waive this requirement. ¶195. "Knowing that Viaskin Peanut had failed to meet the FDA's pre-specified adhesion rate in its Phase III trials, Defendants knew it was highly unlikely the FDA would approve the BLA." ¶198. Second, *even if* Court accepts Defendants unwarranted version of events and assumes the FDA did not specifically voice concerns with patch-site adhesion until March 2020, Defendants were still knowingly, or severely reckless in submitting, and then

4

resubmitting, the BLA based on the PEPITES data when they knew from at least October 2017 that the study failed to attain the FDA required 90% patch adhesion rate.

Defendants' other attacks fare no better. Defendants' assertion that this is a mere fraud by hindsight case is belied by Defendants' contemporaneous knowledge of Viaskin Peanut's efficacy-related and manufacturing-related failures that rendered their Class Period statements false and misleading. Nor can Defendants avail themselves of the PSLRA safe harbor for forward-looking statements. Defendants misrepresented present and historical facts, not predictions, and to the extent any misstatement is construed as forward-looking, Defendants had actual knowledge that the PEPITES trial failed to meet FDA's prespecified adhesion standard, and therefore Defendants made the statements with actual knowledge of their falsity, precluding safe harbor protection. The Complaint sufficiently alleges that Defendants knowingly or recklessly misled investors regarding Viaskin Peanut and DBV's BLA during the Class Period. The Motion should be denied.

## II.   FACTUAL BACKGROUND

### A.   DBV and Its Main Product Candidate, Viaskin Peanut

Viaskin Peanut was DBV's lead product candidate during the Class Period. ¶¶1, 50. The success of Viaskin Peanut was incredibly important to DBV because the Company had no material revenue and no approved products in the market. The Viaskin Peanut patch, when applied on intact skin, is supposed to form a condensation chamber that hydrates the skin and dissolves the antigen, allowing it to penetrate. This mechanism is designed to generate an immune response that results in allergen desensitization. ¶54. Viaskin Peanut is a transdermal delivery system, or TDS. ¶79. Transdermal and topical delivery systems, like Viaskin Peanut, typically must demonstrate a prespecified adhesion rate, or compliance endpoint, to pass FDA scrutiny. ¶80. The amount of drug delivered into and through the patient's skin from a TDS is dependent, in part, on

the surface area dosed.  To be effective, the patch must reliably adhere to the skin in order to build up sufficient moisture to enable the skin to absorb the antigen.  It is therefore necessary that the entire surface area of the patch remain consistently and uniformly adhered to the patient's skin throughout the duration of wear under the conditions of use described in the product labeling.  ¶82. When a TDS loses its adherence during wear, the amount of drug delivered to the patient may be reduced.  TDS products that do not maintain consistent and uniform adhesion during the required wear period can experience varying degrees of TDS detachment, which undermines efficacy.  ¶83.

**B.      Viaskin Peanut Clinical Trials and Topline Results Announced in 2017**

DBV has been developing Viaskin Peanut for over ten years.  As part of its Phase III program, DBV initiated the Peanut EPIT Efficacy and Safety Study, or PEPITES, a pivotal Phase III trial, in December 2015.  PEPITES was designed to evaluate the safety and efficacy of Viaskin Peanut in peanut allergic patients four to 11 years of age.  ¶92.  PEPITES was one of two Phase III trials supporting DBV's BLA submission to the FDA.  ¶97.

The Statistical Analysis Plan V4.0 for the PEPITES study (the "SAP") describes the statistical methods for analyzing and reporting data collected in the PEPITES Phase III study.  The SAP represents an agreement between DBV and the FDA on the requirements for the statistical analyses of the PEPITES study.  ¶98.  The SAP, Section 4.11 entitled "Adhesion," unequivocally set forth the FDA's prespecified requirements to demonstrate sufficient adhesion:

> The viaskin patch adhesion will be evaluated during 28 days between M3 and M6…The scoring system for adhesion and occlusion of Viaskin patches is indicated as follows:..
> …***Patch adhesion will be considered as acceptable if more than 90% of the patches at the expected time of patch removal, i.e. at 24 plus or minus 4 hours after patch application have an adhesion score of less than or equal to 1 as assessed by the subjects' parents/guardians***. In other words, adhesion of the patch will be considered as acceptable if less than 10% of the patches are evaluated with an adhesion grade 2 or 3 at time of removal, during the period of adhesion, for the overall population.

6

¶100.  Section 4.11 of the SAP also stated that DBV was prohibited from using Tegaderm to make the patch stick to the user's skin:

> The use of hypoallergenic adhesive dressing (e.g. Tegaderm) to prevent possible patch adhesion issues was authorized on Dec. 2. 2016…and is collected in the eCRF (investigator assessment at study visits).  Following a comment from the FDA, this decision was cancelled on Feb. 2, 2017.

¶102.
In October 2017, DBV announced positive topline results from PEPITES, but omitted that Viaskin Peanut failed to meet the prespecified adhesion rate.  ¶95.

**C.    Former Employees Corroborate Viaskin Peanut's Adhesion and Manufacturing Failures Prior to and During the Class Period**

Former employees report that Viaskin Peanut had serious adhesion problems and that DBV encountered intractable difficulties in manufacturing the patch.  Confidential Witness ("CW") 1, a Regional Director of Supply Chain, learned of DBV's manufacturing and adhesion problems during CW1's work at DBV's French manufacturing facility.  While at the facility, Pascale Ehouran, DBV's Vice President of Manufacturing, informed CW1 about the adhesion problems, and CW1 recalled that the adhesion problems related to a fundamental design flaw.  ¶108-09.  CW1 had additional corroborating conversations about the adhesion and manufacturing flaws with facility employees and the Senior Director of Market Development.  ¶¶109-110, 113.

Corroborating Plaintiffs' expert's opinion (*e.g.*, ¶112), CW1 noted that despite the known problems, DBV did not seriously consider using a different adhesion mechanism because the Company would have to formally document such a change in the clinical trial protocol and also get FDA approval for the change, resulting in substantial additional costs and delay.  ¶111.  During the same visits to the French manufacturing facility, CW1 also discovered that DBV was significantly behind in scaling up its Viaskin Peanut manufacturing operations to launch a commercial product.  ¶106.  While DBV could produce small batches for the Phase 3 trials, CW1

7

explained that DBV's technology was inadequate to produce the large-scale batches required for commercial production and FDA approval. ¶107.

CW2, DBV's Senior Director, Market Development (Food Allergies), corroborates CW1's account. CW2 also travelled to DBV's manufacturing facility in France and learned both that that Viaskin Peanut was experiencing adhesion problems and that DBV was having problems scaling up and implementing the electrospray technology. ¶117. CW2 reported that because of the adhesion problems, during clinical studies it was necessary to affix the patches to patients using Tegaderm. ¶119. Based on these observations, at the beginning of the Class Period, in February 2018, CW2 did not believe that DBV realistically would be able to submit its BLA for Viaskin Peanut to the FDA with success "anytime soon." ¶120. Still, CW2 explained, CW2 believed that DBV was in a race against its competitors and needed to show progress to investors by submitting the BLA in 2018. *Id.* CW3, DBV's consultant, also recounted DBV's manufacturing difficulties. CW3 explained that DBV's electrospray technology could not produce the proper dose for the Viaskin Peanut patch consistently due to the spray-jets becoming clogged while running at full production. ¶121. According to CW3, this manufacturing and quality control issue contributed to DBV's withdrawal of the first BLA in December 2018.

