MINTZ, LEVIN, COHN,
FERRIS, GLOVSKY and POPEO P.C.

Andre K. Cizmarik
Douglas P. Baumstein (*admitted pro hac vice*)
666 3rd Ave
New York, NY  07079
Phone: (212) 692-6734
Fax:  (212) 983-3115
AKCizmarik@mintz.com
DBaumstein@mintz.com

Emily Kanstroom Musgrave (*admitted pro hac vice*)
One Financial Center
Boston, MA 02111
Phone: (617) 542-6000
EKMusgrave@mintz.com

*Counsel for DBV Technologies S.A.,
Daniel Tasse, Pierre-Henri Benhamou,
David Schilansky, and Susanna Mesa*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| TRAVIS ITO-STONE, Individually and on Behalf of All Others Similarly Situated,<br><br> *Plaintiff,*<br><br>v.<br><br>DBV TECHNOLOGIES S.A., DANIEL TASSE, PIERRE-HENRI BENHAMOU, DAVID SCHILANSKY, and SUSANNA MESA,<br><br> *Defendants.* | Case No. 2:19-CV-00525-MCA-LDW<br><br>**ORAL ARGUMENT REQUESTED**<br><br>Motion Date:  March 15, 2021<br><br>*Document Filed Electronically* |

**REPLY BRIEF IN FURTHER SUPPORT OF DBV TECHNOLOGIES S.A.,
DANIEL TASSE, PIERRE-HENRI BENHAMOU, DAVID SCHILANSKY AND
SUSANNA MESA'S MOTION TO DISMISS
<u>THE SECOND AMENDED CLASS ACTION COMPLAINT</u>**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...........................................................................................1

ARGUMENT....................................................................................................................2

I.    THE SAC FAILS TO PLEAD ANY FALSE OR MISLEADING STATEMENTS ..........2

    A.    Plaintiffs Improperly Plead Fraud By Hindsight ......................................................2

    B.    Defendants Accurately Described DBV's Manufacturing Systems
          And Made No False Promises Of Regulatory Compliance Or FDA Approval.......4

    C.    The SAC Pleads No Facts Showing Defendants Were Aware Of Any
          Manufacturing Or Regulatory Issues Before Submitting The BLA ........................7

    D.    The SAC Fails To Plead Any False Or Misleading
          Statements With Respect To The "Patch Adhesion" Allegations ...........................9

II.    OPTIMISTIC STATEMENTS ABOUT POTENTIAL FDA APPROVAL
     ARE IMMUNE FROM LIABILITY UNDER THE PSLRA SAFE HARBOR ...............12

    A.    The SAC Does Not Allege That Any Optimistic Statement DBV Made About
          FDA Approval Was Knowingly False...................................................................12

    B.    Defendants Provided Ample Warning Of The Risks Related To
          FDA Approval ....................................................................................................13

III.    THE SAC FAILS TO ALLEGE FACTS GIVING
      RISE TO A STRONG INFERENCE OF SCIENTER .......................................................14

    A.    The SAC Fails To Allege Any Motive To Defraud................................................15

    B.    The SAC Does Not Assert A Plausible Theory Of Scienter..................................16

    C.    Plaintiffs' Other Allegations Of Scienter Fail ......................................................19

    D.    The SAC Does Not Allege Corporate Scienter.....................................................19

IV.    THE COMPLAINT DOES NOT PLEAD A SECTION 20(a) CLAIM...........................20

CONCLUSION................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Acito v. IMCERA Grp.*,
    47 F.3d 47 (2d Cir. 1995)..................................................................................................11

*City of Edinburgh Council v. Pfizer, Inc.*,
    754 F.3d 159 (3d Cir. 2014)..............................................................................................18

*City of Roseville Emples. Ret. Sys. v. Sterling Fin. Corp.*,
    963 F. Supp. 2d 1092 (E.D. Wash. 2013) .........................................................................14

*Curran v. Freshpet, Inc.*,
    2018 U.S. Dist. LEXIS 5833 (D.N.J. Jan. 9, 2018) ..........................................................13

*Emples. Ret. Sys. of Puerto Rico Elec. Power Auth. v.. Conduent, Inc.*,
    2020 U.S. Dist. LEXIS 99287 (D.N.J. June 5, 2020) ........................................................20

*Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*,
    778 F.3d 228 (1st Cir. 2015).......................................................................................15, 17

*Hill v. Gozani*,
    638 F.3d 40 (1st Cir. 2011)..........................................................................................11, 12

*Hoey v. Insmed*,
    2018 U.S. Dist. LEXIS 24907 (D.N.J. Feb. 15, 2018) ......................................................15

*In re Columbia Labs., Inc.*,
    602 F. App'x 80 (3d Cir. 2015) .........................................................................................18

*In re FBR Inc. Sec. Litig.*,
    544 F. Supp. 2d 346 (S.D.N.Y. 2008)................................................................................12

*In re Fusion-io Sec. Litig.*,
    2015 U.S. Dist. LEXIS 18304 (N.D. Cal. Feb. 12, 2015) ...................................................7

*In re Genzyme Corp. Sec. Litig.*,
    754 F.3d 31 (1st Cir. 2014)................................................................................................14

*In re Raytheon Sec. Litig.*,
    157 F. Supp. 2d 131 (D. Mass. 2001) ...............................................................................11

*In re ViroPharma Inc. Sec. Litig.*,
    2003 U.S. Dist. LEXIS 5623 (E.D. Pa. Apr. 3, 2003) .......................................................17

ii

*In re ViroPharma Inc. Sec. Litig.*,
    21 F. Supp. 3d 458 (E.D. Pa. 2014) ...........................................................................13

*Inst. Invs. Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009).....................................................................7, 8, 14, 15

*Li v. Aeterna Zentaris, Inc.*,
    2016 U.S. Dist. LEXIS 26772 (D.N.J. Mar. 2, 2016).............................................2, 3

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011).....................................................................................................10

*Odeh v. Immunomedics*,
    2020 U.S. Dist. LEXIS 135917 (D.N.J. July 31, 2020)...............................................6

*P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*,
    142 F. Supp. 2d 589 (D.N.J. 2001) ...........................................................................20

*Roofer's Pension Fund v. Papa*,
    2018 U.S. Dist. LEXIS 125885 (D.N.J. July 27, 2018).............................................6, 9

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC*,
    351 F. Supp. 3d 874 (E.D. Pa. 2018) ........................................................................10

