IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| TRAVIS ITO-STONE, Individually and | : | Civil No. |
| On Behalf of All Others Similarly | | 19-cv-525-MCA |
| Situated, | : | |
| | | TRANSCRIPT OF |
| Plaintiff, | : | HEARING ON MOTION |
| v. | : | |
| DBV TECHNOLOGIES S.A., DANIEL | : | |
| TASSE, PIERRE-HENRI BENHAMOU, | | |
| DAVID SCHILANSKY, and SUSANNA | : | |
| MESA, | | |
| | : | |
| Defendants. | | |

---------------------------------------x

Via Zoom Teleconference
July 29, 2021

BEFORE:

    THE HON. MADELINE COX ARLEO, U.S.D.J.

Reported by:
CHARLES P. McGUIRE, C.C.R.
Official Court Reporter

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

CHARLES P. McGUIRE, C.C.R.

2

APPEARANCES:

    THE ROSEN LAW FIRM, PA
    609 W. South Orange Avenue
    South Orange, New Jersey 07079
    BY: LAURENCE M. ROSEN, ESQ., and
        SARA FUKS, ESQ.
    Attorneys for Plaintiff

    MINTZ LEVIN COHN FERRIS GLOVSKY & POPEO PC
    663 3rd Avenue
    New York, New York 07079
    BY: DOUGLAS P. BAUMSTEIN, ESQ.,
        ANDREW K. CIZMARIK, ESQ., and
        EMILY K. MUSGRAVE, ESQ.
    Attorneys for Defendants

3

(The following takes place via Zoom teleconference)

THE COURT:  All right.  Good afternoon, everyone.

We're here for oral argument in Ito-Stone v. DBV Technologies.

Can I have appearances of counsel, please?

MR. ROSEN:  Good afternoon, Your Honor.  This is Laurence Rosen for the Plaintiffs and the class.  Also with me is Sara Fuks.

THE COURT:  Okay.

MR. BAUMSTEIN:  Good afternoon, Your Honor.  This is Doug Baumstein from Mintz Levin on behalf of the Defendants.  I have Andre Cizmarik with me, and I believe Emily Musgrave is with me as well.

THE COURT:  Okay.  So noted.  Thank you, everyone.

So, we are proceeding today with oral argument by Zoom videoconference.  If at any time anyone cannot see or hear me, please so indicate or give a text to Amy, and we'll try to fix it.

This hearing is being taken down stenographically by my reporter, Charles McGuire, who is also present on the Zoom video.

Mr. McGuire, can you see and hear us?

MR. McGUIRE:  I can, Your Honor, yes, thank you.

THE COURT:  Okay.  I ask you to remember, even though we're on a Zoom, it will also be recorded

CHARLES P. McGUIRE, C.C.R.

4

stenographically, so please speak slowly, and give each other an opportunity to speak as well.

Any questions at any time, if you need to stop, if your screen freezes, anything like that, just indicate it, and I'm happy to stop and accommodate it.

So, we're here for oral argument because I had some issues that I wanted to resolve, and I will tell you before I begin where I'm headed, is to -- I'm concerned about certain deficiencies that I see in this second amended complaint, and to give the Plaintiffs another opportunity to amend following today's oral argument. That's where I'm sort of headed, and I'll give you a little bit of direction, I'll let everyone be heard, and then I'll make my ruling.

Before the Court is Defendant's motion to dismiss the second amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Lead Plaintiffs Ruth Pruitt and Mr. Delgado oppose the motion.

Here are a little bit of facts that are taken from the second amended complaint.

Plaintiffs bring this putative securities class action on behalf of all purchasers and entities besides Defendants who purchased shares of DBV on the NASDAQ between February 14th of 2018 and March 16th of 2020, which is the class period, alleging violations of section 10(b) and 20(a) of the Securities Exchange Act of 1934 as a result of

5

various claims and misrepresentations, false statements, and omissions by Defendant during that period.

Plaintiffs are individuals who purchased DBV shares during the class period.  DBV is a publicly traded company engaged in clinical-stage specialty biopharmaceuticals.

During the class period, Defendants Daniel Tasse and Mr. Benhamou served as DBV's CEO, as well as other ranking executives are named as individual Defendants.

Plaintiffs claim cases based on DBV representation to investors surrounding its ability to bring the Viaskin Peanut, a patch worn on the skin and designed to treat peanut allergies, to market.  In developing the Viaskin Peanut, DBV developed a novel technology called the Viaskin patch.  The manufacturing process of the Viaskin patch is designed to use electrospray to spray a liquid solution of electrically charged proteins onto the patch which then solidifies and sticks to the patch.  Then when the Viaskin patch is applied to skin via an adhesive, it forms a condensation chamber, dissolving a protein.  The process is designed to generate an immune response in cells that results in desensitization to peanuts.

Again, this is all taken from the complaint.