> **D.** **The First BLA Submission And Withdrawal**

On February 14, 2018, the first day of the Class Period, DBV announced that the FDA agreed that the available efficacy and safety data for Viaskin Peanut supported the submission of a BLA. ¶123. Following this announcement, the price of DBV's ADS increased $5.64 per share, a 27% increase from the prior day's closing price. On October 22, 2018, DBV announced it had submitted the Viaskin Peanut BLA to the FDA. ¶144.

On December 19, 2018, after the close of trading, DBV issued a press release announcing that the "BLA [for Viaskin Peanut was] withdrawn following discussions with FDA regarding insufficient data on manufacturing procedures and quality controls[.]" ¶146. On a conference call hosted the same day, Tasse explained that "the other option was to continue with the file, quite simply, but the right decision here was for us to withdraw the file." ¶152. On this news, DBV's stock price fell $8.39 per share (nearly 60%), closing at $5.76 on December 20, 2018. ¶147.

**E.      Defendants Announce Plans to Resubmit the BLA and Publish Final Results From the PEPITES Study**

On February 13, 2019, DBV announced it would resubmit the BLA for Viaskin Peanut in the third quarter of 2019. ¶158. In response, shares of DBV ADS rose 11% in after-hours trading. ¶161. On February 22, 2019, the full results of the PEPITES study were published in the Journal of American Medicine ("JAMA"). ¶162. The PEPTIES study SAP is marked "CONFIDENTIAL" with an effective date of September 28, 2016 and a "Project Document Effective Date" of October 4, 2017. ¶99. As noted above, the SAP required DBV to demonstrate that the patch had an adhesion rate of 90% or greater and specifically prohibited the use of Tegaderm to achieve adhesion. However, the JAMA article reporting on the PEPITES study is silent as to whether the trial results met the adhesion criteria. ¶164. Defendants did not reveal the negative adhesion data from the PEPITES study precisely *because* they knew it failed the FDA's prespecified adhesion compliance endpoint and they wanted to conceal this adverse news from investors. ¶165.

On August 7, 2019, DBV announced it had resubmitted a BLA to the FDA, and specifically assured investors that "[t]he submission addresses the additional data needed on manufacturing procedures and quality controls which were communicated by the FDA in December 2018, when DBV voluntarily withdrew its prior BLA submission for Viaskin Peanut." ¶174.

**F.      Defendants Again Announce Serious FDA Concerns With The BLA**

On March 16, 2020, the last day of the Class Period, DBV disclosed that the FDA "has informed the Company that during its ongoing review of the Biologics License Application (BLA) for investigational Viaskin Peanut, it **_has identified questions regarding efficacy, including the impact of patch-site adhesion_**."  ¶190.   The same day, Defendant Tasse revealed that "[t]he questions from the agency have to do with the potential impact on efficacy of patch adhesion and patch attachment."  ¶193.  Analysts were surprised with this revelation and pressed Tasse on the FDA's adhesion and efficacy concerns, in response to which Tasse admitted: "**_[s]o the adhesion rate that was prespecified by the FDA based on their transdermal patch experience was that 90% adhesion rate was required.  The adhesion rate in PEPITES was below the prespecified 90% from both placebo and active arms_**."  ¶193.  On this news DBV ADS fell $2.72 (52%) from a closing price of $5.26 per share on March 16, 2020, to open at $2.54 on March 17, 2020.  ¶191.

**G.      Post-Class Period Developments: the FDA Issues a Complete Response Letter**

On August 4, 2020, DBV revealed that it received a Complete Response Letter from the FDA: "The Complete Response Letter indicates that the FDA cannot approve the application in its present form. **_The FDA has identified concerns regarding the impact of patch-site adhesion on efficacy and indicated the need for patch modifications, and subsequently a new human factor study. The FDA has also indicated that supplementary clinical data would need to be generated to support the modified patch. In addition, the FDA requested additional Chemistry, Manufacturing and Controls data._**"[4]

---

[4]    August    4,    2020    Form    6-K    and    press    release,    _available    at_ https://dd7pmep5szm19.cloudfront.net/2308/0001193125-20-209288.pdf.  "It is well-settled that a court may take judicial notice of documents filed with the SEC but not relied upon in the complaint." _In re Vicuron Pharm., Inc. Sec. Litig._, 2005 WL 2989674, at *2 (E.D. Pa. July 1, 2005) (citing _In re NAHC, Inc. Sec. Litig._, 306 F.3d 1314, 1331 (3d Cir.2002); Fed. R. Evid. 201).

### III.    LEGAL STANDARDS

In considering a Rule 12(b)(6) motion to dismiss, the court must accept all alleged facts as true and draw all reasonable inferences in favor of the plaintiff. *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008); *Odeh v. Immunomedics, Inc.*, 2020 WL 4381924, at *5 (D.N.J. July 31, 2020) (Arleo, J.) (citing cases).[5]  Dismissal is inappropriate even where "it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." *Allegheny*, 515 F.3d at 231.  Accordingly, a complaint will survive if it provides a sufficient factual basis such that it states a facially plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

To state a claim under Section 10(b) of the Exchange Act, a plaintiff must allege (1) the purchase of a security; (2) a material misrepresentation or omission by the defendant (*i.e.*, "falsity"); (3) scienter; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1317 (2011); *see also Immunomedics*, 2020 WL 4381924, at *5 (citing cases).  Defendants' Motion contests only falsity and scienter, thus conceding the sufficiency of the Complaint's allegations as to the other elements.

### IV.    ARGUMENT

#### A.    The SAC Sufficiently Alleges Falsity

To satisfy Fed. R. Civ. P. 9(b) and the PSLRA's pleading requirement for falsity, a plaintiff needs to specify each statement alleged to be misleading and why the statement is misleading, setting out the "first paragraph of a newspaper story— that is, the who, what, when, where and how" concerning the statements at issue. *Curran v. Freshpet, Inc.*, 2018 WL 394878, at *3 (D.N.J. Jan. 12, 2018) (Arleo, J.) (quoting *In re Alpharma, Inc. Sec. Litig.*, 372 F.3d 137, 147 (3d Cir. 2004)); 15 U.S.C. § 78u-4(b)(1).  Here, there is no question that the SAC satisfies that standard.

---

[5] Unless otherwise indicated, all emphasis is added and internal citation and quotations are omitted.

### 1.    Defendants Made Materially Misleading Statements Regarding Viaskin Peanut and the BLA

Throughout the Class Period, Defendants repeatedly made materially misleading statements and omissions about Viaskin Peanut's BLA, knowing that there were serious CMC problems, including the patch's inability to reliably and consistently adhere to the skin, that undermined product efficacy and stood squarely in the way of FDA approval.

### (a)    Defendants' Pre-BLA Submission Statements About CMC Readiness Were Misleading

On February 14, 2018, Defendants misleadingly announced that the FDA "agreed that the available efficacy and safety data for Viaskin Peanut supports the submission of a [BLA] for Viaskin Peanut" and that the FDA provided written responses to DBV which "reflect agreement" on the content of the BLA, thus putting DBV "on track" to submit the BLA in the second half of 2018. ¶123.  Moreover, leading up to the October 2018 BLA submission, Defendants continued to mislead investors into believing that there were no material problems with the BLA, *specifically* from a CMC perspective.  For example, on February 22, 2018, DBV's COO boasted of DBV's proprietary electrospray technology that "we've been able to actually bring everything up to speed in order to scale up" and assured the market that "we are ready to launch that drug."  ¶127.  On September 13, 2018, Defendant Mesa assured investors that "all of those key challenges [facing the BLA] that were important for DBV, we've tackled" (¶140) and on October 2, 2018 she emphasized that "from the manufacturing standpoint . . . we're there" (¶142).  In response to direct analyst inquiry regarding whether DBV could confidentially manufacture the "exact same patch," Mesa responded positively, explaining that because the electrospray machine is "highly technicalized," the patches are "replicable."  ¶142.