*Skiadas v. Acer Therapeutics Inc.*,
    2020 U.S. Dist. LEXIS 105814 (S.D.N.Y. June 16, 2020)...................................15, 16

*Smallen v. Western Union Co.*,
    2019 U.S. Dist. LEXIS 52578 (D. Colo. Mar. 27, 2019) ...........................................11

*Tanaskovic v. Realogy Holdings Corp.*,
    2021 U.S. Dist. LEXIS 11090 (D.N.J. Jan. 21, 2021) ...............................................13

*Todd v. STAAR Surgical, Co.*,
    2016 U.S. Dist. LEXIS 186511 (C.D. Cal. Apr. 12, 2016) ........................................10

*Tomaszewski v. Trevena, Inc.*,
    2020 U.S. Dist. LEXIS 156618 (E.D. Pa. Aug. 28, 2020).........................................16

*Wilson v. Bernstock*,
    195 F. Supp. 2d 619 (D.N.J. 2002) .....................................................................11, 17

*Winer Family Tr. v. Queen*,
    503 F.3d 319 (3d Cir. 2007)......................................................................................19

*Zavolta v. Lord, Abbett & Co. LLC*,
    2010 U.S. Dist. LEXIS 16491 (D.N.J. Feb. 23, 2010) ..............................................20

**Regulations**

17 C.F.R. § 240.10b-5....................................................................................................10, 11, 13

**Other Authorities**

U.S. Food & Drug Administration, Special Protocol Assessment: Guidance for
    Industry (April 2018), https://www.fda.gov/media/97618/download ......................................3

DBV,[1/] Daniel Tassé, Pierre-Henri Benhamou, David Schilansky, and Susanna Mesa submit this reply brief in further support of their motion to dismiss the SAC.

## **PRELIMINARY STATEMENT**

Plaintiffs' Opposition tries to fit the square peg of DBV's unsuccessful pursuit of its BLA for Viaskin Peanut into the round hole of securities fraud based on allegedly knowingly false statements made to investors. But the securities laws do not penalize bad corporate outcomes – they penalize lies to investors. So, Plaintiffs, with the benefit of hindsight, try to stretch contemporaneously accurate statements concerning the status of the BLA and DBV's belief in its product's efficacy and manufacturing capabilities into misstatements concerning patch adhesion or CMC compliance. Plaintiffs' contortions, however, fail to establish with particularized facts that the Company misled investors:

- Plaintiffs' assertions of undisclosed manufacturing problems suffer from their inability to show that DBV claimed it was ready to manufacture at scale or, for that matter, that any purported inability to do so mattered, as it is uncontested that the BLA was withdrawn in December 2018 based upon FDA concerns about manufacturing data, not practices;

- Plaintiffs' assertion of misleading statements concerning "patch adhesion" likewise fails because it is clear that the Company never discussed or had a concern about "patch adhesion" until the FDA first raised the issue in March 2020, and DBV immediately disclosed it to investors. Further, Plaintiffs are simply incorrect that there was a pre-specified level of patch adhesion required for FDA approval. General statements made by DBV concerning its product are not rendered false because DBV did not discuss patch adhesion and did not believe it was relevant until the FDA first raised concerns.

Plaintiffs' effort to rescue their inadequate theory based on the allegations of three confidential witnesses ("CWs") who "travelled" to DBV's facilities in France fails. The CWs' allegations are, by turns, temporally irrelevant and based exclusively on second-hand information. Because

---

[1/]     Unless otherwise stated, capitalized terms have the meanings set forth in the Opening Brief of DBV Technologies, S.A., Daniel Tassé, Pierre-Henri Benhamou, David Schilansky, and Susanna Mesa's Motion to Dismiss the Second Amended Class Action Complaint ("Defs.' Br." or "Opening Brief" (ECF. No. 51-2)).

Plaintiffs fail to allege a single knowingly or recklessly false statement, actionable omission or strong inference of scienter, the SAC should be dismissed with prejudice.

<div align="center">

**ARGUMENT**

</div>

**I.     THE SAC FAILS TO PLEAD ANY FALSE OR MISLEADING STATEMENTS**

**A.     Plaintiffs Improperly Plead Fraud By Hindsight**

Pleading "fraud by hindsight" is improper and the courts of this Circuit routinely reject it. (Defs.' Br. at 6)  Plaintiffs argue that they are not pleading by hindsight because Defendants "knew" of "Viaskin Peanut's failure to meet the SAP's prespecified adhesion rate…no later than October 2017" and did not disclose it.  (Pls.' Br. at 22)  Plaintiffs' claims are *post hoc* speculation that the Company knew beforehand that the FDA would at some later point raise previously–unvoiced concerns about a "prespecified adhesion rate."  Indeed, the SAC alleges that, when the FDA expressed those concerns in March 2020, it was an entirely "new development" in the "ongoing dialogue" between the agency and DBV.  (SAC ¶¶190, 192)

Plaintiffs' argument is also entirely dependent upon their incorrect assertion that DBV was aware that the SAP created an adhesion criteria necessary for FDA approval.  Plaintiffs, however, have no response to Defendants' showing that the SAP does not establish approval criteria, but is merely a plan for analyzing clinical trial data.  (Defs.' Br. at 17)  Instead, Plaintiffs subtly (and misleadingly) misstate the import of the SAP by citing *Li v. Aeterna Zentaris, Inc.*, 2016 U.S. Dist. LEXIS 26772 (D.N.J. Mar. 2, 2016), for the proposition that a "failure to disclose that reported study results deviated from requirements set forth in *Statistical Analysis Plan* that governed the study was an actionable omission[.]" (Pls.' Br. at 16 (emphasis added))  This is not what the decision in *Li* says.  *Li* did not address evaluation criteria in a *Statistical Analysis Plan* (SAP), but rather addressed requirements set forth in a *Special Protocol Assessment* (SPA).  2016 U.S. Dist. LEXIS 26772, at *3-4.  The distinction is dispositive.  While Plaintiffs do not dispute that an SAP

<div align="center">

2

</div>

is merely a plan for analyzing data, an *SPA*, by contrast, is a process through which a drug sponsor and the FDA attempt "to reach agreement on the design and size of certain clinical trials … to determine if they adequately address scientific and regulatory requirements for a study that could support marketing approval."[2/]  The *SPA* in *Li* did not simply describe an analytical approach, as the SAP did here, but rather set forth hard requirements for the clinical trial.  Indeed, in *Li*, the plaintiff alleged that the omitted information concerned the failure of a clinical trial to meet the "stated primary efficacy objective as agreed to in the SPA." *Id*. at *5.  In this case—as Defendants pointed out and the Plaintiffs do not deny—"[p]atch adhesion was *not* the primary endpoint (or even a secondary endpoint) of the PEPITES trial."  (Defs.' Br. at 18 (emphasis added))