In 2012 through '15, DBV received FDA fast track and breakthrough designations, designations reserved for

CHARLES P. McGUIRE, C.C.R.

6

products meant to treat serious or life-threatening conditions and which have demonstrated positive trial results through clinical evidence to the Viaskin Peanut. Although these designations help speed up potential FDA approval of a product to market, the biologic must still go through the Biologic License Application -- known as a BLA -- approval process.  The BLA is a request for approval to market the biologic for one or more specified indications and must contain proof of safety, purity, potency and efficacy.

Prior to the submission of a BLA, a biologic must go through preclinical laboratory testing as well as human clinical trials, and the results of these trials must be evaluated for safety and efficacy.  Then the results of the trials as well as information about the manufacturing process are submitted to the FDA as part of the BLA in order to ensure product quality.  Once the BLA submission is accepted by the FDA, the FDA has 60 days to conduct a preliminary assessment of the BLA to determine whether it will be accepted for full review.  If accepted for full review, the FDA will review the BLA to determine, among other things, whether the proposed product candidate is being manufactured in accordance with current Good Manufacturing Practice to assure and preserve the product candidate's identity, strength, quality, purity and potency.

CHARLES P. McGUIRE, C.C.R.

7

Again, this is all from the complaint.

Ultimately, the FDA either issues an approval letter authorizing commercial marketing of the product or a complete response letter indicating that the product is not approved in its current form and identifying deficiencies in the BLA.

On February 14th, 2018, DBV announced that the FDA agreed that the available efficacy and safety data for the Viaskin Peanut was sufficient to support the submission of a BLA and that DBV planned to submit the BLA in the second half of 2018.

DBV submitted the BLA on October 22nd, 2018.  On December 19th, 2018, two days prior to the expiration of the 60-day window of FDA assessment, DBV announced that it was withdrawing the BLA based on conversations it had with the FDA about a need for additional detail with regard to data on manufacturing and quality control.

On February 13th, 2019, DBV announced that it would resubmit a BLA, and on August 7th, 2019, DBV announced that it had resubmitted a BLA for the Viaskin Peanut.

On October 4th, 2019, DBV notified investors that the FDA had accepted the BLA's filing for review, but on March 16th, 2020, DBV disclosed that the FDA had identified new questions regarding efficacy, including the impact of patch site adhesion on efficacy.  DBV explained that based

CHARLES P. McGUIRE, C.C.R.

8

on these questions, it may need to submit new information to the FDA which may constitute a major amendment for the BLA and could extend the target action date.

Plaintiffs contended throughout the class period DBV made misleading and false statements about the Viaskin Peanut and the ultimate likelihood of BLA approval. Although Plaintiffs mentioned a slew of statements made by DBV in press statements at conferences and to investors, those statements generally surround two subjects:  First, DBV's ability to scale up its operation to bring the Viaskin Peanut to market, and, two, the patch adhesion element of the Viaskin Peanut.

First, Plaintiffs contend that DBV made statements indicating that it would be ready to scale up operations for commercialization and for that on the manufacturing side, things were on track.  According to Plaintiff, these statements were false and misleading because Defendants knew the company suffered from serious chemistry, manufacturing and control shortcomings and DBV lacked adequate manufacturing procedures and quality control to support its BLA for FDA approval.

In support, Plaintiff relies on the testimony of three confidential witnesses.  These confidential witnesses generally stated that they were skeptical of DBV's ability to scale up its production for commercialization, and they

CHARLES P. McGUIRE, C.C.R.

9

also stated there were problems with electrospray technology.  None of the confidential witnesses were employed by DBV during the class period.

Second, Plaintiffs contend that DBV made a series of omissions and misstatements about the likelihood that the Viaskin Peanut would be approved by FDA because DBV knew as early as 2017 that the Viaskin Peanut was experiencing adhesive issues and that it was highly unlikely that it would be approved.  In support, Plaintiffs cite to the testimony of the confidential witnesses, but also rely on results of the 2017 PEPITES trial, which purportedly failed to meet a numerical level of adhesion prescribed by the FDA.

So, I think that's a pretty accurate recitation of the facts.

I see there are two different strains of actionable conduct here.  One centers around the operations, we'll call it the manufacturing issues, and then the other has to do with the adhesive issues.

So, I'd like to talk first about and I have some questions for Mr. Rosen about the adhesive issues.

So, I looked at the second amended complaint.  I see that you allege that there were both intentional -- there were omissions and intentional misrepresentations, I think it's in paragraph 215, that there were misrepresentations, that Defendants made misrepresentations

CHARLES P. McGUIRE, C.C.R.

10

and failed to disclose material facts.

Are you alleging in this case that the Defendants had a duty to disclose whatever problems existed with this adhesion with respect to the peanut patch?

MR. ROSEN:  Yes, Your Honor, we are.