In truth, DBV had not surmounted all the "key challenges" facing the BLA submission, nor was the Company's CMC ready to submit the BLA, let alone launch the drug to market.

12

Defendants knew that Viaskin Peanut suffered from adhesion problems since at least October 2017 (and continued to do so for the duration of the Class Period and beyond), and as CW3 detailed, during the time Defendants made these false statements, DBV had a quality control problem with the manufacturing system used to spray the active ingredient onto the patches. ¶121. Contrary to Mesa's assurances about manufacturing consistency, the Complaint alleges, based on credible former employees' personal knowledge, that DBV's electrospray technology could not consistently produce the proper 250mg dose for the Viaskin Peanut patch. ¶121. Given these problems, Defendants' statements touting DBV's CMC and manufacturing abilities were materially misleading. *Rihn v. Acadia Pharm. Inc.*, 2016 WL 5076147, at *6 (S.D. Cal. Sept. 19, 2016) (defendants' omission concerning CMC readiness materially misleading because defendants led the public to believe that all appropriate steps had been taken to ensure the NDA was ready but had insufficient basis to support suggestion that necessary infrastructure for commercial-scale operations was in place); *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *14 (D.N.J. July 27, 2018) (Arleo, J.) (citing cases and finding that statements assuring investors that the company is "on track" actionable and misleading where material omissions alleged).

Similarly, in this Court's recent decision in *Immunomedics*, 2020 WL 4381924, at *6, defendants' statements that the company was "very pleased with the overall status and quality and c[ould] confirm that all critical work streams [for FDA approval], including ... manufacturing validation runs, [were] yielding positive results" were misleading where defendants were aware of serious issues, including a Data Integrity Breach, that could seriously jeopardize FDA approval.[6]

_____

[6] Defendants contend that they accurately described DBV's manufacturing systems, and therefore no reasonable investor could have been misled about DBV's manufacturing capabilities. Mot. at 7-8. The language Defendants cite purports to describe potential risks of DBV scaling its technology for commercial production. As discussed in Sec. IV.B., *infra*, these warnings were meaningless where they failed to disclose that many of the supposed "risks" already existed. *In re*

13

**(b)**     **Defendants' Assurances Post-BLA Withdrawal and Following Resubmission Were Misleading**

Following Defendants' withdrawal of the BLA in December 2018, Defendants assured investors that they would thoroughly review the entire BLA submission, including the clinical package, in addition to CMC.  ¶159.  For example, on February 13, 2019, DBV issued a press release announcing its plans to resubmit the BLA for the patch in the third quarter of 2019.  During a conference call held the same day, Defendant Tasse fielded analysts' inquiries concerning the resubmission.  Responding to the question "what if any other tweaks you're going to make to the BLA resubmission outside of the CMC module?" Tasse stated, "we're going to use the opportunity since we have to invest time in answering the CMC questions, *also, take a look at the whole- the clinical trial*. . . But we're just giving it a once-over to be certain here that there's nothing else that we may want to round off or to add to it. *At this point in time, nothing has been identified*.  But out of principle, we have a look at it." *Id.*  Knowing that the trial failed to meet the 90% patch-site adhesion requirement set forth in the SAP, Defendants' statements were highly misleading.

Further, following DBV's August 2019 BLA resubmission, Defendants' continued to mislead investors that the resubmitted BLA addressed all known problems that may threaten FDA approval.  For example, on February 26, 2020, Defendant Tasse stated, "[w]e were first faced with the setback of a delay that we had to pull and re-file. *All that work was done*. The team did a fantastic job." ¶188.  Defendant Tasse's statement suggested that that DBV did not have to address anything else in the clinical module.  Further, Tasse's statement assuring investors that "all that work was done" on the resubmitted BLA was materially misleading given that Defendants still

---

*Viropharma, Inc., Sec. Litig.*, 21 F. Supp. 3d 458, 471 (E.D. Pa. 2014) ("*Viropharma II*").  Nor does this language touch on the other known CMC issues DBV was facing outside of scaling.

had not rectified the CMC problem with its electrospray machine and knowingly or recklessly ignored that the data from the PEPITES trial failed to meet the FDA's prespecified adhesion rate.

Both of these known problems presented material undisclosed risks of non-approval, the omission of which was misleading. *Immunomedics*, 2020 WL 4381924, at *6 (rosy statements concerning BLA misleading when defendants were aware of undisclosed issue that could seriously threaten FDA approval); *SEB Inv. Mgmt. AB v. Endo Int'l, PLC,* 351 F. Supp. 3d 874, 898 (E.D. Pa. 2018) (falsity alleged where defendants had knowledge of actual surveillance data that would jeopardize FDA approval); *see also Todd v. STAAR Surgical Co.*, 2016 WL 6699284, at *6 (C.D. Cal. Apr. 12, 2016) (statements regarding CMC compliance made with knowledge that FDA had previously identified issues with compliance were "misleadingly optimistic").

"The law does not permit corporate executives to mislead investors through half-truths. By putting the issue of [the BLA] 'in play,' Defendants 'acquire[d] a duty to disclose information relating to that topic.'" *Papa*, 2018 WL 3601229, at *13 (quoting *Viropharma II*, 21 F. Supp. 3d. at 472). In touting DBV's CMC readiness and assuring investors that when DBV resubmitted the BLA in 2019, they had assessed the entire BLA and that "all" of the "work" was done for the resubmission, Defendants assumed a duty to disclose that Viaskin Peanut actually continued to face both CMC issues as well as a clinical failure to meet the FDA's prespecified adhesion rate. *Immunomedics*, 2020 WL 4381924, at *6; *SEB*, 351 F. Supp. 3d at 902 (defendants' statements concerning FDA submission misleading because defendants failed to disclose unfavorable data that, undoubtedly would, and did, influence the FDA's decision); *see also Viropharma II*, 21 F.Supp.3d at 471 (finding defendants made material omissions by failing to reveal study deficiencies because it bore directly on its discussions regarding market exclusivity).

**2.    Defendants Misleadingly Concealed that Viaskin Peanut Failed to Demonstrate the FDA's Prespecified Adhesion Rate**

15

Defendants' concealment of the known fact that the study failed to reach the prespecified adhesion rate set forth in the SAP is actionable. *See, e.g.*, *Bing Li v. Aeterna Zentaris, Inc.*, 2016 WL 827256, at *4 (D.N.J. Mar. 2, 2016) (failure to disclose that reported study results deviated from requirements set forth in Statistical Analysis Plan that governed the study was an actionable omission). This omission is material and actionable because "market participants were keenly focused on the regulatory pathway of [Viaskin Peanut]" during the Class Period. *Immunomedics*, 2020 WL 4381924, at *6. Moreover, as discussed above, where Defendants put the issue of the BLA contents and readiness in play (e.g., ¶¶123, 142, 159), they had a duty to disclose material information that tended to undercut those statements—such as the adhesion rate failure. *Papa*, 2018 WL 3601229, at *13.