Plaintiffs further try to muddy the waters concerning the import of patch adhesion by citing to the out-of-context statement Tassé made that used the *terms* "prespecified adhesion rate" and referenced the 90% figure in discussing the FDA's newly-raised concerns.  (Pls.' Br. at 4, 10, 16-17, 28-29)  But Tassé explained at the time that:

> Importantly, during the pre-BLA meeting and subsequent discussions, *the FDA did not raise any concerns regarding efficacy related to patch adhesion.  So this is a new development* in our ongoing dialogue that we will work to address . . . . [W]e very much believe that patch adhesion is not a factor in clinical outcome and *are looking forward to engaging with the agency on discussing exactly that*. (SAC ¶¶192-193 (emphasis added))

Plaintiffs do not allege facts calling to question Tassé's statements that prior to March 2020 the FDA had *not* raised an efficacy issue related to patch adhesion and that he believed patch adhesion was *not* a factor in clinical outcome.[3/]  Moreover, Plaintiffs misstate that the "SAP prespecified

---

[2/]    U.S. Food & Drug Administration, Special Protocol Assessment: Guidance for Industry, at 1 (April 2018), available at https://www.fda.gov/media/97618/download.

[3/]    For the same reason, Plaintiffs' assertion – that Defendants' statements that they did not identify additional concerns with the BLA after its withdrawal is misleading because of the subsequent FDA concerns raised about patch adhesion – fails. (Pl. Br. at 14-15)  Plaintiff simply

that the PEPITES trial must demonstrate a 90% adhesion rate to show efficacy." (Pl. Br. at 4) Plaintiffs have no response to Defendants' showing that adhesion was *not* an efficacy endpoint – adhesion is never even discussed with respect to the "efficacy" goals of the study. (Defs.' Br. at 17-18) Rather, according to the SAP, data would be considered sufficiently usable for determining efficacy if the prespecified criteria were met and, if not, separate treatment-response statistics for this sub-group would be calculated to determine whether, despite lower adhesion scores, the patches applied to these subjects had been efficacious. (Defs' Br. at 19-20; ECF No. 51-11 (SAP) at 63-65) There are no facts alleged that Defendants knew that patch adhesion was a material FDA concern prior to the agency raising the issue.

**B.      Defendants Accurately Described DBV's Manufacturing Systems And Made No False Promises Of Regulatory Compliance Or FDA Approval**

DBV demonstrated in its opening brief that it did not, as Plaintiffs argue, guarantee its CMC compliance, manufacturing capabilities or ultimate FDA approval. (Defs.' Br. at 7-10) Plaintiffs now point to a few statements Defendants made in February and September 2018 concerning manufacturing readiness and the ability to seek FDA approval as allegedly misleading, but fail to address the context showing that the statements were not misleading. (Pls.' Br. at 12)[4]

---

fails to allege facts showing that the Company had identified patch adhesion as an efficacy concern prior to the FDA raising the issue in March 2020.

[4]      Specifically, Plaintiffs point to statements by Defendants that (1) the FDA "agreed that the available efficacy and safety data for Viaskin Peanut supports the submission of a [BLA] for Viaskin Peanut"; (2) "the FDA provided written responses to DBV which 'reflect agreement' on the content of the BLA, thus putting DBV 'on track' to submit the BLA in the second half of 2018," and (3) in terms of the electrospray technology, "we've been able to actually bring everything up to speed in order to scale up" and "we are ready to launch that drug." (Pls.' Br. at 12 (internal quotations and citations omitted))

*First,* Plaintiffs have no response to Defendants' showing that their beliefs concerning FDA approval and DBV's ability to launch Viaskin Peanut should it obtain approval were all made with qualified, cautious optimism of the type that is not actionable.  (Defs.' Br. at 8-10)

*Second*, Plaintiffs omit that, in describing its ability to "scale up," DBV also explained that DBV was still in the process of "getting ready on the CMC side," and thus could only say that the patch would "be, hopefully, launched in 2019."  (SAC ¶127)  Plaintiffs also fail to address that in its Form 20-F, DBV cautioned in its disclosure: (i) "[t]o date, our Viaskin product candidates have only been manufactured at a scale which is adequate to supply our research activities and clinical trials," (ii) "[w]e have not built commercial-scale manufacturing facilities, and we have limited manufacturing experience with Viaskin patches," and (iii) while "we completed development of a commercial-scale version of our electrospray manufacturing tool…, ongoing quality control testing … is still being conducted, which could delay the commercialization of our product candidates."  (ECF No. 51-4 (2017 Form 20-F) at 19)  No reasonable investor could have interpreted Defendants' statements as unequivocal statements of CMC readiness.

*Third,* Plaintiffs now try to assert that "DBV had not surmounted all the 'key challenges' facing the BLA submission" because "Defendants knew that Viaskin Peanut suffered from adhesion problems since at least October 2017."  (Pls.' Br. at 12-13)  Plaintiffs' argument once again disregards the context of Defendants' statements.  Mesa's comment about tackling "key challenges" is made in reference to specific issues identified by the FDA and confirmation the Company received from the agency concerning its approach to them in "CMC pre-BLA meetings."  (SAC ¶140)  Plaintiffs make no allegations showing that FDA concerns raised in those meetings were not addressed.  Moreover, though they misstate the nature of the "prespecified adhesion critieria" in the SAP, there is no allegation that the FDA raised adhesion issues with the Company

5

until March 2020, a year and a half after the challenged statement.  And, adhesion problems have nothing to do with CMC compliance or manufacturing readiness.  Nor are CW3's vague, second-hand musings enough, even if relevant: CW3 did not even work at DBV as an outside consultant until *an entire year later: February 2019*.  (Pls.' Br. at 13 (citing SAC ¶121))[5]

Plaintiffs point to two statements made after October 2018 that they argue are misleading. *First*, in February 2019 (after DBV withdrew its first BLA submission) DBV stated that, while it was reworking the submission, it planned to take a look at the entire clinical trial (not just the issues identified by the FDA), and that "*[a]t this point in time, nothing has been identified.*"  (Pls.' Br. at 14 (citing SAC ¶159) (emphasis original))  Plaintiffs do not allege that the Company had, in fact, identified any concerns at that time.  Rather, they point to their mischaracterized patch adhesion requirement, but it is nowhere alleged that the Company had identified that as a concern before the FDA raised it in March 2020.