There are three bases for duty to disclose, generally.  One is that a statute or regulation requires disclosure, and that's not at issue here; two is if the Defendant is selling stock, and that is an issue here because the Defendant here sold over half a billion dollars of stock to the public during the class period; and the third basis for disclosure which is at issue -- which is also at issue here is that once a defendant speaks on topic, they are required by the securities laws to speak truthfully, completely, and to ensure that they include all other information so that the statements they've made about the topic do not mislead investors in any way.

And so, here, having, you know, undergoing a series of four large public offerings totaling over a half a billion dollars during the class period, all of which were completed shortly after misleading statements --

THE COURT:  Let me stop you for a second.

So, let's talk about the last one, that once you speak on something, you have a duty to continue to clarify it.

CHARLES P. McGUIRE, C.C.R.

11

The only thing I saw about the comments about the adhesion issues was in paragraph 142, at a conference, where Mesa stated that DBV was doing some adhesion testing.

Where else did Defendants speak affirmatively about adhesion testing?

MR. ROSEN:  Yes, Your Honor.  Well, so let's start with the first misleading statement.

The class period begins February 14th, 2018. That's paragraph 123 of the amended complaint.  The press release says that the FDA agreed that the available efficacy and safety data for the Viaskin Peanut supported the submission of the BLA.

Now, they're stating that the FDA has agreed that the efficacy data supports the BLA.  And yet, at the --

THE COURT:  I'm looking at -- let me stop you.

123, there's a press release.  Where does it talk about the adhesion?

MR. ROSEN:  Well, the press release is also -- the full press release -- let me see -- it says, the first paragraph, it says, "DBV Technologies today announced that the U.S. Food and Drug Administration (FDA) has agreed that the available efficacy and safety data for Viaskin Peanut supports the submission of the biologics license application for the treatment of peanut allergies."

THE COURT:  Listen, it says it supports the

CHARLES P. McGUIRE, C.C.R.

12

submission of a license.  One, it doesn't say anything about adhesion, and, number two, it doesn't say anything about, we're going to get approval.

And I say this for this reason, Mr. Rosen: --

MR. ROSEN:  Yes.

THE COURT:  -- you're going to have a hard time convincing me that this is a reflection of the Defendant speaking on a topic that now imposes a duty for him, for it in the future to speak, because, under your theory, if they ever say anything about, we're hopeful that we're going to get approval, that we think -- we're hopeful that they've agreed to accept our application, that means they have a duty to report everything about, every single detail of the clinical trial, every detail of every issue that may affect this?

That's not the law.

You need to say, I've spoke it -- if the president of the company said, We are so excited about the adhesion, it's amazing, it's like 95 percent, it's not coming off, it's going to get it done, then, yes, you're right:  They may have a duty to follow it up if they have data that says something contrary.

But they can make some vague comment at a press release about, We're excited that they're letting us submit a license, an application.  That means they've spoken on a

CHARLES P. McGUIRE, C.C.R.

13

topic?  There's nothing in your complaint where they spoke on a topic.  There's one time where they said, in paragraph 142, that they're doing some adhesion testing.  To me, that's not speaking on the topic.

So, I get back to -- so you're saying -- the second point was -- okay.  Anywhere else in this complaint where you can show me where they have spoken on the topic of adhesion?

MR. ROSEN:  Yes.  They were speaking on the topic of efficacy, and they --

THE COURT:  I didn't say efficacy.  You know what efficacy means?  Efficacy means it's working.  So, you can't take the word, since they're saying, we're hopeful about efficacy, we're confident about efficacy, and say that means -- that means, under your theory, it completely expands the definition of the duty to disclose; anything touching on efficacy in the broadest sense possible, then they have a duty to disclose.

That's not the law.  The law is, if you speak on a topic specifically, you then have to follow up.

Efficacy is a broad topic.  That's saying, I think it's a good drug.  That's really all efficacy says:  I think it's a good working drug.

That's not enough.

You show me in this complaint where they speak

CHARLES P. McGUIRE, C.C.R.

14

about, in the context -- we're talking about the context of where you have a duty to disclose.  Show me.  There's nothing where they talk about a material representation where they have spoken on the topic, other than broad statements.

MR. ROSEN:  Yes, Your Honor.

So, before I point to another paragraph, I'd like to just clarify that the issues with patch adhesion relate to both chemistry, manufacturing, quality control, the CMC, as well as efficacy.

THE COURT:  Well, let's stop for a minute.

That's really expanding it to mean everything, because, when you say manufacturing problems means patch adhesiveness, I think it's the equivalent of having a product liability case and having a manufacturing defect and a design defect.  The patch problem is a design defect.  Your whole complaint goes to, it can't hold, it doesn't administer the medicine properly, it doesn't stay on the arm; it's not adhesive, people are not going to get the medicine they need.  That's a design defect, as opposed to, once I have the design down, can I get it up to speed, can I manufacture it.