Desperate to downplay the obvious materiality of DBV's failure to meet the prespecified patch adhesion rate set forth in the Statistical Analysis Plan that governed the study, Defendants ask this Court to conclude *as a matter of law* that the failure was immaterial to investors. In so doing, they go to great lengths to convince this Court to ignore the allegations of the Complaint, to ignore what former insiders said about the known adhesion problems (¶¶108-111, 113, 115, 119), to ignore what Plaintiffs' expert said about the significance of demonstrating adhesion in the context of a TDS product like Viaskin Peanut (¶¶79-88), to ignore the clear contents of the SAP governing the study (¶100), and to ignore that Defendants themselves admitted *at the time* both that the adhesion requirement existed and that DBV failed it (¶193). Defendants ask the Court to ignore all of those well-pled facts and to instead take their word for it *now* on a motion to dismiss that the FDA's patch adhesion endpoint requirement set forth in the SAP, that DBV agreed to, was not *really* required. Mot. at 15-20. Defendants cannot prove that no reasonable investor would have found the failure to meet the FDA's key efficacy-related and compliance endpoint—

16

demonstrating whether a TDS product sufficiently adheres—so obviously unimportant as to be immaterial as a matter of law.  In short, Defendants urge this Court to commit reversible error. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1421 (3d Cir. 1997) (reversing order granting motion to dismiss where court failed to properly credit plaintiffs' facts and alleged inferences).

Defendants' novel redefinition of the word "requirement" falls far short of a basis for dismissal.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007) (dismissal inappropriate unless "a reasonable person" could not be misled "from the alleged facts.").  Perhaps most significantly undercutting Defendants' proffered redefinition is Defendant Tasse's own explanation of the prespecified adhesion rate and his admission of DBV's failure *at the time*: "***[s]o the adhesion rate that <u>was prespecified by the FDA</u> based on their transdermal patch experience was that 90% adhesion rate was required.*** The adhesion rate in PEPITES was below the prespecified 90% from both placebo and active arms."  ¶193.[7]  This prespecified rate was set for a reason—as Plaintiffs' FDA expert explains—because sufficient adhesion in a TDS product is critically important, as it is an important component of CMC and cGMP, and necessary to show safety and efficacy.  ¶86.

But *even if* reaching the 90% adhesion rate was not an FDA "requirement" for approval, the patch's failure to demonstrate adhesion to the rate specified in the SAP still would have been viewed by a reasonable investor as having significantly altered the "total mix" of information

---

[7] Defendants point to the industry guidance cited in the SAC (¶¶81, 86) and claim that it does not support Plaintiffs' claims because the October 2018 FDA guidance and the Scale-Up and Post Approval Change (SUPAC) guidance "did not establish a 90% threshold."  Mot. at 20 n.6.  Of course these documents did not set the PEPITES trial's 90% standard—the FDA set that requirement in the SAP and DBV agreed to it.  The guidelines, which are representative of general and recognized industry standards concerning transdermal delivery systems, merely serve to further inform the expectations around and importance of the adhesion standard stated in the SAP.

available. *Matrixx*, 563 U.S. at 38 ("materiality requirement is satisfied when there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."). Put another way, regardless of whether the Court credits Defendants' "not a requirement" argument (and it should not), Defendants cannot show, as a matter of law, that no reasonable investor would have found Viaskin Peanut's adhesion problems and its failure to meet the SAP requirements important in evaluating DBV.

Defendants alternatively suggest that the reported adhesion rates were muddled due to the PEPITES trial methodology, which relied on parents and guardians to collect and report data. Mot. at 18-19. Calling into question the reliability of DBV's own trial methodology hardly absolves Defendants for having misled investors as to the conduct and results of that trial and its ability to support a BLA. And it does not change the fact, previously conceded by Defendants, that the PEPITES study failed to meet the FDA's prespecified adhesion rate.

Finally, Defendants artificially segregate "categories" of misleading statements into CMC on the one hand and patch-site adhesion on the other. Mot. at 10-25. But the SAC alleges, as Plaintiffs' expert explains, that patch adhesion relates not only to CMC and cGMP, but is also critical for efficacy. ¶86. The patch cannot be effective if it doesn't adhere to a patient's skin. ¶¶9, 80, 82, 108, 115, 119, 190. The FDA requires transdermal delivery systems to undergo compliance and performance testing as a part of the CMC submission for BLA approval. ¶86. Former employees explained that DBV's CMC problems were caused by the failure of its electrospray technology to consistently apply the correct amount of antigen to the patch, and the patch's design utilizing condensation to allow the antigen to permeate the skin. These CMC problems caused the patch to fall off and created uncertainty as to whether patients absorbed the

18

proper amount of antigen through their skin.  ¶¶8-12, 108, 119, 121.  During the Class Period, Defendants explained the interplay between manufacturing and adhesion issues to investors, stating: "from a manufacturing standpoint, the requirements of the FDA has asked are pretty much along the same line of what they've asked for their patch development. Some adhesion testing, some stability testing."  ¶142.  Therefore, Defendants' misstatements concerning CMC cannot be divorced from the omission concerning Viaskin Peanut's adhesion at this juncture.[8]

### 3.    The Confidential Witness Accounts Should Be Credited

As this Court has recognized, in the case of confidential witness allegations, the court must evaluate the "detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." *Papa*, 2018 WL 3601229, at *23 (quoting *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 263 (3d Cir. 2009)).  The SAC's allegations undoubtedly meet this standard.  *See* ¶¶106-121.  Defendants' criticisms of these former employees are unfounded.  Each is identified by title, location, and tenure, and for each, the Complaint alleges facts demonstrating that he or she was in a position to know the information provided. *See id.*  That is all the law requires. *Avaya*, 564 F.3d at 263.

In contravention of well-settled precedent, Defendants assert that the Court should disregard CW1 and CW2 because they did not work at DBV during the Class Period.  Mot. at 10-

---

[8] Defendants claim "Plaintiffs never identify a specific FDA requirement for manufacturing capacity, never say what capacity such a benchmark might have required, and never allege how DBV fell short." Mot. at 14.  This argument ignores the fact that CMC requirements underlying a BLA are unique to the particular biologic, and such CMC benchmarks may contain trade secrets. Therefore, of course Plaintiffs do not know what the exact CMC benchmarks were for DBV because Defendants have never disclosed the information to the investing public.  But Plaintiffs have alleged particularized facts demonstrating specific, serious issues with CMC that were impacting DBV.

19

11.  The Third Circuit has repeatedly credited CW allegations regardless of whether the witness worked for the corporate defendant during the Class Period.  *See Avaya*, 564 F.3d at 260, 266 (upholding allegations based on CWs who worked at the company prior to class period); *see also Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, 363 F. Supp. 3d 476, 493 (D. Del. 2019) (crediting CW allegations even though witnesses were not employed for the full class period because the complaint described each CW with sufficient particularity to support the probability that the CW had personal knowledge of the company's practices).  CW1 and CW2 had knowledge of DBV's manufacturing facilities and problems with patch adhesion that reflect on Defendants' knowledge and DBV's practices prior to and during the Class Period.  ¶¶106-120.

CW1 and CW2 had firsthand knowledge of problems facing DBV's manufacturing facilities because they both travelled to France and visited those facilities (¶¶106, 117). Defendants superficially assert that "nothing about [the CWs] job titles indicates that any of the CWs were involved in, or a basis to access, the company's manufacturing capabilities."  Mot. at 11.  Job "titles" aside, the SAC explicitly alleges that both CW1's and CW2's jobs required them to travel to DBV's manufacturing facilities in France and view, first hand, the status of manufacturing and CMC.  ¶¶106, 117.  In fact, CW2's job required CW2 to travel to DBV's manufacturing facilities several times.  ¶117.