*Second*, Plaintiffs point to Tassé's statement in February 2020 (several months after DBV resubmitted the BLA) that "[w]e were first faced with the setback of a delay that we had to pull

---

[5]    Plaintiffs rely heavily on two cases from this Court.  (Pls.' Br. at 13)  Both are easily distinguishable because, unlike here, the alleged omissions in those cases concerned the same issue as the alleged misrepresentations.  For example, in *Odeh v. Immunomedics*, the defendants had stated that the company "c[ould] confirm that all critical work streams [for FDA approval] . . . [were] yielding positive results" and that FDA review was a "very much sort of a check-the-box exercise" at the same time the company knew its manufacturing plant had "suffered from a serious data integrity breach" involving deliberately manipulating samples and misrepresenting test procedures, and the FDA had issued a Form 483 logging thirteen manufacturing-related issues (including two related to the data breach).  2020 U.S. Dist. LEXIS 135917, at *8, 11, 16-17. (D.N.J. July 31, 2020); *see also Roofer's Pension Fund v. Papa*, 2018 U.S. Dist. LEXIS 125885, at *30, 38 (D.N.J. July 27, 2018) (company's statement that generic drug pricing was "on track to achieve an 8%-12% organic growth rate" was actionable where the complaint alleged with particularity that the company was "experiencing difficulty maintaining those growth rates[.]").  Here, however, Defendants' statements about "CMC and manufacturing abilities" (*see* Pls.' Br. at 13) have nothing to do with patch adhesion or the FDA's concerns regarding manufacturing data and there is no well-pled allegation that the Company was aware of FDA patch adhesion concerns at the time.

6

and re-file.  ***All that work was done.***"  (Pls.' Br. at 14 (citing SAC ¶188) (emphasis original))

Plaintiffs assert that this statement was false because DBV "still had not rectified the CMC

problem with its electrospray machine" and had not fixed the patch-adhesion problem.  (*Id.* at 15-

16)  To start, the phrase "all that work was done" plainly refers to re-filing the BLA, which was

true.  Moreover, Plaintiffs cite no basis for their assertion that any CMC problems were not

rectified by February 2020.  The only source of any allegations concerning CMC failures are the

CWs, but the CWs had left their affiliation with the Company (one was never an employee), three

years, two years and one year before the statement, so their allegations are irrelevant as to the then-

current facts.  *See, e.g.*, *In re Fusion-io Sec. Litig.*, 2015 U.S. Dist. LEXIS 18304, at *62-63 (N.D.

Cal. Feb. 12, 2015) (CW account about company's problems in November 2012 did not support

inference of falsity with respect to statements made about company's health three months later).

And, CMC issues were not alleged to have ever been raised by the FDA.

### C.    The SAC Pleads No Facts Showing Defendants Were Aware Of Any Manufacturing Or Regulatory Issues Before Submitting The BLA

The falsity and scienter allegations of the SAC rest almost entirely on allegations attributed

to three confidential witnesses.  But the CWs were not employed during a time when they would

have relevant information concerning the accuracy of Defendants' statement and provide at best

second-hand information.  (Defs.' Br. at  10-15)  Plaintiffs argue that "all the law requires" is a

CW's "title, location, and tenure" and "facts demonstrating that he or she was in a position to know"

what the CW then recounted.  (Pls.' Br. at 19 (citing *Inst. Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242,

263 (3d Cir. 2009)))  This is wrong, as *Avaya* itself makes clear: the Third Circuit "evaluat[es] the

detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the

sources, the corroborative nature of other facts alleged, including from other sources, the coherence

and plausibility of the allegations, and similar indicia."  *Avaya*, 564 F.3d at 263 (internal quotations

7

and citation omitted).  Where, as here "anonymous source allegations are found wanting with respect to these criteria, then we must discount them steeply." *Id.*

None of the CWs had (i) any involvement in designing or manufacturing the Viaskin patch, (ii) any working relationship with the Individual Defendants, or (iii) job responsibilities that would have provided insight into the Company's manufacturing capabilities or regulatory status.  (SAC ¶¶106-120)  Plaintiffs now argue that "CW1 and CW2 had firsthand knowledge of problems facing DBV's manufacturing facilities because they both travelled to France and visited those facilities." (Pls.' Br. at 20 (citing SAC ¶¶106, 117))  Although the CWs may have "visited" the facilities, the allegations on which the SAC relies are all at best second-hand: CW1's account of the alleged patch adhesion problems was explicitly second-hand, recounting only (i) some vague non-particularized information obtained from a manufacturing executive, (SAC ¶109), and (ii) somewhat more specific information "based on informal conversations" with unnamed other employees.  (SAC ¶110)  The SAC indicates that CW2 "learned" about problems scaling up and implementing the electrospray technology (SAC ¶118), and "also reported learning" about adhesion problems with the patch.  (SAC ¶119)  The SAC does not say, however, how CW2 "learned" about these issues, and provides no indication CW2 had any hands-on experience designing or manufacturing the product.  Significantly, no CW explains how alleged CMC or manufacturing issues connect in any way to the FDA's concerns about the "*data* on manufacturing and quality controls" that led to the withdrawal of the BLA in December 2018.  (SAC ¶146 (emphasis added))  Nor, for that matter, do Plaintiffs respond to Defendants' showing that the vague assertions attributed to them were consistent with the Company's contemporaneous disclosures. (Defs.' Br. at 12-15)

Plaintiffs also fail to address how CW1 and CW2 could have had relevant firsthand knowledge as to the status of the Company's manufacturing and regulatory status throughout the class period in light of the fact that CW1 left the Company in August 2017, six months before the Class Period (SAC ¶106), and CW2 left DBV at or before the start of the Class Period, in February 2018 (SAC ¶116).  (Defs.' Br. at 10-12)  Similarly, CW3's allegations are limited to his uncorroborated assertion "that the reason DBV withdrew its BLA for Viaskin Peanut in December 2018 was because of a quality control problem with the manufacturing system used to spray the active ingredient onto patches." (SAC ¶121) CW3, however, worked at DBV for just three months as an outside consultant beginning in February 2019 and there is no basis to believe that CW3 was sufficiently entrenched at DBV to dispute the Company's stated basis for withdrawing the BLA. Thus, CW3's account of events that took place back in December 2018 is second-hand and he or she makes no allegation concerning other issues.  Plaintiffs admit that allegations from confidential witness may be considered only from "former-employee witnesses whose positions afforded them **_firsthand knowledge_** of the underlying facts."  (Pls.' Br. at 21 (quoting *Papa*, 2018 U.S. Dist. LEXIS 125885, at *69) (internal quotations omitted) (emphasis added))  Because none of the CWs is alleged to, or could have, firsthand information, this Court should disregard the CW allegations.