Two very separate theories.

And most of your theory is the design, that they didn't have the design, the patch efficacy.

CHARLES P. McGUIRE, C.C.R.

15

The efficacy, in terms of the 90 percent, didn't have to do with manufacturing, it had to do with design:  We have to design a patch that the science can allow to stay on the arm to deliver the medicine.  And that was the problem.  That's design.

So, you can't just have this broad view that because you have to manufacture the patch, that anything dealing with manufacturing or efficacy relates to adhesion.  I don't buy it.  It would be a gross expansion of how we look at material misrepresentations or omissions.

MR. ROSEN:  Well, I think when they say things that, like, we are ready on our CMC requirements, and the CMC requirements definitely include patch site -- patch adhesion, that it's related.  And, I mean, the entire company is a patch company.  They're a transdermal patch company.  Their first product, their farthest along is the peanut allergy, but they also have an egg allergy and a milk allergy, and the whole existence of this company is staked on the company's ability to make a patch that sticks on someone's arm and effectively delivers a dose of antigen.  And because of the design defect -- so there was a manufacturing defect, there's a -- in the electrospray machine, so it doesn't have a consistent dose.  Then you have a problem with the design of the patch, it doesn't adhere correctly, so that's a design defect, requires a

CHARLES P. McGUIRE, C.C.R.

16

correction of the design, and then you have -- and that directly impacts efficacy, and that's the -- you know, the reason that they claim, the CRL that the FDA denied approval.

And if you look at the August 4th final complete response letter, the CRL, which is quoted, is cited in footnote 4 of our opposition brief, the -- you know, they admit that not only did the FDA say that it wasn't effective because it didn't adhere, they also said they had to do additional -- they had to do additional CMC work and redesign the patch.

So it was --

THE COURT:  That was in 2020; correct?  That was in 2020?

MR. ROSEN:  August 2020.  But the FDA --

THE COURT:  The PEPITES study starts in '15.

MR. ROSEN:  Right, but all of -- all of the --

THE COURT:  Right.  So let's just get the dates right.  '15, in February; '18, they say we're going to submit the first BLA; October, they submit it, of '18; December, they withdraw it, lack of manufacturing procedures and quality control, no specific reference to the patch.

February 13th, they resubmit the BLA as announced, they actually resubmit it in August of '19, and then they make a -- in March of '16, they notify that FDA found new

questions regarding efficacy and patch efficacy.  They don't just say efficacy, they say patch efficacy specifically, and they made a major amendment.

So, I go back to where I'm going to give you a final opportunity, Mr. Rosen, to plead this, and if the best you have is -- let me go backwards for a minute.

If you're going to argue that you have a duty to -- you have a duty to disclose, okay?  You said the third one is once they spoke on the topic.  You're going to have a hard time convincing me that general statements about drug efficacy is going to be enough to impose a duty.  You can try it; I'll give you a full -- you can brief it, but I want you to know what I'm concerned about.

The second thing you said was -- it actually doesn't count.  Selling stock imposes a duty to disclose?

MR. ROSEN:  Yes, Your Honor.

THE COURT:  To disclose what?

MR. ROSEN:  All material information relevant to the value of the stock.

So, if you look at the case they cite, Oran v. Stafford, in their brief, 226 F.3d 275 at page 286, the 3rd Circuit says that a company trading in its own stock creates a duty to disclose.  Actually, what they say is, that particular complaint did not allege that the issuer was trading in its own stock during the relevant period, and

CHARLES P. McGUIRE, C.C.R.

18

they address insider trading separately.  So when they use the term "insider trading," they're talking about either trading by the issuer company or trading by individual defendants.

Here, the trading is by the issuer company, and there's a lot of case law which, you know, if you have any doubt on that issue, we can provide.

THE COURT:  Just so I'm understanding your theory, your theory is, because the company was trading in the stock, they have to disclose everything about the product? Is that your theory?

MR. ROSEN:  No, no, Your Honor.  Material, non-public information relevant to the product that is at issue, because this was -- this is their sole product.  All of these public offerings, if you look at the facts here, all these public offerings occur immediately or shortly after a positive statement about the filing of a BLA, the plan to file a BLA, the acceptance of a BLA.  I mean, this is what is keeping these -- is making these -- letting these offerings happen.  And so when they're doing these offerings, they have a duty to disclose material information to the shareholders, and that's, I mean, that's one of the three bases for a duty of disclosure.

THE COURT:  Okay.  So, what I want you to do when you replead -- so let's talk about that in terms of the

19

patch.

So you're saying they had a duty to disclose before each BLA, or they had a duty to disclose throughout the class period?  What's your theory?