Despite Defendants' contention otherwise, these CWs did not have to work at DBV's manufacturing facilities full time to have firsthand knowledge about the CMC issues observed there.  Mot. at 11.  Nor are their accounts only "gleaned from statements made to them by other DBV employees."  *Id.*  The CWs made their own first-hand observations of the conditions at DBV's manufacturing facility in addition to learning certain information through fellow DBV employees. For example, while in France, CW1 discussed problems with manufacturing and

adhesion with Pascale Ehouran, DBV's Vice President of Manufacturing (¶109), as well as Valerie Larricq, Vice President of Supply Chain Management (¶110). The basis for CW1's knowledge is thus a far cry from the "rumor mill." As to CW2, based on CW2's prior experience working at Sanofi, CW2 was able to personally observe that DBV's manufacturing processes and capabilities were "not as established." ¶117. In addition, the CWs' accounts of the manufacturing and adhesion problems corroborate one another and, importantly, corroborate the plain results of the PEPITES which show that Viaskin Peanut failed to meet the prespecified adhesion rate. *See Avaya*, 564 F.3d at 263 (crediting corroborating CW accounts in finding falsity).

Moreover, CWs are not required to communicate or discuss "their purported knowledge with the Individual Defendants" to be relevant. Mot. at 12. This Court has recognized that there need not be a "direct link" between the allegations and the Individual Defendants for this Court to credit the CW allegations. *Papa*, 2018 WL 3601229, at \*23. Rather, the Court must consider whether these "former-employee witnesses, 'whose positions afforded them firsthand knowledge of the underlying facts,' provide circumstantial evidence of at least reckless behavior." *Id.* Here, the CW accounts, in conjunction with SAC's other well-pled allegations meet this standard.

### 4. The SAC Does Not Plead Fraud By Hindsight

The SAC alleges that Defendants made material misstatements, with contemporaneous knowledge of facts that undercut their public statements, and that those statements formed the basis for DBV's investors' perceptions concerning Viaskin Peanut and the BLA. *In re Viropharma, Inc. Sec. Litig.*, 2003 WL 1824914, at \*5 (E.D. Pa. Apr. 7, 2003) ("*Viropharma I*") (recognizing that while corporate officials do not need to be clairvoyant, they are responsible for revealing material facts known to them). Accuracy in these types of factual statements lies at the

21

heart of what the securities laws are written to protect. *Id.* Plaintiffs do not allege that Defendants should have been clairvoyant; Plaintiffs allege that Defendants should have been truthful.

"It is the failure to disclose 'issues' and 'concerns'. . . not who was ultimately right about the underlying science--that matters." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 709 (9th Cir. 2016). Here, Defendants had knowledge of serious issues and concerns undermining the BLA including, *inter alia*, Viaskin Peanut's failure to meet the SAP's prespecified adhesion rate. They knew of this failure no later than October 2017—more than four months prior to the start of the Class Period—when they announced the topline results of the PEPITES study, and they failed to disclose it throughout the Class Period. Defendants' ongoing concealment of existing facts establishing that the risk of FDA non-approval was much greater than Defendants represented to investors is classic fraud, not fraud-by-hindsight. *In re PTC Therapeutics, Inc. Sec. Litig.*, 2017 WL 3705801, at \*18 (D.N.J. Aug. 28, 2017).[9]

### 5.    Defendants' Statements Are Not Inactionable Opinions

Defendants cherry pick certain of their statements and claim they are inactionable opinions. Mot. at 9 (challenging ¶¶131, 142). But even a statement of opinion is actionable where—as here—it omits material facts concerning the speaker's basis for the opinion, which, if disclosed,

---

[9] The cases Defendants cite (Mot. at 6-7) do not move the needle. As the court noted in *In re Discovery Labs. Sec. Litig.*, plaintiffs must allege that defendants knew they were being overly optimistic. 2007 WL 789432, at \*5 (E.D. Pa. Mar. 15, 2007), *aff'd*, 276 F. App'x 154 (3d Cir. 2008). This is precisely what Plaintiffs allege. Defendants were aware of Viaskin Peanut's adhesion failure, which did not meet the FDA compliance endpoint, and thus it was misleading to assure investors that the BLA, especially after resubmission, addressed all known issues. Moreover, in *Bauer v. Eagle Pharm., Inc.*, the court did not find that plaintiffs alleged fraud by hindsight. 2017 WL 2213147, at \*7 (D.N.J. May 19, 2017), *dismissed*, 2017 WL 8181543 (3d Cir. Oct. 5, 2017). Plaintiffs there failed to plead factual allegations tending to show that during the class period, defendants had reason to believe the human clinical trials would be required. *Id.* In contrast, the SAC here clearly pleads facts suggesting that during the Class Period (and before) Defendants learned of issues (*i.e.*, Viaskin Peanut's adhesion failure) that suggested the FDA would raise concerns about the adhesion rate. *See supra* Sec. II.

would "conflict with what a reasonable investor would take from the statement." *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1329 (2015).

Moreover, the majority of the alleged misleading statements were not mere opinions; they were misrepresentations of the existing state of *facts—i.e.*, whether DBV's CMC was in fact sufficient to support the BLA (¶133); whether the electrospray technology was in fact capable of manufacturing at commercial scale and ready to launch to market (¶¶127, 140); whether DBV was in fact able to produce the patch consistently (¶142); and whether all the necessary "work" was in fact done to support the BLA resubmission (¶188)*. PTC Therapeutics*, 2017 WL 3705801, at *14 n.19.

### B.    THE SAFE HARBOR DOES NOT APPLY

The PSLRA's safe harbor provision, 15 U.S.C. § 77z–2, "immunizes from liability any forward–looking statement, provided that: the statement is identified as such and accompanied by meaningful cautionary language; or is immaterial; or the plaintiff fails to show the statement was made with actual knowledge of its falsehood." *Freshpet*, 2018 WL 394878, at *4 (citing *Avaya*, 564 F.3d at 254). As an initial matter, Defendants fail to specify *any* statement as forward-looking and non-actionable under the safe harbor. *See* Mot. at 25-28. Rather, Defendants blanketly assert that any statement conveying "optimistic sentiment for FDA approval" or "assured" regulatory success, is insulated. Mot. at 25. Not so.

#### 1.    Omissions Of Present Fact Are Not Forward-Looking Statements Protected By The Safe Harbor

As Defendants concede, this case is partially an "omissions case." Mot. at 22. Because Defendants misled investors by their omissions of existing facts concerning the patch's failure to meet the FDA's prespecified adhesion rate, and known problems with the electrospray technology, the safe harbor does not apply. "[O]missions of existing facts or circumstances are not forward-

23

looking, and thus do not qualify for safe harbor protection." *ViroPharma II*, 21 F. Supp. 3d at 471 (statements concerning a future FDA drug decision were not forward looking because statements omitted FDA notification to defendants that the drug's study was not adequate and well-controlled); *see also Freshpet*, 2018 WL 394878, at *3 (no safe harbor for omissions).

### 2. Defendants' Statements Were Made With Actual Knowledge Of Falsity

The safe harbor also does not apply because Defendants' statements were made with actual knowledge that they were false or misleading. "No manner of cautionary language can cure false statements knowingly made." *In re Veritas Software Corp. Sec. Litig.*, 2006 WL 1431209, at *7 (D. Del. May 23, 2006); *Reid v. Hemispherx Biopharma, Inc.*, 2010 WL 11710594, at *2 (E.D. Pa. Apr. 20, 2010) (allegations of specific, known false statements concerning FDA approval process sufficient and not protected by safe harbor); *Walsingham v. Biocontrol Tech., Inc.*, 66 F. Supp. 2d 669, 679 (W.D. Pa. 1998) (no safe harbor for defendants' statements made with knowledge of inadequate test results materially impacting FDA approval). Defendants were aware of the negative adhesion rate test results from the PEPITES trial no later than October 2017, and thus had actual knowledge their statements were misleading well before the Class Period. ¶¶194, 198.