> **D.      The SAC Fails To Plead Any False Or Misleading Statements With Respect To The "Patch Adhesion" Allegations**

Although Plaintiffs continue to misleadingly refer to a preset patch adhesion rate as a "requirement" (without saying what it was required for), they do not seriously contest Defendants' showing that FDA approval was not tied to meeting a specific adhesion rate, that the adhesion rate was only "prespecified" for bucketing how certain data would be analyzed, or that DBV did not know prior to the FDA's raising of the issue that patch adhesion rates would be significant to approval.  (Defs.' Br. at 15-21)  Nor do Plaintiffs contest Defendants' characterization of their

9

theory as being that "it was misleading for DBV to say *anything* about the patch" in the absence of "omitted material information" concerning patch adhesion.  (*Id.* at 22-23 (emphasis original)) Indeed, Plaintiffs confirm Defendants' view by arguing that it was Defendants' "concealment of the known fact that the study failed to reach the prespecified adhesion rate set forth in the SAP" that "is actionable."  (Pls.' Br. at 16)  In so arguing, however, Plaintiffs fail to show *a statement* that is rendered false as a result, and instead incorrectly argue that all they must show is that patch adhesion results from the PEPITES study were material.  That is not the law.

For this "omissions" case (Pls.' Br. at 16), a duty to disclose patch adhesion results could have arisen here only if disclosure was "necessary in order to make the statements made, in the light of the circumstances under which they were made, ***not misleading***[.]*"* 17 C.F.R. § 240.10b-5 (emphasis added).  Plaintiffs do not establish any such nexus between Defendants' statements and the allegedly "omitted" information.[6/]  There is no requirement to disclose every bit of specific information "relating to" any broadly-formulated "topic" that is supposedly "put in play" by the company's statements.  *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (Rule 10b-5 does not create an affirmative duty to disclose "any and all material information").

---

[6/]   As the cases on which Plaintiffs rely demonstrate, an omission does not render statements misleading absent a connection between the substance of the statements made and the omitted information. (*Compare* Pls.' Br. at 15 *with supra* fn. 5)  For example in *SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874 (E.D. Pa. 2018), company executives made public statements that clinical data for one of its lead products, a reformulated opioid, showed that it was less susceptible to abuse. *Id.* at 906.  In fact, the underlying data demonstrated that, while the drug's reformulation made it less susceptible to *intranasal* abuse, it had become more susceptible to *intravenous* abuse, which was clinical data that: (1) company executives knew; (2) was not disclosed; and (3) directly contradicted the executives' public statements. *See id.* at 888-89, 906.  Similarly, in *Todd v. STAAR Surgical, Co.*, the defendants put the specific issue of regulatory compliance into play by stating that the company had improved its regulatory compliance and "believes it is substantially in compliance with" FDA regulations, but the company failed to disclose that the FDA had recently issued a formal "Warning Letter" to the company that documented fifteen separate regulatory violations.  2016 U.S. Dist. LEXIS 186511, at *9-10, 26 (C.D. Cal. Apr. 12, 2016).

Plaintiffs misdirect the Court from its obligation to establish how omitted information rendered affirmative statements misleading by conflating the standard for an actionable omission with the standard for *materiality.* Thus, Plaintiffs argue that the adhesion issues in the PEPITES study needed to be disclosed because those problems "would have been viewed by a reasonable investor as having significantly altered the 'total mix' of information available," and that the omissions were actionable because it cannot be said that the undisclosed issues were "so obviously unimportant as to be immaterial as a matter of law." (Pls.' Br. at 17-18)[7/] This is not the law. Instead, Plaintiffs' burden is—as Rule 10b-5 itself says—to allege facts which show that it was "necessary" to disclose the information at issue in order to prevent the "statements made" from misleading investors. *See, e.g.*, *In re Raytheon Sec. Litig.*, 157 F. Supp. 2d 131, 150 (D. Mass. 2001) (for an omission to be actionable, the issue is whether "the omitted fact is material to the statement in that it alters the meaning of the statement."). In other words, Plaintiffs had to allege facts to show that, while Defendants disclosed a "risk," the omitted information made the adverse outcome into something approaching a "certainty." *See, e.g.*, *Hill v. Gozani*, 638 F.3d 40, 59 (1st Cir. 2011).[8/] This they do not, and cannot, do. Even though the FDA saw DBV's data for the first

---

[7/]     Plaintiffs insinuate that the Defendants agree that the only question is one of materiality, claiming that "Defendants ask this Court to conclude *as a matter of law* that the failure was immaterial to investors." (Pls.' Br. at 16 (emphasis original)) Not so. With hindsight resulting from the FDA's March 2020 comments, it is plain that adhesion data from PEPITES later became material, but (i) there is no allegation that the Defendants knew it was material at the time it spoke and, critically, (ii) proof of materiality is not sufficient for a successful securities fraud claim: "allegations that the defendant possessed knowledge of facts that are later determined by a court to have been material, without more, is not sufficient to [permit an inference] that the defendant intentionally withheld those facts from, or recklessly disregarded the importance of those facts to" investors. (Defs.' Br. at 28 (citing *Wilson v. Bernstock,* 195 F. Supp. 2d 619, 639 (D.N.J. 2002)))

[8/]     *See also Acito v. IMCERA Grp.*, 47 F.3d 47, 53 (2d Cir. 1995) (no duty to disclose FDA plant inspection where it was not a "foregone conclusion" that plant would fail inspection or that adverse consequences would ensue); *Smallen v. Western Union Co.*, 2019 U.S. Dist. LEXIS 52578, at *43 (D. Colo. Mar. 27, 2019) (no duty to disclose ongoing investigations where allegations did not indicate that "the outcomes of the investigations were near certainties or