MR. ROSEN:  Immediately prior to their public offerings, they had a duty to disclose.  These are underwritten public offerings, so this stock is going out to the public, right?  It's no different than the guy who is --

THE COURT:  Right.  So, I want you to carefully articulate it.  It's not in your complaint.  I want to know exactly what your theory is.  They had a duty to disclose immediately prior to public offerings, and what did they know at that time that they had a duty to disclose?  Because a lot of your issues -- so you go back to what they knew, all right?  You talk a lot about that -- you talk a little bit about this whole SAP.  You know, Defendants say it's a Statistical Analysis Plan, which is a method for analysis as opposed to a criteria for judgment.  So you have to say that they had a duty to disclose that whatever exactly you say they knew at that time that they failed to disclose.  You need to tell me that, because they had a duty.  You're telling me the duty arose right before, immediately prior to the public offering.  Tell me what they knew that they should have disclosed.  That's the first thing.  And tell me how you knew it.

CHARLES P. McGUIRE, C.C.R.

20

So, you have three witnesses, and you have one of them that -- the third one is a consultant who talks about stuff he or she knew back two years earlier, that she heard about two years earlier.  Those witnesses, you're going to have to plead for me the who, what, where, when, and why, the details, what that third witness knew at the time, because you're telling me now the duty was immediately prior to the public offering, what they knew at the time that they should have disclosed.

Part of the Defendant's -- this is not clear-cut in terms of this whole adhesion thing.  They said this was a Statistical Analysis Plan.  It was a method to analyze as opposed to a criteria for judgment.  But under your theory, it didn't matter what it was, you had a duty to disclose it because it was material, that the patch -- the efficacy, the adhesive efficacy was not working.  To what degree wasn't it working?  What did they have to disclose?  What did they know before each of those public offerings?

That's not pled in this case.  I'm going to give you a chance to do it again.  I want it tied to the duty to disclose and omission.

Secondly, if you're going to have a theory based on it was a material misrepresentation, if your theory is, the misrepresentation was general statements about efficacy of the drug, tell me what those statements are.  I'm not

CHARLES P. McGUIRE, C.C.R.

21

inclined to find that those are enough, because there's only one statement, affirmative statement that I've alluded to, the Mesa statement in 2020 that says, you know, we're working on -- where is it? Right here. Paragraph 142: "Mesa stated that they're doing some adhesive testing."

I don't think that qualifies as speaking on the topic.

So, what you need to show me, if it's a material misrepresentation, is it all based on general statements about efficacy, and it was materially misleading because they didn't include precisely what they should have included about the testing. Is the testing -- is what they didn't include about adhesions going back to the 2015 PEPITES trial and the data that came out of that trial? Because, clearly, they were continuing to test; they said that. '15 is a long way away from '20. So in those five years, things change.

So I think you're going to have a hard time convincing me that there were some clinical data that predated the BLA that was now the basis for misrepresentations during the second public offering back in '19. You have to say to me they continued to know, they continued to study it, and they knew that it was going to fail, that it was likely to fail. I want that pled, because I want to know clearly what your theory is here so I can analyze it on a full record.

CHARLES P. McGUIRE, C.C.R.

22

MR. ROSEN:  May I just address --

THE COURT:  Or not even a full record.  I want to understand what your allegations are.  You throw a lot in the complaint, but the securities law says you've got to really be specific about misrepresentations and omissions, and I don't see that clarity enough for me to make a ruling without giving you the benefit of the doubt, which is what your theories are.

MR. ROSEN:  Your Honor, in order for me to amend the complaint, I just wanted to mention one thing, which is that we pled that -- once these trials closed in 2017, the trials were completed, and the data showed that the patch was not adhering sufficiently, it had failed the test, that if they were going to make any changes, whether it's changes to the machinery or changes to the patch design or anything else, any change to the product would require additional testing, a new test, a new clinical test in order to get FDA approval, because the product that you ultimately sell to consumers has to be the identical product that was tested on the humans in the clinical trial.  So if they after the closing --

THE COURT:  Can I stop you for a minute?  Can I ask you a question, then?

MR. ROSEN:  Sure.

THE COURT:  If that's the case, then the FDA

CHARLES P. McGUIRE, C.C.R.

23

accepted the BLA based on that clinical trial and all the alleged fraud was in it; correct?

MR. ROSEN:  Well, this is -- this is why --

THE COURT:  They had to get permission to file a BLA, right, after, following the clinical trial.

MR. ROSEN:  Right.  So --

THE COURT:  So you got permission, and the FDA saw that, and they saw it and they allowed them to file it anyway under your theory, so the data in '15 was sufficient for the FDA.  The FDA never said a word about that in 2020.

MR. ROSEN:  But, Your Honor, we say that when they say the FDA agreed it was safe and effective enough to file a BLA, we're saying that's a false and misleading statement, because simply filing a BLA, the FDA is accepting it for review, and all they're saying is, the package is complete. When they accept something for review, they're saying, all of the modules have been submitted, and we have all the -- you know, all the data that is ordinarily required from what we can -- from our initial review is there.  They're not -- when they accept it for review, they're not passing on its safety and efficacy.