### 3. Defendants' Purported Cautionary Language Was Neither Meaningful Nor Adequate

Even if any of Defendants' misstatements could be considered forward looking, their cautionary language was not (1) sufficiently meaningful or adequate to satisfy the safe harbor and (2) some of the risks warned of had already transpired. It is well established in this Circuit that "vague or blanket (boilerplate) disclaimer, which merely warn[] the reader that the investment has risks will ordinarily be inadequate to prevent misinformation." *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 243 n.3 (3d Cir. 2004). "To suffice, the cautionary statements must

instead be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge." *Id.*

Defendants' cited boilerplate warnings in DBV's 2016 and 2017 Form 20-Fs (Mot. at 26-27), such as "the FDA may delay, limit or deny approval of Viaskin Peanut for many reasons including . . . . the FDA . . . may not approve the manufacturing processes or facilities," are not meaningful. As the court aptly explained in *In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*:

> In evaluating the meaningfulness of cautionary language, courts have rejected the alleged significance of boilerplate warnings true to every company that interacts with the FDA. For example, in *Yanek v. Staar Surgical Co.*, 388 F. Supp. 2d 1110 (C.D. Cal. 2005), that court rejected applying the PSLRA's "Safe Harbor" provision to statements that could apply to "literally any issues subject to FDA regulation." *Id.* at 1123. The rejected cautionary language in that case, which is similar to the cautionary language used here, included statements that "[t]he FDA approval process is typically lengthy and expensive, and approval is never certain," and that "[n]oncompliance with applicable United States regulatory requirements can lead to ... denial or withdrawal of pre-marketing approvals." *Id.*

2020 WL 1479128, at *17 (E.D. Pa. Mar. 25, 2020).

This is the exact same meaningless cautionary language Defendants invoke. *See* Mot. at 26-27). Moreover, courts take into consideration whether a company's cautionary language changes overtime to incorporate new information and risks. *Innocoll*, 2020 WL 1479128, at *17 (citing cases). Here, as Defendants' own Motion and exhibits make clear, the cautionary language Defendants cite did not change. *See* Mot. at 26-27 (relying on identical 2017 and 2016 risk warnings, including "only a small percentage [of drugs] successfully completes the FDA regulatory process and is commercialized."). Defendants also claim that DBV sufficiently warned investors of the risks facing DBV's manufacturing systems because the 2016 and 2017 20-Fs stated that there can be "no assurance that the procedures currently used to manufacture our product candidates will work at a scale which is adequate for commercial needs." Mot. at 27. However, as explained above, at the time these supposed risk warnings were made, many of the risks being

25

warned of had already come to pass, rendering the cautionary language meaningless. *ViroPharma II*, 21 F. Supp. 3d at 471; *see supra* at Sec. II.C; IV.A.3, (CWs detailing the substantial issues with DBV's manufacturing systems at the time cited risk warnings given to investors).

Defendants contend that even if they were "overly optimistic about DBV's manufacturing systems or the BLA's prospects for approval," DBV's "contemporaneous warnings confirm that no reasonable investor could have been misled to believe that approval was a certainty." Mot. at 27. This argument misses the point. Regardless of whether DBV warned investors that FDA approval was not absolutely certain, it was still misleading for Defendants to make statements touting the BLA and manufacturing readiness when DBV was experiencing material CMC problems and Defendants knew of Viaskin Peanut's adhesion failure. *Frater v. Hemispherx Biopharma, Inc.*, 996 F. Supp. 2d 335, at 348–49 (E.D. Pa. 2014) (the fact that company did not guarantee application's FDA approval irrelevant to whether defendants "systemically misled investors about the key components of […] the NDA". . . that it should have known were unreasonable under the circumstances); *ViroPharma II*, 21 F. Supp. 3d at 471 (warning of potential risks is insufficient if the "risks had already come to pass.").[10]

---

[10] *See also In re Tellium Inc., Sec. Litig.*, 2005 WL 1677467, at *21 (D.N.J. June 30, 2005) (citing *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 709 (3d Cir. 1996) (allegation that loss reserves were known to be insufficient under current economic conditions, and not merely that future economic developments might cause further losses, would assume actual significance to a reasonable investor contemplating the purchase of securities)); *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004) ("It would be perverse indeed if an offeror could knowingly misrepresent historical facts but at the same time disclaim those misrepresented facts with cautionary language."); *Rubinstein v. Collins*, 20 F.3d 160, 171 (5th Cir. 1994) (reiterating view that " '[t]o warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit" ').

## C.   THE SAC ALLEGES A STRONG INFERENCE OF SCIENTER

To plead scienter, a plaintiff must "allege facts giving rise to a strong inference of either reckless or conscious behavior." *Avaya*, 564 F.3d at 267.  Recklessness is "an extreme departure from the standards of ordinary care, … which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* at 267 n.42.  The inference "need not be irrefutable, i.e. of the smoking-gun genre, or even the most plausible of competing inferences," but must merely be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 324 (2007).  The question is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323 (emphasis in original).  The answer to that question in this case is a resounding Yes.

### 1.   Defendants Were, At *Minimum*, Deliberately Reckless In Failing To Disclose Known Facts Contrary To Their Public Statements

A strong inference of scienter can be established by allegations of defendants' knowledge of facts or access to information contradicting their public statements.  *Innocoll*, 2020 WL 1479128, at *8 (citing *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 599 (D.N.J. 2001)).  "[T]he fact that the defendants published statements when they knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002).  The Complaint sufficiently alleges Defendants' scienter by demonstrating that Defendants made statements when they knew and had access to facts suggesting the statements were misleadingly incomplete.

At all times during the Class Period, Defendants were aware that the SAP for the PEPITES study included a prespecified 90% adhesion requirement that the study failed to meet.  ¶¶100, 198. DBV also knew, by virtue of its high level employees responsible for manufacturing, of serious

27

deficiencies in its proprietary electrospray technology, that prevented DBV from manufacturing the patch consistently and at commercial scale. ¶¶106-120. Despite this known unfavorable information, Defendants made positive statements to investors about the study and BLA, with Defendant Tasse assuring, for example, that all the "work" was done—including after the Company had pulled the BLA, and purportedly re-reviewed the CMC *and* clinical module.

In light of their actual knowledge of these adverse facts, there is a strong inference that the Defendants knew their statements were misleading or that they acted with an extraordinary lack of care when making these positive statements about Viaskin Peanut, the PEPITES trial, and the BLA. *Viropharma I*, 2003 WL 1824914, at *9 (scienter inferred based on defendants' access to non-public reports which contained the results of the clinical trials that contradicted statements); *SEB*, 351 F. Supp. 3d at 905 (scienter alleged where individual defendants had access to information and unfavorable data that significantly impacted the chances of obtaining FDA approval).[11]

### 2.    Viaskin Peanut's Success Was Vital To DBV's Operations

Where, as here, Defendants' misrepresentations and omissions involve "core matters of central importance" to a company and its executives, the inference of scienter is strengthened. *SEB*, 351 F. Supp. 3d at 905–06. This case concerns DBV's most important product, Viaskin Peanut. No later than October 2017, Defendants had the study results reflecting Viaskin Peanut's failure to achieve the FDA's prespecified adhesion rate. In fact, they announced these results— or, at least, the portion of the results that they deemed most favorable—to the market prior to the Class Period. Defendants' public comments regarding the BLA in press releases and earnings

---

[11] It is unnecessary for Plaintiffs to explicitly plead that Defendants examined or considered the information available to them. Plaintiffs need only plead access to such evidence. *Innocoll*, 2020 WL 1479128, at *12.

calls during the Class Period confirm they had intimate first-hand knowledge of the study's requirements and BLA approval, including the PEPITES adhesion data. *E.g.*, ¶¶87, 193.