11

time no later than October 2018, it did not raise patch adhesion as an issue *until March 2020*. Though it took the FDA a year and a half to determine that adhesive performance represented a potential threat to regulatory approval, Plaintiffs insist, but do not show, that Defendants should have known that regulatory failure was a foregone conclusion right from the start.  Because the SAC fails to plead the omitted information made regulatory failure anything close to a "certainty," Plaintiffs' allegations fail.  *See Id.*

## II.    OPTIMISTIC STATEMENTS ABOUT POTENTIAL FDA APPROVAL ARE IMMUNE FROM LIABILITY UNDER THE PSLRA SAFE HARBOR

Plaintiffs' first argument in response to Defendants' showing that both inlets to the PSLRA safe harbor apply to statements that conveyed an optimistic sentiment of FDA approval or assurance of regulatory success (Defs.' Br. at 25-28) is that Defendants fail to specify the covered statements. (Pl. Br. at 23)  The failing is Plaintiffs'.  Defendants cited to paragraphs 145 and 178 of the SAC (Defs' Br. at 25), two catch-all pleading paragraphs that allege falsity as to the preceding challenged statements for expressing an "optimistic sentiment for FDA approval."

### A.    The SAC Does Not Allege That Any Optimistic Statement DBV Made About FDA Approval Was Knowingly False

Plaintiffs further argue that forward looking statements were knowingly false because Defendants allegedly omitted that "Defendants were aware of the negative adhesion rate test result from the PEPITES trial no later than October 2017, and thus had actual knowledge their statements were misleading well before the Class Period."  (Pl.'s Br. at 24)  This argument fails because Plaintiffs have not identified any statement DBV made *contradicting* its alleged awareness of the negative adhesion rate test result and therefore disclosure was not "necessary in order to make

---

foregone conclusions"); *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 362 (S.D.N.Y. 2008) (no duty to disclose alleged regulatory violation where risk of loss therefrom had neither "transpired" nor become a "near certainty").

12

[DBV's] statements…not misleading." 17 C.F.R. § 240.10b-5. Plaintiffs also argue that because they are asserting an omission, the safe harbor does not apply. (Pls.' Br. at 23-24) This argument fails for at least two reasons. *First*, courts in this district disagree whether this is even the law— and told Plaintiffs' counsel the same just last month. *See Tanaskovic v. Realogy Holdings Corp.*, 2021 U.S. Dist. LEXIS 11090, at *56 (D.N.J. Jan. 21, 2021) (finding plaintiff's argument, based on the case law Plaintiffs press here, "weak"). *Second*, "even if this Court were to apply this rule," there must actually be an "omission." *See id.* (granting motion to dismiss, explaining even if safe harbor does not protect omissions, Plaintiff did not show any omission). Here, as discussed, there were no pre-specified adhesion criteria for FDA approval, and no statement concerning adhesion requirements for statistical analysis purposes, so DBV omitted nothing. (Defs.' Br. at 24)[9/]

### B.    Defendants Provided Ample Warning Of The Risks Related To FDA Approval

The second route to the safe harbor also remains open because Defendants warned that DBV's manufacturing systems had not yet been approved by the FDA. (Defs.' Br. at 26-27) Plaintiffs argue that the cautionary language Defendants used is insufficient "boilerplate." (Pls.' Br. at 23-24) Here, DBV warned "the FDA … may not approve the manufacturing process"; and there can be "no assurance that the procedures currently used to manufacture our product candidates will work at a scale which is adequate for commercial needs and we may encounter difficulties in the production of Viaskin patches…." (Defs. Br. at 26-27) DBV's language was

---

[9/]    The facts here are readily distinguishable from the cases cited by Plaintiffs. *Compare Curran v. Freshpet, Inc.*, 2018 U.S. Dist. LEXIS 5833, at *11-12 (D.N.J. Jan. 9, 2018) ("omission of existing facts" about "their Fridge-placement and sales problems at major retailers" precluded safe harbor for "actionable misleading statements about [defendants'] ability to grow Fridge placement across North American retailers"); *In re ViroPharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 471 (E.D. Pa. 2014) (no safe harbor protection for omission where "public statements directly contradict information" company "had privately received from the FDA" about study inadequacies).

appropriately "tailored" to the forward-looking statements it references, and, for the reason, too, the safe harbor applies. *See Avaya*, 564 F.3d at 257. Further, as noted, it is not well-pled that FDA concerns with DBV's manufacturing capabilities related to the failure to achieve BLA approval.

## III. THE SAC FAILS TO ALLEGE FACTS GIVING RISE TO A STRONG INFERENCE OF SCIENTER

As Defendants showed, the most compelling inference from the facts alleged is that Defendants believed Viaskin Peanut had a reasonable prospect of FDA approval and did not know of FDA concerns about manufacturing data or patch adhesion before the FDA raised them, at which point those concerns were promptly disclosed. (Defs' Br. at 29)[10] Plaintiffs argue that the more compelling inference is that Defendants were committing fraud because "Defendants knew, at the very latest October 2017, that the study failed to reach the FDA's prespecified adhesion rate set forth in the SAP." (Pls.' Br. at 32) *First*, such argument is entirely premised on the Plaintiffs' misapprehension that the "prespecified adhesion rate" was an established FDA criterion for drug approval, not a cut-off for determining how different streams of data would be interpreted in assessing efficacy as set forth in the SAP (*see supra* at 2-5 and Defs' Br. at 16-25). *Second*, Plaintiffs make no allegation calling into question Defendants' contemporaneous statement when the Company learned of the FDA's concern that "this is a new development" (SAC ¶192) and "we very much believe that patch adhesion is not a factor in clinical outcome and are looking forward to engaging with the agency on discussing exactly that." (SAC ¶193) Consequently, Plaintiffs

---

[10] Defendants' prompt disclosure of the FDA concerns further undercuts any inference of scienter. *See In re Genzyme Corp. Sec. Litig.*, 754 F.3d 31, 42 (1st Cir. 2014) (fact that defendant "promptly disclosed" issues concerning the FDA's extended review of defendant's BLA "further undercut any inference of fraudulent intent on the part of defendants.") (citation omitted); *City of Roseville Emples. Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1141 (E.D. Wash. 2013) (defendants' disclosures "tend to further negate an inference of scienter, because it shows that Defendants did not conceal adverse information – and thereby profit – but rather promptly disclosed it").

fail to show that "defendants knew or should have known that their failure to disclose those facts present[ed] a danger of misleading buyers or sellers" as required. *See Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*, 778 F.3d 228, 245 (1st Cir. 2015) (internal quotations and citations omitted). Instead of pointing to facts showing that Defendants knew that they were misleading investors or had some personal motivation to mislead, Plaintiffs point to irrelevancies.