They went further here.  They took an additional step, an additional liberty and they said, the FDA has agreed that the safety and efficacy results support filing, which is different than just saying they've accepted it for

CHARLES P. McGUIRE, C.C.R.

24

review.

And so we say it's a false statement, because the FDA did not agree that safety and efficacy results support filing, they're just saying they're going to accept it for review. I mean, and then ultimately, they didn't accept it for review. It was withdrawn. So it's clearly a false statement.

And in any event, my point that I just want to make, Your Honor, is that it doesn't matter that these witnesses left, you know, at the start of the class period, because any -- no change would have permitted the BLA to be successful. Any change would have required additional clinical trials, another two- or three-year delay, which was part of the motive here for the --

THE COURT: Let me stop you for a minute, because what you do in your complaint, frankly, is, you mix a lot of facts up and you throw it all at me. So let's put the patch aside for a minute, and let's talk about the manufacturing defects, because that is what the witnesses talk about.

MR. ROSEN: Yes, Your Honor.

THE COURT: They don't say much about the adhesion at all. They talk about -- and this is why --

MR. ROSEN: They don't talk about what, Your Honor? I couldn't hear.

THE COURT: The adhesion, the adhesive, the

CHARLES P. McGUIRE, C.C.R.

25

efficacy, the adhesion efficacy.  They talk about manufacturing.

I can read you all of it.  It's contained in paragraph 106.

So you're right that you have -- you submit the PEPITES trial, and then you continue to get your manufacturing up to speed.  You don't have to have your manufacturing -- you don't have your manufacturing plant ready to go at the time that you do a clinical trial in '15.  You continue to work, but you get up to speed, you work on it.  So timing matters a lot with a manufacturing plant, right?  So you can't say, I have a plant ready to go; as soon as you approve this, I can get it done.  You continue to get your plant up to speed.

So what the Confidential Witness 1 says, she worked there -- I'm okay when she worked there, '15 to '17.  She recalled they were significantly behind in scaling up and they had a long way to go.  That's her testimony at page 107.  She actually said that the electrospray has the potential to be amazing technology but that the technology was not scaled up.

What you need to do on this second one is tell me -- she worked there from '16 to '17.  They didn't submit the BLA, the first BLA until October of '18.  She had no information about the manufacturing effort post, I would

26

take it, August '17.  So you at least have to tell me between that one-year frame some detail about what she saw, what she based it on.  Was it her opinion that they had a long way to go?  Because you just said that the company had certain elements in place, such as financing, and the company had a long way to go in regards to scaling it up, and that she said that based on what she saw, the technology was not scaled up.  So it's nothing anyone told her; it's what she saw as a supply chain director.

So you have to tell me what she saw, when she saw it, how she concluded, and did she know anything about how those -- the scope of her knowledge ends in '17, because, if they didn't have to -- if they weren't told until December of '18 that there were quality control and manufacturing problems, her knowledge, at the latest, was, you know, over a year earlier, when she was there.

And that's my problem.  I wouldn't expect the company to be -- she said it was an amazing technology, and -- not that anyone told her, but her visual was, her impression was they had a long way to go.

I don't know what that means.  You've got to give me more data.  What did she see?  What did she base it on?  Did it end at August of '17?  When did she see it?  When did she make those two trips?

The second one is -- the same defect with the

CHARLES P. McGUIRE, C.C.R.

27

second CW.  Significant problem -- oh, wait, CW talks about the problem with the stability of the Peanut patch.  This may have been reflective for design -- what is this based on?  She's a regional supply person.  Did someone tell her?  Does she have a degree?  Does she understand scientific biomedical designs?  She just seems like she recalled they had been designed in this way, this may have been a poor design.  She's a regional -- a supply chain person opining about her views like an expert about a design.  What's that based on?  Is it based on conversation?  She couldn't discern that based on viewing the manufacturing plant.  She had to have conversations with someone.  I want to know what the conversations were, when the conversations took place, who said what to whom, when, where and why.

She said that she learned some of this from a vice president of manufacturing.  Tell me what he said to her.

She said she had conversations with someone, and I want more detail about that, because we're hearing secondhand what she heard, without any dates or exactly what he told her, the best that she can recall what he told her.

That's about CW-1.

CW-2, also, same thing.  She visited twice.  When?  Didn't have experience; did not believe they would be realistically able to submit the BLA any time soon.  And so I want more detail with the senior director of marketing

CHARLES P. McGUIRE, C.C.R.

28

during her time between April -- again, she was up there right through February of '18, when they announced that they would be submitting a BLA, but I need more details about exactly what she knew and who she talked to.

And third, I don't know what to do with CW3. She learned that this development -- she learned that there were problems in 2018 because of manufacturing problems. What was that? Who did she hear that from? What did she hear exactly a year later, or what did she learn in '19 about something that happened in '18?