Defendants, as officers, were speaking as authoritative sources who possessed the information to support their statements. When they did so, they knew that withholding the negative information and data that contradicted their public statements was likely to mislead investors. *See SEB*, 351 F. Supp. 3d at 905–06; *see also Viropharma I*, 2003 WL 1824914, at *9 ("because Pleconaril was Viropharma's leading product and Defendants were the highest ranking members of the company, it can be assumed that the Defendants were aware of these [clinical trial] facts.").

### 3. Defendants' Motive Supports Scienter

DBV had no material revenue and no sellable products during the Class Period. DBV's multiple stock offerings, raking in proceeds of more than ***$532.2 million*** during the Class Period, were essential for it to stay afloat and avoid insolvency. ¶¶26, 135, 166, 179, 183. This bolsters scienter. *Immunomedics*, 2020 WL 4381924, at *8 ("long history of operating losses" such that "the financing from the June 2018 [stock] offering" was critical to the company's "ultimate commercialization of IMMU-132" supported strong inference of scienter); *Tomaszewski v. Trevena, Inc.*, 2020 WL 5095865, at *10 (E.D. Pa. Aug. 28, 2020) (strong inference of scienter where plaintiffs alleged that defendants needed to raise funds to keep the company afloat).[12]

---

[12] *See also Skiadas v. Acer Therapeutics Inc.*, 2020 WL 3268495, at *11 (S.D.N.Y. June 16, 2020), *reconsideration denied*, 2020 WL 4208442 (S.D.N.Y. July 21, 2020) ("The inference of scienter is also bolstered by the fact that Defendants admitted in their SEC filings that they needed to raise funds for Acer to remain viable."); *Nguyen v. Radient Pharm. Corp.*, 2011 WL 5041959, at *8 (C.D. Cal. Oct. 20, 2011) (need to raise money to keep biotech company afloat shows scienter).

Defendants incorrectly claim that raising financing to avoid stay afloat during the Class Period does not support a strong inference of scienter. Mot. at 29-30. This argument overlooks the above-cited caselaw's distinction between ordinary financings and financings that are necessary for the company to avoid insolvency. *Skiadas*, 2020 WL 3268495, at *11 ("That makes sense: An executive at a company that will go belly up if it fails to fundraise has different incentives from a

Defendants could not have raised half a billion dollars if they told investors that the patch failed to meet the FDA's adhesion requirement and that DBV could not manufacture a product that could consistently and reliably adhere to the user's skin. Of course, Defendants knew that investors understood the critical basics: the patch *had* to stick. Thus, because DBV's very survival was depended on serial stock offerings, Defendants could not tell investors the whole truth.

In addition, as Plaintiffs' expert explains, in order to actually *fix* the adhesion problem documented in the PEPITES trial, DBV would have had to find a better adhesive *and* would also have had to (1) conduct a new study testing the new TDS and (2) the new TDS would need to meet the FDA adhesion criteria. ¶112. This would result in significant delay and additional cost for DBV. While Defendants hoped to avoid this result—and thus recklessly forged on with the BLA regardless of the adhesion problems—it is exactly what happened. The August 2020 Complete Response Letter from the FDA mandated, among other things, that DBV find another adhesion design and conduct another study testing the modification. *See* Sec. II.G., *supra*. The inference from these facts and allegations are far from "generalized motivations." Mot. at 29-30.

### 4. DBV's Top Executives' Resignations Bolster Scienter Inference

The resignations of key executives "bolsters the evidence of conscious or reckless behavior." *Papa*, 2018 WL 3601229, at *20 (citing *W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, 2015 WL 3755218, at *17 (E.D. Pa. June 16, 2015)). On November 29, 2018, just over a month after DBV submitted the BLA and just three weeks before it was withdrawn, DBV co-founder Pierre-Henri Benhamou stepped down as CEO (but remained on the Board of Directors). ¶199. Then, on January 3, 2019, two weeks after DBV withdrew its BLA, DBV

---

generic corporate insider. One salient difference is that the former executive has a stronger incentive to bet the farm in a reckless gamble because the alternative is certain failure.").

announced that that its Chief Medical Officer Dr. Lucia Septien-Velez was leaving the Company to "pursue other opportunities." ¶200. On March 5, 2019, DBV announced that Pierre-Henri Benhamou had resigned from the Board of Directors. ¶201. Also on March 5, 2019 DBV announced that Charles Ruban, the Company's Chief Operating Officer who oversees regulatory, product development and commercial operations would be leaving the Company to "pursue new opportunities." *Id.* And DBV also announced that Laurent Martin, Chief Development Officer would leave his regulatory and product development role. *Id.* Finally, on May 14, 2019, DBV announced that Defendant Schilansky had stepped down as deputy CEO. DBV stated that Schilansky has decided to leave the Company to "pursue other professional opportunities." ¶202.

Given the timing and number of these high level resignations, including Benhamou's departure just three weeks before the BLA withdrawal, when Benhamou was DBV's co-founder and had been its CEO since 2002, contributes to the inference of scienter. *Papa*, 2018 WL 3601229, at *20 (finding probative value in resignation given the timing of the announcement); *see also In re Par Pharm. Sec. Litig.*, 2009 WL 3234273, at *8-10 (D.N.J. Sep. 30, 2009) (considering executive resignation in holistic scienter analysis and finding those allegations "reinforce the Court's conclusion that the SAC states claim").

### 5.    Viewed Holistically, The SAC Alleges A Strong Inference Of Scienter

When viewed "holistically," the inference that Defendants acted with scienter is at least as compelling as any other inference. *See Tellabs*, 551 U.S. at 328; *Papa*, 2018 WL 3601229, at *24 (considering Plaintiff's allegations collectively, including defendants' decision to speak on the issue and imply firsthand knowledge, the "core business" allegations, and the former-employee witnesses, and finding all support a strong inference of scienter).

31

Defendants have not offered a plausible inference of non-culpable conduct that is *more* compelling than the inference of scienter alleged by Plaintiffs. Defendants claim that they believed Viaskin Peanut had "a reasonable prospect of FDA approval and did not know of FDA concerns about manufacturing data or patch adhesion before the FDA raised them." Mot. at 29. But this is a far less compelling than the inference that Defendants *knew* that the trial failed to meet the FDA's prespecified adhesion rate under the SAP and nonetheless knowingly submitted (and resubmitted) the BLA in the hopes that they could convince the FDA to accept it. *See, e.g., Trevena*, 2020 WL 5095865, at *9 (cogent and compelling inference alleged where, in response to a time and money crunch, defendants took—and lost—a calculated gamble in regulatory process in the hope that the FDA would end up agreeing with the data from the Phase 3 studies and approve the drug).