### A.        The SAC Fails To Allege Any Motive To Defraud

Plaintiffs argue that because Viaskin Peanut was the Company's most important product and the Company was raising money during the back half of the class period, the Individual Defendants and the Company had a particularized motive to mislead investors. (Pls.' Br. at 28-29) To the contrary, these are classic, generalized motivations shared by *every* company with a key product and are insufficient to plead scienter. *Avaya*, 564 F.3d at 278 (desire to raise funds and retire corporate debt did not give rise to a "strong inference" of scienter because such actions merely reflect common attempts by corporate officers to improve their company); *see also Hoey v. Insmed*, 2018 U.S. Dist. LEXIS 24907, at *63-64 (D.N.J. Feb. 15, 2018) (holding general allegation that corporate officials had a desire to conduct a successful study insufficient to allege scienter because "these allegations of motive are applicable to any corporation seeking to commercialize an investigational drug"). The case law upon which Plaintiffs rely is distinguishable. (Pls.' Br. at 29, n.12) For example, in *Skiadas v. Acer Therapeutics Inc.*, the company had issued a "going concern" warning about its ability to operate absent new financing. 2020 U.S. Dist. LEXIS 105814, at *33-34 (S.D.N.Y. June 16, 2020). The court found plaintiffs' allegation sufficient to support scienter—in derogation of the rule that "[m]otives that are generally possessed by most corporate directors and officers do not suffice"—because "[a]n executive at a company that will go belly up if it fails to fundraise has different incentives from a generic corporate insider," including "a stronger incentive to bet the farm in a reckless gamble because the

15

alternative is certain failure." *Id.* at \*34-35.  Plaintiffs here, however, do not allege the BLA not being accepted doomed DBV to "certain failure."  *See id.*

Further, here, in light of the requirement that the FDA comment on a BLA within 60 days, any knowing insufficiency in the BLA, whether based on adhesion or manufacturing deficiencies, could be expected to be exposed by the FDA within 60 days of the original BLA submission in October 2018.[11/]  The fact that neither issue was raised by the FDA in December 2018 (and in the case of alleged manufacturing deficiencies, never was) or during any other interactions before March 2020 further bolsters the most plausible inference: that the Company did not believe that manufacturing or adhesion issues rose to the level of endangering the BLA.  That the Company did not anticipate the FDA's patch adhesion concerns first raised in March 2020, especially after the FDA had raised issues in December 2018 concerning detail regarding data on manufacturing procedures but ***not*** about efficacy or adhesion, shows no more than an honest mistake in judgment, not severe recklessness akin to willful blindness or an intent to defraud.[12/]

### B.  The SAC Does Not Assert A Plausible Theory Of Scienter

Plaintiffs' theory of scienter hinges entirely on conflating presumed (though not actually pleaded) knowledge of facts concerning the SAP's terms with knowledge that the failure to disclose them rendered other public statements misleading.  (*See* Pls.' Br. at 25 (arguing for an

---

[11/]   Notably, there was no fundraising in the short window between October 2018 and December 2018 when the FDA first commented and DBV withdrew its BLA.

[12/]   Plaintiffs' reliance on *Tomaszewski v. Trevena, Inc.*, 2020 U.S. Dist. LEXIS 156618 (E.D. Pa. Aug. 28, 2020), is misplaced.  (Pls.' Br. 29, 32-22)  In *Tomaszewski*, in addition to allegations of company financial distress, there were allegations that the defendant "attended the relevant FDA interactions" and omitted known FDA "disagreements with the Phase 3 program and the accompanying increased risk that [the drug candidate] would not be approved." *Id.* at \*26, 28.  By contrast, here, the Complaint is devoid of any allegations that the Defendants were aware of, but omitted express FDA concerns.  To the contrary, when the FDA raised concerns, the Defendants promptly disclosed them.

inference of scienter because of "defendants' knowledge of facts or access to information contradicting their public statements."))  Plaintiffs have no response to Defendants' argument, and thereby concede that they cannot demonstrate scienter through the typical means: "'clear allegations of admissions, internal records or witnessed discussions' that suggest that defendants were 'aware that they were withholding vital information or at least were warned by others that this was so' when they made the misleading statements."  (Defs.' Br. at 30 (citing *In re Biogen Sec. Litig.,* 193 F. Supp. 3d 5, 44-45 (D. Mass. 2016) (quoting *In re Boston Sci. Corp. Sec. Litig.,* 686 F.3d 21, 31 (1st Cir. 2012)) (both granting motions to dismiss)))

Moreover, even if knowledge of the SAP's terms is presumed, that does not demonstrate recklessness or intent in failing to disclose it.  *See Abiomed*, 778 F.3d at 245; *Wilson v. Bernstock,* 195 F. Supp. 2d 619, 639 (D.N.J. 2002).  Rather, *In re ViroPharma Inc. Sec. Litig.*, 2003 U.S. Dist. LEXIS 5623 (E.D. Pa. Apr. 3, 2003), upon which Plaintiffs rely, shows that there must be a tight nexus between the allegedly known facts and the statements rendered misleading by the alleged omission.  In that case, defendants declared a Phase II study a success, even after: (1) Phase II trials showed no statistically significant effect; (2) a Phase III study completed just a year prior "had failed to show any significant treatment benefit; (3) the second Phase III study "showed that the drug had a negative impact on smokers," excluded those suffering from heart problems and other co-morbid conditions, "underrepresented" "minorities and the elderly," and "did not show a significant treatment effect in the male population"; and (4) "because Pleconaril was Viropharma's leading product and Defendants were the highest ranking members of the company," knowledge could be imputed to them.  *Id.* at *9-11, 30-31.  As a result, the court concluded plaintiffs had sufficiently alleged "that the Defendants either knew that their statements were false or acted with reckless disregard for the truth of those statements."  *Id.* at *30.