I'm just going to pause a minute and give the Defendants an opportunity to respond on these two topics, and I'll go back to Mr. Rosen.

MR. BAUMSTEIN: Sure, Your Honor. Very quickly, obviously, you know, it's not a surprise to you that I agree with your analysis here, and, you know, starting I guess first with the patch adhesion issue, you're a hundred percent correct that there's just not a duty to disclose in this circumstance because there's no nexus between patch adhesion and anything the company ever talked about.

And, you know, and I know obviously we cited cases in our brief, but I definitely would commend you, Judge, to Judge Wolfson's decision in Hoey v. Insmed, where it I think really addresses the materiality issue, which is really what the Plaintiffs are saying: Hey, this is material, so you

CHARLES P. McGUIRE, C.C.R.

29

had to disclose it.  But that's not the law, and you're correct there.

And then the second thing, and, of course, this is, you know, not -- the larger failing overall is, of course, the company didn't know that patch adhesion was an issue.  The only evidence that patch -- the first time patch adhesion is raised by the FDA as a concern is not within the 60 days after the submission; it's not when the FDA tells the company that it can go ahead and make the application.  It's a year and a half after the fact.

Now, obviously that caught the company by surprise, but naturally there's a --

THE COURT:  Let me stop you for one minute and ask you just a clarification.

Do you get a letter from the FDA?  Is it an oral conversation, or is it a letter, and has that been disclosed?  Do they have it?

MR. BAUMSTEIN:  So, I believe, and I can double-check, that those are oral communications.  So I know for a fact that the December 19th or 18th communication was a phone call.  They said, we want to talk to you about your BLA.  They went through a number of very detailed issues concerning data, again, not actually manufacturing, but data, the company took notes, and as a result, you know, said, we know what to do when we do this, and also obviously

CHARLES P. McGUIRE, C.C.R.

30

made the decision to withdraw its BLA, and promptly reported that to the market.  It was, in fact, a relevant fact, and lots of courts have found that, you know, when you properly report things from the FDA, that's indicative of a lack of scienter.

Then, further on, when the company does eventually in March 2020 get the first word that the FDA believes patch adhesion is an issue -- and I should point out that patch adhesion in the 20 or 30 pages talking about the importance of -- that identifies both the efficacy and safety end points of the study, patch adhesion is not one of those.  It's just not mentioned.

But what happens, and you can actually see this in paragraph 193 of the complaint, when Mr. Tasse explains what was happening and why they were caught off guard by this, the company obviously disagreed that patch adhesion mattered.  You know, and the law is pretty clear that, you know, to be misleading, it's very important that, you know, I think -- I like the way the Court in Abiomed, 778 F.3d 228, says it:  "For an omission case, the key question is not whether defendants had knowledge of certain undisclosed facts, but rather whether the defendants knew or should have known that a failure to disclose those facts presented a danger of misleading buyers or sellers."

So what Mr. Tasse says is, we believe that patch

31

adhesion is not a factor in clinical outcome, and then he explains why.  Right?  What he says is -- you know, first of all, the reason that patch adhesion comes out, that we even believe that there's a patch adhesion issue is that this is a patch for children four to 11 years old.  They scratch at it.  If they scratch at it and the patch comes loose, that doesn't mean that it's not efficacious or safe, the drug.

But, more importantly, and this is actually kind of the key thing that he says, and there's no -- there's no facts at all --

THE COURT:  Where did you see this?

MR. BAUMSTEIN:  It's paragraph 193.

THE COURT:  Okay.

MR. BAUMSTEIN:  What he says is, we also did -- they also analyzed the people for whom the patch didn't adhere as well and said, and we did a subgroup analysis that showed similar clinical benefits in subjects reporting patch adhesion, and that to the subjects with patch adhesion issues, when they were compared to the general study population, the data, quote, "suggested no substantial impact on clinical efficacy."

In other words, the company just didn't know that this was an issue, right, and that was reasonable.  In retrospect, maybe it was wrong.  It clearly was.  The FDA had a concern later.  But none of that can possibly show why

CHARLES P. McGUIRE, C.C.R.

32

there was a concern at the time.

And that's why this, in all their efforts, they're never going to be able to replead because they can't show that the company believed beforehand that patch adhesion was an issue.  The facts show otherwise.  There's no allegations otherwise.

So, you know, I understand obviously you want to give them leave to replead, and certainly, you know, we think that that additional complaint will appropriately be dismissed as well, but it's important to know that they're not going to be able to get there, and it's not merely a matter of showing, you know, what was going on with the confidential witnesses, which I agree, as you pointed out, they really are inadequate here.  They just don't have the knowledge base, there's not enough detail about what they knew, and frankly, the time that they're talking about manufacturing issues are not there.