It is not *more* compelling, on a motion to dismiss, to infer in Defendants' favor that they "did not know of FDA concerns about manufacturing data or patch adhesion" when Defendants knew, at the very latest October 2017, that the study failed to reach the FDA's prespecified adhesion rate set forth in the SAP. Such a failure should raise "concern" to any product sponsor seeking FDA approval. Defendants' suggestion that DBV had no idea that the FDA would be "concerned" about the adhesion criteria during the Class Period is not only far *less* compelling than the inference of scienter, it is hardly even plausible.[13] The same can be said of the other manufacturing issues, such as the failure of the electrospray technology to consistently and uniformly apply product to the patch. Defendants' suggestion that they were unaware of such a

---

[13] Nor do Plaintiffs have to allege that "the FDA *actually* provided any feedback to DBV early in its review period." Mot. at 33. Defendants are not absolved of liability because the FDA (allegedly) did not provide affirmative warnings where Defendants knew of the adhesion rate failure under the SAP, and the resulting (undisclosed) likelihood of adverse FDA action and/or risks to approval. *See, e.g., Shah v. Zimmer Biomet Holdings, Inc.*, 2018 WL 4637247, at *16 (N.D. Ind. Sept. 26, 2018) (plaintiffs alleged scienter by showing that defendants anticipated but failed to disclose a significant risk that the FDA would find manufacturing deficiencies).

32

fundamental failure—all the while touting the technology—is hardly a plausible inference to draw, let alone a *more* compelling inference than that they knew but hid it from investors.

*Even if* Defendants thought or hoped that Viaskin Peanut had "a reasonable prospect of FDA approval" *despite* the adhesion rate failure and other manufacturing problems, those failures and problems still should have been disclosed to investors to allow them to make their own assessment of the approval prospects based on complete and accurate information. The concealment of that negative material information, while gambling on a positive outcome and while raising hundreds of millions of dollars from investors, gives rise to a strong inference of scienter. *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) ("The fact that a gamble—concealing bad news in the hope that it will be overtaken by good news—fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble. It is like embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they are discovered to be missing"); *Indiana Public Retirement System v. SAIC, Inc.*, 818 F.3d 85 (2d Cir. 2016) (finding "cogent and at least as compelling" inference that defendants might have believed that "the benefits of concealment might have exceeded the costs").

Defendants further claim that it is illogical that they would stake DBV's existence on a clinical trial that the Company thought was doomed to failure. Mot. at 31-32. This argument, again, misses the point. *See Trevena*, 2020 WL 5095865, at *10 (rejecting similar argument); *PTC Therapeutics*, 2017 WL 3705801, at *19 (same). Plaintiffs do not allege that Viaskin Peanut had no path to approval; rather, the SAC alleges that Defendants deceived investors about the increased risk that it would not be approved. In sum, a reasonable person would deem Plaintiffs' inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged, and therefore, Plaintiffs have adequately alleged scienter.

33

### D.    THE SAC ALLEGES CORPORATE SCIENTER

Defendant DBV is also liable under the doctrine of corporate scienter.  While the Third Circuit itself has "neither accepted nor rejected th[e] doctrine [of corporate scienter]," *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 121 n.6 (3d Cir. 2018), district courts within this Circuit have applied the doctrine.  *See, e.g.*, *Employees Ret. Sys. of Puerto Rico Elec. Power Auth. v. Conduent Inc.*, 2020 WL 3026536, at *8 (D.N.J. June 5, 2020).  In *Conduent*, the court found corporate scienter through an inference based on misconduct attributable only to management level employees.  *Id.*  Specifically, a confidential witness had reported that s/he had attended meetings with the company's executives to discuss incidents that "had a significant impact on Conduent's business," and based thereon, the executives' scienter was imputable to the corporation.  *Id.*

Similarly, here, CW1 spoke directly with DBV's Vice President of Manufacturing, Pascale Ehouran, and Valerie Larricq, DBV's Vice President of Supply Chain Management, about DBV's CMC and adhesion issues (¶¶109-110), both of which materially impacted DBV's business.  DBV knew, by virtue of these and other high level employees responsible for manufacturing, of serious deficiencies in its proprietary electrospray technology, that prevented DBV from manufacturing the patch consistently and at commercial scale.  ¶¶106-120.  Accordingly, the scienter of these management level executives is properly imputable to DBV under the doctrine of corporate scienter.  *See Christine Asia Co. v. Ma*, 718 F. App'x 20, 24 (2d Cir. 2017); *Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).

### V.    THE SAC ALLEGES CONTROL PERSONS CLAIMS

To state a claim under §20(a), Plaintiffs must demonstrate a violation of the Exchange Act, that the Individual Defendants were control persons of the corporation, and that they were "culpable participant[s] in the fraud." *Immunomedics*, 2020 WL 4381924, at *8.  Ignoring the

34

SAC's actual allegations, Defendants superficially argue that Plaintiffs failed to plead Defendants were culpable participants in the alleged fraud. Mot. at 34-35. As detailed above, and in the Complaint, Defendants are wrong. *See* ¶¶41-44, 123-195. Plaintiffs have sufficiently alleged §20(a) claims against the Individual Defendants. *Immunomedics*, 2020 WL 4381924, at *8.

## VI.   BENHAMOU AND SCHILANSKY HAVE WAIVED SERVICE ARGUMENTS

Defendants incorrectly argue that Benhamou and Schilansky should be dismissed because they have not been served. Mot. at 35. But because Defendants did not raise the objection to service in their first Rule 12 motion filed in March 2020 (ECF No. 30), any service argument has been waived.[14] It is well established law in the Third Circuit that if a Rule 12 motion is made and the defendant omits its objection to the timeliness or effectiveness of service under Rule 12(b)(5), that objection is waived. *McCurdy v. Am. Bd. of Plastic Surgery*, 157 F.3d 191, 194 (3d Cir. 1998) ("This court has long recognized that objections to service of process are waived if not timely raised.") (citing, *e.g.*, *Government of the Virgin Islands v. Sun Island Car Rentals, Inc.*, 819 F.2d 430, 433 (3d Cir.1987) (defective service waived if not challenged in first defensive pleading). Thus, the Court should deny Benhamou's and Schilansky's request for dismissal based on service grounds because they waived the argument.

## VII.   CONCLUSION

Plaintiffs respectfully request that the Court deny the Motion in its entirety. Should the Court dismiss any part of the Complaint, Plaintiffs respectfully request leave to amend. Fed. R. Civ. P. 15(a) (2) ("The court should freely give leave when justice so requires.").

---

[14] Defendants do not specifically state the grounds for their service argument in the Motion. The Motion is brought under Rule 12(b)(6) not 12(b)(5). Rule 12(b)(6) does not provide grounds for dismissal based on insufficient service.

Dated: January 25, 2021

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: */s/Laurence M. Rosen*
Laurence M. Rosen
609 W. South Orange Avenue, Suite 2P
South Orange, NJ 07079
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

Sara Fuks (*admitted pro hac vice*)
275 Madison Avenue, 40th Floor
New York, NY 10016
Tel: (212) 686-1060
Email: sfuks@rosenlegal.com

**GLANCY PRONGAY & MURRAY LLP**
Kara Wolke, Esq. (*admitted pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Email: kwolke@glancylaw.com

*Co-Lead Counsel for Lead Plaintiffs*
*and the Putative Class*

36

**CERTIFICATE OF SERVICE**

I certify that on January 25, 2021, I electronically filed the foregoing document with the Court for the U.S. District Court for the District of New Jersey, using the electronic case filing system of the court, which sent notification of such filing to all CM/ECF participants.

By: */s/ Laurence M. Rosen*
　　Laurence M. Rosen

*Attorney for Plaintiffs*