By contrast, here, the SAC does not specifically allege anything of the sort. Plaintiff merely points to paragraphs in the SAC that note that the SAP had a section entitled "Adhesion" setting forth the FDA's "prespecified requirements" for the patch (SAC ¶100), and a series of bald allegations that Viaskin Peanut "did not meet the FDA's required adhesion criteria" (SAC ¶198). (*See* Pls.' Br. at 27)  For the reasons discussed throughout Defendants' opening brief and here, there were no such "prespecified requirements" for approval (as opposed to for determining how to analyze data). (*See, e.g.*, Defs' Br. at 16-25)  As a result, Plaintiffs have failed to "specifically allege" Defendants had knowledge or access to information contradicting their public statements. *See City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 170 (3d Cir. 2014) (affirming grant of motion to dismiss where plaintiffs "failed to adequately allege defendants did not honestly believe their interpretation of the interim results or that it lacked a reasonable basis," and explaining that cases like *Viropharma* are distinguishable "because they involve plausible allegations of affirmative false statements about a drug's efficacy and safety.").

In sum, the inference – that Defendants honestly believed that DBV's demonstration of efficacy was a sufficient basis for regulatory approval – is far more compelling than the contrary view that, despite not being informed by the FDA, and in the absence of any allegation showing direct knowledge of the FDA's concerns, the Defendants somehow knew the BLA was a dead letter based upon adhesion or manufacturing concerns but continued pursuing it anyway. *See In re Columbia Labs., Inc.*, 602 F. App'x 80, 82-83 (3d Cir. 2015) (rejecting claims that a pharmaceutical company knew its NDA would not be approved, and affirming holding that the more compelling inference was that the Defendants did not believe the NDA was likely to fail).

18

### C.     Plaintiffs' Other Allegations Of Scienter Fail

Although Plaintiffs have abandoned certain scienter arguments (*compare* Defs.' Br. at 32-34 *with* Pls.' Br. at 27-34), they continue to press their scienter argument based on the departure of executives.  Plaintiffs, however, concede that the resignation of key employees will not support a strong inference of scienter, even when the resignations occur "in close proximity to the public release of 'bad news,'" unless there are additional allegations "cogently suggest[ing] that the resignations resulted from the relevant executives' knowing or reckless involvement in a fraud." (Defs.' Br. at 34 (citing *In re Hertz Glob. Holdings, Inc.*, 905 F.3d 106, 119 (3d Cir. 2018))) Plaintiffs point to no such allegation here, but merely assert in conclusory fashion that certain resignations "contributes to the inference of scienter." (Pls.' Br. at 31)  That is insufficient.

### D.     The SAC Does Not Allege Corporate Scienter

Finally, conscious that the allegations fail to particularize facts demonstrating a strong inference of scienter as to any Individual Defendant, Plaintiffs argue for finding that DBV is liable based on the "corporate scienter" doctrine.  This fails because: (1) as Plaintiffs concede, the Third Circuit has not accepted the doctrine; and (2) in any event, the facts here would not support it.  (*See* Pls.' Br. at 34 (citing *Hertz*, 905 F.3d at 121 n.6))

This Court should reject the corporate scienter doctrine.  Corporations operate through individuals, so this Court cannot find that a corporation acted with scienter unless the scienter of a high level executive can be imputed to it.  *See Winer Family Tr. v. Queen*, 503 F.3d 319, 335, 337 (3d Cir. 2007) (concluding "group pleading doctrine" under which "statements in group-published documents" like annual reports "are attributable to officers and directors who have day-to-day control" over company operations "is no longer viable" post-PSLRA, because "[t]he PSLRA requires plaintiffs to specify the role of each defendant, demonstrating each defendant's

19

involvement in misstatements and omissions."); *see also P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*, 142 F. Supp. 2d 589, 620 (D.N.J. 2001) ("agree[ing]" with "other district courts' refusal to recognize the group published information doctrine after the passage of the PSLRA.").

Even in *Conduent* (Pls.' Br. at 34), where corporate scienter was found, the factual predicate was "an inference based on alleged misconduct that is attributable only to management level corporate officials." *Empes Ret. Sys. of Puerto Rico Elec. Power Auth. v. Conduent, Inc.*, 2020 U.S. Dist. LEXIS 99287, at *24 (D.N.J. June 5, 2020). Plaintiffs have alleged none here. Instead, Plaintiffs allege only that a CW spoke with the Vice President of Manufacturing and the Vice President of Supply Chain Management who described the "patch's adhesion problems." (Pls.' Br. at 34 (citing SAC ¶¶109-110)) Such alleged communications do not support an inference that the Company was severely reckless or consciously intending to mislead investors by making statements about the patch that did not mention purported adhesion problems or CMC concerns. *See Zavolta v. Lord, Abbett & Co. LLC*, 2010 U.S. Dist. LEXIS 16491, at *33 (D.N.J. Feb. 23, 2010) (finding allegations insufficient to establish scienter even "[a]ssuming, without deciding that collective scienter is permissible in this circuit in the corporate context post-*Winer Family Trust*").

## IV.   THE COMPLAINT DOES NOT PLEAD A SECTION 20(a) CLAIM

Plaintiffs concede that they are required to show each of the Individual Defendants' culpable participation, yet they fail to point to facts showing that any Individual Defendant knew that undermined the challenged statements. This claim should be dismissed.

## CONCLUSION

For the reasons stated herein, the Second Amended Complaint should be dismissed with prejudice.

20

Date:  February 25, 2021

<div style="margin-left:auto">

MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO P.C.


 */s/* Andre K. Cizmarik

Andre K. Cizmarik
Douglas P. Baumstein (*admitted pro hac vice*)
Mintz Levin Cohn Ferris Glovsky and Popeo P.C.
666 3rd Ave
New York, NY 07079
(212) 692-6706
AKCizmarik@mintz.com
DBaumstein@mintz.com


Emily Kanstroom Musgrave (*admitted pro hac vice)*
Mintz Levin Cohn Ferris Glovsky and Popeo P.C.
One Financial Center
Boston, MA 02111
(617) 542-6000
EKMusgrave@mintz.com

*DBV Technologies S.A., Daniel Tassé,*
*Pierre-Henri Benhamou, David Schilansky, and*
*Susanna Mesa*

</div>

21

## CERTIFICATE OF SERVICE

Pursuant to Local Rule 14(b)(1), I hereby certify that, on February 25, 2021 the foregoing Reply Brief in Further Support of DBV Technologies S.A., Daniel Tassé, Pierre-Henri Benhamou, David Schilansky, and Susanna Mesa's Motion To Dismiss The Second Amended Class Action Complaint was filed electronically with the United States District Court for the District of New Jersey through the Court's ECF System, which constitutes service on all parties under Local Civil Rule 5.2.

Dated:  February 25, 2021

/s/_Andre K. Cizmarik_____
Andre K. Cizmarik