And then finally, I want to make just a last observation here on the manufacturing issues.

There really is a disconnect between the allegations that the Plaintiffs make and actually what the FDA said.  So what the FDA raised with the company, it says, we have issues with your data concerning manufacturing issues.  Whether that's a data retention or generation issue, it's not a matter with your manufacturing processes.

CHARLES P. McGUIRE, C.C.R.

33

And the actual allegations here are about the processes.  Now, granted, they're from six months or more beforehand, so they're irrelevant from a timing point of view, but they're also irrelevant, ultimately, you know, for showing that anything was ever falsely stated at the time.

I mean, the fact is, quite simply, and it's unfortunate, you know, companies that develop new drugs often don't get them approved.  And even, you know, the Plaintiffs cite an analyst report that they say how bullish it was, after everything gets resubmitted, that analyst report still identifies a 40-percent chance that the drug doesn't get approved.

It's very hard to get drugs approved.  The fact that it doesn't is not indicative of securities fraud.  It's just not how it works.

THE COURT:  Okay.

Mr. Rosen, anything further you want to add?

MR. ROSEN:  No, Your Honor.

THE COURT:  Okay.  So, I'm going to give you -- I'm going to dismiss this case, with leave to amend.  I'm going to grant the motion.  I'm going to give you leave to amend, and with this direction.

We haven't even talked about scienter.  That's the other thing that troubles me, because, you know, bad news and resignations is not enough.  You need a little bit more

CHARLES P. McGUIRE, C.C.R.

34

than that, and you don't have it here, unless you can change the other underlying allegations with somehow, some other confidential witnesses or some other evidence that shows something more that would demonstrate scienter.  What you have now isn't enough.  I want you to break down the ends for it, both factually and legally, the omissions and the misrepresentations.  I want you to talk about the two different threads, the adhesion efficacy, the manufacturing defects, deal with the issue of data that Mr. Baumstein brings up, as opposed to other, you know, problems with the manufacturing, and you deal with that by, I really need some meat on the bones of those CWs, which you don't have, the who, what, when, where and why, which is required under the law.

You see what my concerns are.  I'm going to give you a chance to replead, and my question is, how much time do you need?  Thirty days, 45?

MR. ROSEN:  Well, Your Honor, if we could get 45 days, it would be ideal.  It's obvious people are on vacation, and --

THE COURT:  Okay.  How about September 15th?  Does that work?

MR. ROSEN:  Yes, Your Honor, that would be great.

THE COURT:  All right.  So September 15th.  If you need more time, let me know, but that's a Wednesday.

CHARLES P. McGUIRE, C.C.R.

35

And then, Mr. Baumstein, whenever you -- 30 days, if you can refile your motion.

MR. BAUMSTEIN:  The only reason I don't want 30 days is I know I have a summary judgment case, a summary judgment motion due on October 15th in a case that's very big, so if we can get another -- make it 45 days, for October 30th.

THE COURT:  Okay.  So what I'm going to do is -- yes, why don't I tell Mr. Rosen that he can take until the end of September, then, give him 60 days to file his, okay?

MR. BAUMSTEIN:  Thank you.

THE COURT:  And that way, then you can have until -- what do you want?  Until the end of October?

MR. BAUMSTEIN:  Yes, I think 30 days probably should be enough.

THE COURT:  You're going to get October 1st.  Why don't we say November 15th?

MR. BAUMSTEIN:  Fine.  That works very well, Your Honor.

THE COURT:  Why don't we say November 12th.  It's a Friday, and that way all your associates won't have to work over the weekend.

MR. BAUMSTEIN:  I agree.  I don't like Monday due dates.  So, thank you, Your Honor, for your consideration.

THE COURT:  I like Friday due dates.

CHARLES P. McGUIRE, C.C.R.

36

So, it's Friday, and then, Mr. Rosen, how much time -- well, I'm sorry, you're going to file your -- so you guys can work out the rest of the schedule. So you see where I'm headed. Take the time you need. Mr. Rosen will file his brief sometime in November. I don't want to jam you up over December, but if you can get it in by the end of the year, that would be great, your opposition, maybe sometime in January for a reply brief.

But why don't you work out the dates, and I'll just put the dates in the amended complaint, and then a briefing schedule based on your vacations or any personal time. Whatever works for you works for me. Okay?

MR. ROSEN: Thank you very much, Your Honor.

THE COURT: All right. We're adjourned. Thank you.

MR. ROSEN: Thank you.

THE COURT: Take care.

MR. BAUMSTEIN: Thank you, Your Honor.

(Matter concluded)

CHARLES P. McGUIRE, C.C.R.

37

Pursuant to Section 753, Title 28, United States Code, the foregoing transcript is certified to be an accurate record as taken stenographically in the above entitled proceedings.

s/CHARLES P. McGUIRE, C.C.R.

CHARLES P. McGUIRE, C.C.R.