THE ROSEN LAW FIRM, P.A.
Laurence M. Rosen, Esq.
One Gateway Center, Suite 2600
Newark, NJ 07102
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

*Co-Lead Counsel for Lead Plaintiffs and the
Putative Class*

GLANCY PRONGAY & MURRAY LLP
Kara M. Wolke, Esq. (admitted *pro hac vice*)
1925 Century Park East
Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: kwolke@glancylaw.com

*Co-Lead Counsel for Lead Plaintiffs and the
Putative Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| TRAVIS ITO-STONE, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>DBV TECHNOLOGIES S.A., DANIEL TASSÉ, PIERRE-HENRI BENHAMOU, DAVID SCHILANSKY, and SUSANNA MESA<br><br>Defendants. | Case No. 2:19-cv-00525-MCA-AME<br><br>Motion Date: April 4, 2022<br><br>Document Filed Electronically<br><br>CLASS ACTION |

**PLAINTIFFS' OPPOSITION TO DBV TECHNOLOGIES S.A., DANIEL TASSÉ, PIERRE-HENRI BENHAMOU, DAVID SCHILANSKY AND SUSANNA MESA'S MOTION TO DISMISS THE THIRD AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................1

II.     STATEMENT OF FACTS AND SUMMARY OF NEW ALLEGATIONS .........................5

    A.  Defendants Touted DBV's Novel Electrospray Technology and Manufacturing, and Explained to Investors How the Patch Worked: It Had to Stick to Patients' Skin .................................5

    B.  The TAC Details Material Patch Site Adhesion Problems that Were Pervasive and Known to Defendants Prior to and Throughout the Class Period ...............................6

        1.  Adhesion Scoring Was an Essential Part of the Patch's Pivotal Phase III Study, the SAP Required a 90% Adhesion Rate, and Defendants Knew Prior to the Class Period that the Study Failed to Achieve It ..........................6

        2.  Trial Participant Complaints About Adhesion .................................7

    C.  The TAC Details DBV's Manufacturing and Quality Control Problems that Were Known to Defendants Prior to and During the Class Period ...........................8

    D.  DBV Conducted Multiple Class Period Offerings, Selling Over $550 Million In Shares to Investors, Thus Giving Rise to Heightened Disclosure Duties .................................9

III.    LEGAL STANDARD ..........................................................................................10

IV.     THE TAC ALLEGES FALSITY ...........................................................................10

    A.  Defendants' Failure to Disclose the SAP Adhesion Failure Was an Omission of Material Fact that Misled Investors .................................10

        1.  The SAP Adhesion Failure Was Material ......................................10

        2.  Defendants Had a Duty to Disclose the Known SAP Adhesion Failure ..........12

        3.  DBV's Purported Study-Related Risk Warnings Were Misleading ....................17

    B.  The TAC Alleges Actionable Misstatements About DBV's Manufacturing ...............17

        1.  Defendants Affirmatively Misrepresented DBV's CMC Readiness ..............17

        2.  Defendants Had a Duty to Disclose the CMC Problems Under Items 303 and 105 of Regulation S-K and as Sellers in the March 2018 Offering .................20

V.      THE TAC ALLEGES SCIENTER .........................................................................21

    A.  The CW Allegations Demonstrate Defendants' Contemporaneous Knowledge Of DBV's CMC And Quality Control Problems Prior To December 19, 2018 ..............21

B.    Defendants Knew or Recklessly Disregarded that Their Failure to Disclose the Patch's Adhesion Failure Risked Materially Misleading Investors ................................................24

C.    DBV's Reliance on Serial Fundraising Further Supports Scienter .................................26

D.    The Suspicious Timing of Benhamou's Resignation Supports Scienter........................27

E.    Defendants' Misleading Responses to Analyst Questions Supports Scienter .............27

F.    The Core Operations Doctrine Supports Scienter...........................................................28

VI.     THE TAC ALLEGES LOSS CAUSATION .............................................................................28

VII.    THE TAC ALLEGES DEFENDANTS' LIABILITY UNDER §20(a) ...................................30

VIII.   CONCLUSION...............................................................................................................................30

# TABLE OF AUTHORITIES

## CASES

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002) ...............................................................................23

*Anderson v. Abbott*,
*Lab'ys*, 140 F. Supp. 2d 894 (N.D. Ill. 2001) ..................................................14

*Bing Li v. Aeterna Zentaris, Inc.*,
2016 WL 827256 (D.N.J. Mar. 2, 2016) ............................................................13

*California Pub. Employees' Ret. Sys. v. Chubb Corp.*,
394 F.3d 126 (3d Cir. 2004) ..............................................................................16

*Carmignac Gestion, S.A. v. Perrigo Co. PLC*,
2019 WL 3451523 (D.N.J. July 31, 2019) ........................................................28

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*,
632 F.3d 751 (1st Cir. 2011) ...............................................................................3

*City of Omaha Police and Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
450 F. Supp. 3d 379 (S.D.N.Y. 2020) ...............................................................20

*Curran v. Freshpet, Inc.*,
2018 WL 394878 (D.N.J. Jan. 12, 2018) .....................................................*passim*

*De Vito v. Liquid Holdings Grp., Inc.*,
2018 WL 6891832 (D.N.J. Dec. 31, 2018) ........................................................11

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336, 342 (2005). ..................................................................................29

*Fire & Police Pension Ass'n of Colorado v. Abiomed, Inc.*,
778 F.3d 228 (1st Cir. 2015) ..............................................................................24

*Ieradi v. Mylan Lab'ys, Inc.*,
230 F.3d 594 (3d Cir. 2000) ..............................................................................11

*In re Adams Golf, Inc. Sec. Litig.*,
381 F.3d 267 (3d Cir. 2004) ............................................................. 4, 11, 12, 13

*In re Allergan Generic Drug Pricing Sec. Litig.*,
2019 WL 3562134 (D.N.J. Aug. 6, 2019) .........................................................13

*In re Discovery Lab'ys Sec. Litig.*,
2007 WL 789432 (E.D. Pa. Mar. 15, 2007) .......................................................18

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
  986 F. Supp. 2d 428 (S.D.N.Y. 2013) ...................................................................................19

*In re Fisker Auto. Holdings, Inc. S'holder Litig.*,
  2015 WL 6039690 (D. Del. Oct. 15, 2015) ...............................................................3, 13, 21

*In re Galena Biopharma, Inc. Sec. Litig.*,
  336 F. Supp. 3d 378 (D.N.J. 2018) ...................................................................................15, 16

*In re Innocoll Holdings Public Ltd. Co. Sec. Litig.*,
  2020 WL 1479128 (E.D. Pa. Mar, 25, 2020) ...........................................................................23

*In re Navient Corp. Sec. Litig.*,
  2019 WL 7288881 (D.N.J. Dec. 30, 2019) ...............................................................................28

*In re NVIDIA Corp. Sec. Litig.*,
  768 F.3d 1046 (9th Cir. 2014) ...............................................................................................15

*In re Par Pharm. Sec. Litig.*,
  2009 WL 3234273 (D.N.J. Sep. 30, 2009) ...............................................................................27

*In re Prudential Secs. Inc. Ltd. P'ships Litig.*,
  930 F. Supp. 68 (S.D.N.Y. 1996) ...........................................................................................20

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) ...............................................................................................23

*In re Safeguard Scis.*,
  2004 WL 2644393 (E.D. Pa. Nov. 17, 2004) ...........................................................................14

*In re Seagate Tech. II Sec. Litig.*,
  843 F. Supp. 1341 (N.D. Cal. 1994) .......................................................................................14

*In re Urb. Outfitters, Inc. Sec. Litig.*,
  103 F. Supp. 3d 635 (E.D. Pa. 2015).......................................................................27, 28, 29

*In re Viropharma Inc. Sec. Litig.*,
  21 F. Supp.3d 458 (E.D. Pa. 2014)...........................................................................................17

*In re Viropharma, Inc. Sec. Litig.*,
  2003 WL 1824914 (E.D. Pa. Apr. 7, 2003) ...........................................................................11

*In re Vivendi Universal, S.A. Sec. Litig.*,
  634 F. Supp. 2d 352 (S.D.N.Y. 2009) .....................................................................................30

*In re Zenith Lab'ys Sec. Litig.*,
  1993 WL 260683 (D.N.J. Feb. 11, 1993)...................................................................................14

iv

*Indiana Public Retirement System v. SAIC, Inc.*,
  818 F.3d 85 (2d Cir. 2016) ................................................................................................26

*Institutional Investors Group v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009) .........................................................................................*passim*

*Jaroslawicz v. M&T Bank Corp.*,
  962 F.3d 701 (3d Cir. 2020) ...........................................................................................16

*Kline v. First W. Govern't Secs., Inc.*,
  24 F.3d 480 (3d Cir. 1994) .............................................................................................12

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
  513 F.3d 702 (7th Cir. 2008) ..........................................................................................26

*M&T Bank Corp. v. Jaroslawicz*,
  141 S. Ct. 1284 (2021) ...................................................................................................16

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) .........................................................................................................10

*McCabe v. Ernst & Young, LLP.*,
  494 F.3d 418 (3d Cir. 2007) ...........................................................................................29

*Monk v. Johnson & Johnson*,
  2011 WL 6339824 (D.N.J. Dec. 19, 2011) .....................................................................24

*Mulderrig v. Amyris, Inc.*,
  492 F. Supp. 3d 999 (N.D. Cal. 2020) ............................................................................27

*Odeh v. Immunomedics, Inc.*,
  2020 WL 4381924 (D.N.J. July 31, 2020).................................................................*passim*

*Oran v. Stafford*,
  226 F.3d 275 (3d Cir. 2000) ................................................................................10, 14, 21

*P. Stolz Family P'ship L.P. v. Daum*,
  355 F.3d 92 (2d Cir. 2004) .............................................................................................17

*Rahman v. Kid Brands, Inc.*,
  736 F.3d 237 (3d Cir. 2013) ...........................................................................................23

*Rihn v. Acadia Pharm. Inc.*,
  2016 WL 5076147 (S.D. Cal. Sept. 19, 2016)............................................................18, 19

*Roberts v. Zuora, Inc.*,
  2020 WL 2042244 (N.D. Cal. Apr. 28, 2020) .................................................................23

*Roofer's Pension Fund v. Papa*,
  2018 WL 3601229 (D.N.J. July 27, 2018)......................................................23, 28

*Shah v. Zimmer Biomet Holdings, Inc.*,
  348 F. Supp. 3d 821 (N.D. Ind. 2018) ......................................................15, 20

*Shapiro v. UJB Fin. Corp.*,
  964 F.2d 272 (3d. Cir. 1992) ......................................................13

*Silverstrand Invs. v. AMAG Pharms., Inc.*,
  707 F.3d 95 (1st Cir. 2013) ......................................................15, 16

*Skiadas v. Acer Therapeutics, Inc.*,
  2020 WL 3268495 (S.D.N.Y. June 16, 2020)......................................................27

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)......................................................12

*Tomaszewski v. Trevena, Inc.*,
  482 F. Supp. 3d 317 (E.D. Pa. 2020)......................................................10, 12, 26

*Tse v. Ventana Med. Sys., Inc.*,
  1998 WL 743668 (D. Del. Sept. 23, 1998) ......................................................14, 21

*Twin Master Fund, Ltd. v. Akorn, Inc.*,
  2020 WL 564222 (N.D. Ill. Feb. 5, 2020)......................................................20

*Vanderhoef v. China Auto Logistics Inc.*,
  2020 WL 5105243 (D.N.J. Aug. 31, 2020)......................................................29

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
  2015 WL 3755218 (E.D. Pa. June 16, 2015)......................................................27

## REGULATIONS

17 C.F.R. §229.105......................................................15, 21

17 C.F.R. §229.303......................................................15, 20

17 C.F.R. §240.10b-5......................................................12

Lead Plaintiffs Ruth Pruitt and Asdrubal Delgado ("Plaintiffs") respectfully submit this opposition to Defendants' motion to dismiss (ECF No. 67; the "MTD") the Third Amended Class Action Complaint (ECF No. 63; the "TAC" or "Complaint").[1]

## I.      **INTRODUCTION**

DBV is a clinical stage biopharmaceutical company that has operated at a loss since its inception. The TAC alleges that Defendants misrepresented and omitted material information regarding DBV's Biologics License Application ("BLA") for its lead product candidate during the Class Period,[2] Viaskin Peanut, an adhesive skin patch intended to treat peanut allergies in children ("the Patch"). During the Class Period, Defendants sold over half a billion dollars of DBV stock to investors in four public offerings at prices artificially inflated by their misstatements and omissions.

Defendants misled investors in two material ways. First, Defendants misrepresented DBV's manufacturing readiness, claiming that DBV had "[f]ully scalable, launch-ready manufacturing capabilities in place for Viaskin Peanut." ¶164; *see also* ¶¶58, 160, 180. In truth, DBV could not produce the Patch consistently and uniformly at scale because DBV's novel electrospray technology constantly malfunctioned, with spray heads becoming clogged, disrupting production. ¶¶121-138, 147, 154. DBV's machine failed to consistently and uniformly spray the correct amount (250µg) of the active pharmaceutical ingredients ("APIs")—a peanut protein—onto the Patch. Demonstrating proof of such consistency and uniformity of production was an essential element of the FDA's review of DBV's chemistry, manufacturing, and controls ("CMC") and compliance with current good manufacturing practices ("cGMP"), and was required for FDA approval. *E.g.*, ¶¶80-84, 92-94, 120, 155.

Given Defendants' assurances of DBV's manufacturing readiness, investors were stunned

---

[1] Defendants are DBV Technologies ("DBV" or "the Company"); DBV's co-founder and first CEO, Pierre-Henri Benhamou ("Benhamou"); its successor CEO, Daniel Tasse ("Tasse"); its deputy CEO, David Schilansky ("Schilansky"); and its Chief Business Officer, Susanna Mesa ("Mesa").

[2] The Class Period is February 14, 2018 through August 4, 2020, inclusive.

when DBV suddenly withdrew the BLA on December 19, 2018, citing "insufficient data on manufacturing procedures and quality controls[.]" ¶190. DBV's share price immediately fell 60%, from $14.15 to close at just $5.76 per share on December 20, 2018. ¶191.

In previously dismissing the CMC-related claims, the Court held that Plaintiffs failed to allege Defendants' knowledge of the manufacturing problems prior to announcing the BLA withdrawal. Defs. Ex. 1 ("Tr.") at 19:13-24, 21:21-25. The TAC remedies this by adding significant detail from CW1, who recalled that DBV executives were aware of significant manufacturing problems prior to the Class Period. ¶¶121-138, 147. As CW1 details, Pascale Ehouarn—DBV's SVP of Production and Supply and CEO Benhamou's "right hand"—admitted to CW1 in December 2016 that DBV's manufacturing capabilities were significantly "behind schedule." ¶¶135-37. DBV did not remedy these problems prior to submitting the BLA in October 2018. *E.g.*, ¶¶153-54. DBV's withdrawal of the BLA in December 2018 for insufficient data on manufacturing and quality control confirms this.

Defendants downplay the BLA withdrawal, characterizing it as a mere need to give the FDA more "data" on manufacturing rather than reflecting any actual problem with DBV's manufacturing capabilities. MTD at 2. This ignores the TAC's well-pled allegations that DBV had insufficient data on CMC and quality control in the BLA *because* its machinery was incapable of consistently producing the Patch. Because DBV's CMC was not "launch-ready," DBV could not provide the FDA with sufficient manufacturing data necessary to support the BLA. If DBV merely needed to *hand over* more data to prove its CMC and quality control readiness—rather than *generate* more data to prove its CMC and quality control readiness—DBV would not have taken the drastic step of withdrawing the BLA.

Second, Defendants misled investors by omitting that in the pivotal Phase III trial (the "PEPITES" trial) the Patch failed to demonstrate a 90% adhesion rate, as the FDA required pursuant to the Statistical Analysis Plan ("SAP") governing the trial. ¶15, 28. DBV announced PEPITES data in October 2017. Thus, Defendants knew prior to and during the Class Period the Patch failed to meet

2

the 90% adhesion rate. Defendants did not disclose this until March 26, 2020. ¶¶257, 260. And when Defendants finally revealed the failure, including that the FDA "identified questions regarding [the Patch's] efficacy, including patch-site adhesion[,]" DBV's share price plummeted 52% (from $5.26 to $2.54). ¶¶ 31, 258. Then, on August 4, 2020 DBV's share price fell 37% when the FDA issued a complete response letter ("CRL") rejecting the BLA because of the adhesion problem. ¶¶263-64.

In dismissing Plaintiffs' adhesion-related claims, the Court held that Plaintiffs failed to allege facts giving rise to a duty to disclose the adhesion failure. Specifically, the Court expressed doubt that Defendants' general claims about the Patch's efficacy, or about eventual FDA approval, gave rise to such a duty.[3] The TAC articulates in detail the sources of Defendants' disclosure obligations under the securities laws. First, because Defendants described in detail *how* the Patch should work—by sticking to the skin and forming a sealed "amniotic chamber" to aid perspiration and absorption of the API (¶¶162, 182)—they were duty bound to disclose that the Patch in fact *did not stick as designed or intended.* Defendants knew of this fundamental failure based not only on complaints from study participants and nurses, which the TAC alleges in detail (¶¶110-118), but based on the PEPITES trial data that failed to meet the 90% adhesion rate. ¶260. This omission was material: if the Patch did not sufficiently stick to the skin, it risked losing potency. ¶11. Accordingly, Defendants "knew or should have known that their failure to disclose those facts presented a danger of misleading" investors. *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*, 632 F.3d 751, 758 (1st Cir. 2011).

Second, because DBV sold over half a billion dollars of shares to investors during the Class Period, Defendants "assume[d] an affirmative duty of disclosure" of material information that "would affect [investors'] investment judgment." *In re Fisker Auto. Holdings, Inc. S'holder Litig.*, 2015 WL 6039690, at *15 (D. Del. Oct. 15, 2015). Accordingly, Defendants were required to either disclose the adhesion failure in each of the Class Period offering documents, and the CMC problems in the March

---

[3] *E.g.*, Tr. at 8:6, 9:4-9, 11:6-15, 17:9-13.

3

2018 offering documents, or abstain from selling stock. ¶¶171-72, 215. <u>Third</u>, Items 303 and 105 of Regulation S-K required DBV to disclose both the adhesion failure and the CMC problems. Under Item 303, these issues constituted "events" or "uncertainties" that were "reasonably likely" to have an adverse impact on DBV's financial condition. ¶¶266-73. Under Item 105 both the adhesion failure and CMC problems were material factors that made investment in DBV speculative or risky. ¶275.

In parrying the Complaint, Defendants assert that their omissions were immaterial. But such materiality arguments are not properly resolved in Defendants' favor on a motion to dismiss. The CMC problems and SAP adhesion failure were not "so *obviously unimportant* to an investor" as to render the challenged statements and omissions inactionable as a matter of law. *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 275 (3d Cir. 2004). Defendants also impermissibly contest the TAC's allegations by arguing that the SAP's adhesion criteria was not actually a "requirement" and/or that it "did not exist." *E.g.*, MTD at 1, 6, 8, 19. But the SAP plainly states: "***Patch adhesion will be considered as acceptable if more than 90% of the patches*** at the expected time of patch removal…, ***have an adhesion score of less than or equal to 1***…." ¶106. Faced with this language, Defendants assert the provision was "a method of analysis, not a criterion for judgment." MTD at 9. Not so. The SAP makes clear that 90% adhesion is a criterion for *judging* whether the FDA will view adhesion as acceptable. The ***method*** is the 0 to 3 scoring system, the ***criteria*** is that 90% of Patches must score equal to or less than 1. Defendants' assertion is further belied by Tasse's statement that "***the adhesion rate that was prespecified by the FDA***…was that ***<u>90% adhesion rate was required.</u>***" ¶260. Because the Court must construe all inferences in Plaintiffs' favor and accept the TAC's factual allegations as true, the Court cannot credit Defendants' far-flung assertion that the adhesion criteria was "nonexistent."

Finally, this is not a fraud by hindsight case. The TAC alleges contemporaneous facts showing that Defendants' statements about the Patch's manufacturing readiness and how the Patch worked, in light of the concealed adhesion failure, were knowingly false and misleading when made. ***All*** of

Plaintiffs' claims are based on then-existing information, known to Defendants, that they consciously or recklessly misrepresented to or concealed from investors. That the FDA *did* eventually point to the CMC and adhesion problems—again, both of which were known to Defendants all along—in first delaying the BLA and then denying approval only reinforces Plaintiffs' claims about the severity of the problems, and clearly alleges loss causation. The Court should deny Defendants' motion.

## II.     STATEMENT OF FACTS AND SUMMARY OF NEW ALLEGATIONS

### A.     Defendants Touted DBV's Novel Electrospray Technology and Manufacturing, and Explained to Investors How the Patch Worked: It Had to Stick to Patients' Skin

The Class Period begins on February 14, 2018, when DBV announced that the FDA agreed that "available efficacy and safety data for Viaskin Peanut supports the submission" of a BLA and that "DBV remains on track to submit its BLA in the second half of 2018." ¶156. DBV explained how the Patch was supposed to work: "Viaskin is based on epicutaneous immunotherapy, or EPIT®, ***DBV's method of delivering biologically active compounds to the immune system through intact skin***."[4] In other words, DBV stated the Patch stuck to the skin allowing absorption of the API.

On February 22, 2018, DBV's COO specifically discussed "CMC and manufacturing."[5] ¶160. He emphasized DBV's technology, explaining "we spray the protein or the peptide that we need on through an electric field of 20,000 volts" (¶160), and conceding that "[t]he antigen has to be present in a certain manner, with a certain dose, in a very soluble manner." ¶182. He also emphasized DBV's CMC readiness, claiming "***we've been able to actually bring everything up to speed in order to scale up*** our activities" and, from a manufacturing standpoint, "***we are ready to launch that drug***." ¶160.

The TAC details that the COO further explained how the Patch supposedly worked:

[The Patch] is not a standard patch. It's called epicutaneous patch. It presents protein. ***It has this condensation chamber…. It leverages the perspiration of the skin in order***

---

[4] DBV repeated this in virtually every press release during the Class Period. *E.g.*, Defs. Exs. 13, 14, 16.
[5] The FDA's review and approval of a sponsor's CMC is required to ensure that products are manufactured consistently to maintain standards of efficacy and quality after drug approval. ¶¶82-84.

*to solubilize the allergen* to present it to [indiscernible] dendritic cells. So *it's a very precise and sharp device and approach*.

¶182.[6] Defendant Benhamou also explained to investors in detail how the Patch *supposedly* worked:

> [T]here is no adjuvant and no glue on this patch and there is a central membrane and the protein stick on the central membrane of the patch by electrostatic forces. And *when you apply the patch on the skin, there is a sort of chamber between the skin and the patch. It's an amniotic chamber, and it enhances the perspiration*. Very quickly, *all the protein is in solution in the moisture and the hydration of the skin under the patch is extremely important, allowing the protein to diffuse in the superficial layer of the skin*. And this is a very original approach, of course.

¶162; Defs. Ex. 2 at 2-3. But the Patch did not work as described. It did not stick as intended.

### B. The TAC Details Material Patch Site Adhesion Problems that Were Pervasive and Known to Defendants Prior to and Throughout the Class Period

#### 1. Adhesion Scoring Was an Essential Part of the Patch's Pivotal Phase III Study, the SAP Required a 90% Adhesion Rate, and Defendants Knew Prior to the Class Period that the Study Failed to Achieve It

The PEPITES trial was governed by a Clinical Study Protocol (the "Protocol") and Statistical Analysis Plan (the SAP)[7] that DBV agreed to with the FDA specifying the requirements for conducting the study and analyzing the data. ¶¶104-05, 107. Demonstrating consistency of exposure to the API in the Patch was critical. ¶¶75, 88. Thus, the Protocol required that "*[t]o ensure that each Viaskin® patch adheres well on the subject's skin for 24 hours and that occlusion of the condensation chamber is guaranteed* over the 24 hours of application of each patch, the parents/guardians will be asked to take photographs and assess these parameters…." Defs. Ex. 4 at 72 of 142. Both the Protocol and the SAP detailed the *method* for assessing adhesion, as follows:

> *the adhesion of the patch to the skin, especially the maintenance of the occlusion of the patch*, will be assessed by the subjects' parents/guardians…., photographs of the patches attached to the skin will be made by the subjects' parents/guardians…. The review of these photos will allow the Investigators to control and ensue that the parents' assessments of the patch adhesion were satisfactory. The trained site staff will also

---

[6] Para. 182 mistakenly dates the Royal Bank of Canada Healthcare Conference as taking place on August 22, 2018. This is a typo; the quoted excepts in ¶182 are from the same February 22, 2018 conference as ¶160.

[7] The Protocol for the study is dated December 9, 2015. Defs. Ex. 4. The SAP also pre-dated the Class Period, with a "Project Document Effective Date" of October 4, 2017. ¶105.

assess the patch adhesion of all subjects at each subject visit….

Defs. Ex. 4 (Protocol) at 5 of 142; Defs. Ex. 3 (SAP) at 11 of 79.

The Protocol and SAP also set forth a specific "scoring system for adhesion and occlusion" of the Patch, ranking adhesion from 0 (the best) to 3 (the worst, the Patch "has fallen off the skin"). Defs. Ex. 4 at 72 of 142; Defs. Ex. 3 at 63 of 79. The SAP stated: "Patch adhesion will be considered acceptable if more than 90% of the patches at the expected time of patch removal…have an adhesion score of $\leq$ 1…. In other words, adhesion of the patch will be considered as acceptable if less than 10% of the patches are evaluated with an adhesion grade 2 or 3 at time of removal…." ¶¶106; Defs. Ex. 3 at 64-65 of 79; *see also* Defs. Ex. 4 at 103 of 142. The 90% rate was the adhesion *criteria*.[8]

DBV announced positive "topline results" from PEPITES in October 2017 (¶¶15, 101), but did not disclose the SAP adhesion failure at that time or any time prior to March 16, 2020.

### 2. Trial Participant Complaints About Adhesion

The adhesion failure was not a mere technical miss. The problem was pervasive. The TAC adds detail about participants in DBV's clinical trials for the Patch reporting adhesion failures during the Class Period. ¶¶110-118. For example, the mother of a REALISE[9] study participant recounted persistent adhesion problems from at least July 2018 through August 2020. ¶111 ("the patches stopped sticking…. They would fall off early in the day or would migrate to a lower spot on his back."). She explained that "[o]ther people were also complaining that patches had stopped sticking." ¶112. "Early on in the study,"—her son began the trial in February 2017—"I joined an online community of patch

---

[8] The Protocol and SAP reflect that the FDA was keenly interested in adhesion and occlusion. *See* Defs. Ex. 4 at 5, 55, 71-73, 80, 84-91, 103; Defs. Ex. 3 at 11, 14, 63-65. The SAP acknowledges that during a brief 2-month period, the FDA allowed DBV to use a "hypoallergenic adhesive dressing (e.g. Tegaderm) to prevent possible patch adhesion issues" but that "[f]ollowing a comment from the FDA, this decision was cancelled on February 2, 2017." ¶108.

[9] Initiated in 2016, the REALISE trial was an expansion of PEPITES, designed to assess the Patch in "routine medical practice." ¶14, n.2, ¶99. While PEPITES was the only pivotal Phase III trial for the Patch, data from REALISE was also included in the BLA. ¶103.

participants. Through them, I learned that many other people had experienced adhesion problems…."

*Id.* Further, complaints of adhesion failure were documented and reported to DBV:

> ***Our study nurse regularly submitted complaints to DBV***. …and sometimes we were told that DBV had adjusted the adhesive. However, we never noticed a change for the better. If anything, ***patch adhesion continued to get worse. . . . Our nurse told us about the number of complaints she submitted on our behalf once the patches stopped staying on. She submitted complaints for some of her other patients, too***. All she ever got in return was a generic 'received' reply. And only once did our new patches come with an assurance that they had a 'better' adhesive.

¶114; *see also* ¶115 (detailing that DBV would dismiss doctors' and nurses' adhesion complaints).

### C. The TAC Details DBV's Manufacturing and Quality Control Problems that Were Known to Defendants Prior to and During the Class Period

The TAC adds significant detail from CW1—a biochemist with 27 years of pharmaceutical industry experience, including in manufacturing and quality assurance, who was a Regional Director of DBV's Supply Chain from October 2016 to August 2017 (¶121)—concerning serious production problems known to Defendants prior to the Class Period. ¶¶121-138, 147. Specifically, CW1 details a 3-week visit to DBV's manufacturing facility in France in December 2016 where CW1 observed critical problems with DBV's electrospray technology. ¶¶123-126. CW1 stated that the machine's spray jets would often get clogged, causing the entire production line to be stopped. ¶128. According to CW1, DBV was still repeatedly "tweaking" the machine and adjusting its settings to try to achieve the right quantity of API's (the peanut protein) on each Patch. ¶¶128-29. CW1 further explained that demonstrating that DBV could manufacture the Patch consistently and uniformly—*i.e.*, "validating" the manufacturing process—was critical to the FDA approval process. ¶129. Plaintiffs' expert confirms that process "validation" by the FDA is an enforceable cGMP requirement. ¶129, n.8.

During CW1's France trip, CW1 met with Defendant Benhamou and discussed DBV's manufacturing problems with Pascale Ehouarn, who was DBV's SVP of Production and Supply at the time, and became the SVP of Engineering, Manufacturing, and Supply in July 2017. ¶¶123, 125-26. Ehouarn, who was Benhamou's "right hand," told CW1 in France that DBV's manufacturing was

significantly "behind schedule." ¶¶135-37. CW1 continued to speak with Ehouarn about DBV's manufacturing at least "a few times per month" after CW1's return to the U.S. ¶135. Based on these conversations, CW1's industry experience, and CW1's observations of DBV's facility in France, CW1 concluded that DBV was significantly behind in ramping production. ¶¶126-27, 132-33. DBV had not remedied the problems by the end of CW1's employment with DBV in August 2017. *Id.*

Other CWs confirm that DBV's manufacturing and quality control problems persisted throughout the end of 2017 and into 2018. For example, CW2, a DBV Senior Director, Market Development (Food Allergies) from April 2016 to February 2018, visited DBV's manufacturing facility in France several times and therein learned that DBV was experiencing problems implementing and scaling its novel technology. ¶¶149-51. DBV had not fixed these problems when CW2 left DBV in February 2018—the start of the Class Period. ¶153. Finally, CW3, who worked as a consultant for DBV from February through May 2019, corroborates the problems with DBV's electrospray technology, specifically, with spray nozzles becoming clogged and the inability to consistently spray the proper 250μg dose. ¶154. CW3 recalled that DBV withdrew its BLA in December 2018 because DBV's electrospray technology could not consistently produce the proper dose for the Patch. *Id.*

**D. DBV Conducted Multiple Class Period Offerings, Selling Over $550 Million In Shares to Investors, Thus Giving Rise to Heightened Disclosure Duties**

Following Defendants' February 14, 2018 announcement that DBV was "on track" to submit the BLA in the second half of 2018 DBV's stock price rose a dramatic 27% ($5.64 per share). ¶158.

With no approved products on the market, DBV relied on serial stock offerings at inflated prices to fund its operations, raising more than $550 million in four public offerings during the Class Period. ¶¶172-74 ($172.5 million in March 2018); ¶¶211-14 ($81 million in April 2019); ¶¶232-33 ($143 million in October 2019); and ¶¶243-45 ($153.7 million in January 2020). By contrast, DBV generated *no revenue* in 2018 or 2019. As DBV conceded, absent this massive fundraising from investors, there was substantial doubt about its ability to continue as a going concern. ¶29.

**III.    LEGAL STANDARD**

The TAC adequately alleges §10(b) claims: (1) Defendants made material misrepresentations or omitted material information; (2) they knew or recklessly disregarded that the misrepresented or omitted information risked misleading investors; and (3) DBV's share price declined when corrective information was revealed. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011).

**IV.    THE TAC ALLEGES FALSITY**

**A.    Defendants' Failure to Disclose the SAP Adhesion Failure Was an Omission of Material Fact that Misled Investors**

A duty to disclose material information arises "when there is insider trading, a statute requiring disclosure, or an inaccurate, incomplete or misleading prior disclosure." *Tomaszewski v. Trevena, Inc.*, 482 F. Supp. 3d 317, 330 (E.D. Pa. 2020) (quoting *Oran v. Stafford*, 226 F.3d 275, 285-86 (3d Cir. 2000)). The TAC makes clear that the adhesion failure was material, and DBV had a duty to disclose the adhesion failure under all three prongs of *Oran*, as set forth below.

**1.    The SAP Adhesion Failure Was Material**

The Patch's failure to show 90% adhesion in accordance with the SAP is material because there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Matrixx*, 563 U.S. at 38. To gain FDA approval, transdermal delivery systems (TDSs) like the Patch must prove acceptable adhesion to ensure that the correct amount of API is consistently delivered, and because adhesion can impact efficacy and safety. ¶¶85-86, 89, 92. The FDA has an established protocol for adhesion studies, which are required for all TDSs like the Patch, and was indeed required for the Patch here. ¶¶90-91. Indeed, the specific Protocol and SAP at issue here make clear that the FDA required DBV to prove that the Patch maintained sufficient adhesion. *See* Sec. II.B.1, *supra*.

Against these facts, Defendants try to diminish the materiality of the adhesion failure by manufacturing a factual dispute about the meaning of the SAP—asserting that the 90% adhesion rate

10

was not an FDA *requirement*. But this argument contradicts the well-pleaded allegations of the TAC, which are based on the plain language of the SAP and Tasse's own statements about the adhesion failure *at the time*.[10] Defendants' other attack on the materiality of the adhesion failure—arguing that it had no substantial impact on efficacy (MTD at 8, n.3, 13-15)—likewise fails. Their argument about the meaning of Tasse's March 16, 2020 statement on the impact on efficacy is *wrong*. What Tasse actually said is that for those who reported adhesion problems, but still met the 90% adhesion score, there was no substantial impact on efficacy. ¶260 ("subjects with no more than 10% patches that were 2 or 3 compared to the general study population suggested no substantial impact on clinical efficacy"); *see also* pp.25-26, *infra*. DBV's claim that there was no impact on efficacy is also belied by the fact that the FDA issued the CRL because of "the impact of patch-site adhesion on efficacy…." ¶263.

At best, Defendants raise factual disputes that cannot be resolved in their favor on this motion. Defendants are not entitled to the benefit of their proffered inference about the SAP meaning, or the impact of the adhesion failure, both of which contradict the well-pled allegations of the TAC. *De Vito v. Liquid Holdings Grp., Inc.*, 2018 WL 6891832, at *28-29 (D.N.J. Dec. 31, 2018) ("weighing the significance of these omissions is the exact type of fact finding that is inappropriate at the motion to dismiss stage."); *Ieradi v. Mylan Lab'ys, Inc.*, 230 F.3d 594, 599 (3d Cir. 2000) ("where there is room for differing opinions on the issue of materiality, the question should be left for jury determination.").

Simply put, Defendants cannot show that the Patch's failure to meet the 90% adhesion rate was "so obviously unimportant to an investor that reasonable minds cannot differ." *Adams Golf*, 381 F.3d at 275. "Indeed, it would be sad day when court[s] could determine that misstatements about [] whether a company's primary product worked did not alter the 'total mix' of information available in the market." *In re Viropharma, Inc. Sec. Litig.*, 2003 WL 1824914, at *6 (E.D. Pa. Apr. 7, 2003).

---

[10] ¶¶93, 260 ("So the ***adhesion rate that was prespecified by the FDA*** … was that ***90% adhesion rate was required***. The adhesion rate in PEPTITES was below the prespecified 90%....").

11

## 2. Defendants Had a Duty to Disclose the Known SAP Adhesion Failure

### (a) Defendants' Explanations of How the Patch Worked—Sticking to the Skin to Form an "Amniotic Chamber"—Gave Rise to A Duty to Disclose that the Patch Did Not Stick As Designed

It is black letter law that a securities issuer cannot "omit to state a material fact necessary in order to make [other] statements made…not misleading[.]" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 318 (2007) ("*Tellabs I*") (citing 17 C.F.R. §240.10b-5). "Once a company has chosen to speak on an issue—even an issue it had no independent obligation to address—it cannot omit material facts **related to** that issue so as to make its disclosure misleading." *Tomaszewski*, 482 F. Supp. 3d at 330 (citing *Kline v. First W. Govern't Secs., Inc.*, 24 F.3d 480, 490-91 (3d Cir. 1994)). Moreover, if there is a question of whether the omission of certain facts rendered related statements misleading—*i.e.*, whether there was a duty to disclose—that question is reserved to a jury. In *Adams Golf*, the Third Circuit reversed the district court dismissal finding no duty to disclose alleged gray market sales, even where the Third Circuit agreed that the defendants' statements about distribution were not "technically false." 381 F.3d at 277. The Court reasoned that a jury should determine whether there was a duty to disclose because "[r]easonable minds could disagree as to whether the omitted fact of Costco's unauthorized possession, in addition to the alleged 'sales by other unauthorized discount retailers and international gray market distributors,' were necessary to make the statements regarding the Company's limited distribution not misleading." *Id.* at 278.

Here, Defendants spoke on the topic of how the Patch was *designed* to work, and further claimed that it *did* work. For example, Benhamou described *in detail* the Patch's design and purported adhesion process, explaining the "chamber between the skin and the patch. It's an amniotic chamber, and it enhances the perspiration." ¶162; *see also* ¶182 ("[The Patch] is not a standard patch…. It has this condensation chamber…. It leverages the perspiration of the skin in order to solubilize the allergen [to allow it to absorb into the skin.] So it's a very precise and sharp device and approach.").

12

In other words, the Patch had to stick. And it had to stick as designed (*i.e.*, maintain occlusion) to form the perspiration chamber. ¶162 (Benhamou stated, it was "extremely important" that the API would dissolve in the moisture chamber under the Patch). The fact that the Patch failed to show adhesion in accordance with the SAP—that it did not stick as designed—certainly is "related to" the issue of how the Patch was designed to work. As such, Defendants had a duty to disclose it.

Defendants cannot escape liability for misleading investors on the adhesion failure by arguing that they never spoke directly on adhesion. MTD at 7. The duty to disclose is not that narrow. They spoke of the Patch sticking, and they spoke of the need for occlusion. This discussion of the Patch's design and function put the related topic of the adhesion failure "in play."[11] *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d. Cir. 1992).[12] At *the very least*, "reasonable minds could disagree as to whether the omitted fact [of the SAP adhesion failure], … [was] necessary to make the statements regarding [how the Patch worked] not misleading." *Adams Golf*, 381 F.3d at 278.

### (b)      DBV's Class Period Offerings Gave Rise To A Duty To Disclose

Defendants had an affirmative duty to disclose all material nonpublic information when selling DBV's shares to the public, or to not sell its shares at all. *Fisker,* 2015 WL 6039690, at *15. Because this rule imparts an affirmative duty to disclose material information, Defendants' liability for violating it does not hinge on the existence of other statements rendered false by the omission. Under this prong of *Oran*, Defendants had a duty to disclose the adhesion failure, which certainly would have affected investors' judgment, regardless of any other statements about the Patch or adhesion.

---

[11] Moreover, while Defendants did not tell investors that the FDA required proof of an adhesion rate of 90%, they *did* tell investors that the FDA had required adhesion testing. ¶186. That disclosure gives rise to a duty to disclose that during that testing, DBV failed to meet the FDA-required adhesion rate.

[12] *See also In re Allergan Generic Drug Pricing Sec. Litig.*, 2019 WL 3562134, *9-*10 (D.N.J. Aug. 6, 2019) (assurances of "strong supply chain" and "diverse portfolio" gave rise to "duty to fully, completely, and truthfully disclose all material facts regarding generic drug pricing, competition, and revenues" including alleged involvement in price fixing); *Bing Li v. Aeterna Zentaris, Inc.*, 2016 WL 827256, *4 (D.N.J. Mar. 2, 2016) (failure to disclose that efficacy data relied on a modified dataset misleading where company claimed "favorable top-line results").

Defendants are wrong that this rule does not apply in the §10(b) context to public offerings of stock. MTD at 15.[13] To the contrary, the Third Circuit has directly held that an affirmative duty to disclose under §10(b) arises "when there is insider trading," and that insider trading includes a corporation *selling its own* shares. *Oran*, 226 F.3d at 285-86 ("Nor do they allege that AHP was trading in its own stock during the relevant period."). In *Fisker*, the court found that "to the extent defendants made statements regarding Fisker Automotive in an effort to entice plaintiffs into becoming shareholders, defendants had a duty to disclose material information[]" under §10(b), rejecting defendants' arguments that they had no duty to disclose because "[the individual defendants] did not engage in 'trading.'" *Fisker*, 2015 WL 6039690, at *15. To be sure, the abstain or disclose rule can give rise to §10(b) liability and applies equally to a corporation selling its own shares to the public.[14]

Nor can Defendants evade liability under this rule by arguing they had no duty to disclose the adhesion failure because it was immaterial. MTD at 15-16. *At best*, whether the FDA "required" the 90% rate, or whether the failure had a "substantial" impact on efficacy, are disputed facts that cannot be resolved in Defendants' favor on this motion. *See* Sec. IV.A.1, *supra*.

        **(c)**       **Defendants Had a Legal Duty to Disclose the Known Adhesion Failure Pursuant to Items 303 and 105 of Regulation S-K**

**Items 303/5(d):** An omission under Item 303 can give rise to a §10(b) claim if it is material

---

[13] Defendants' citation to *In re Safeguard Scis.*, 2004 WL 2644393 (E.D. Pa. Nov. 17, 2004) is misplaced. In *Safeguard*, the court granted a motion to strike and preclude expert testimony on the grounds that the expert's supplemental report was untimely and contradicted the expert's prior testimony; there was no discussion about the underlying claims in the action. *See id.,* at *3-9. While the underlying claims in *Safeguard* concerned in part a duty to disclose based on insider trading, those claims were not disposed of on a motion to dismiss and as such, *Safeguard* does not support Defendants' position. The additional cases cited by Defendants on this point (*Anderson v. Abbott Lab'ys*, 140 F. Supp. 2d 894, 909-10 (N.D. Ill. 2001) and *In re Seagate Tech. II Sec. Litig.*, 843 F. Supp. 1341, 1369 (N.D. Cal. 1994)) are out-of-circuit district court decisions on motions for summary judgment; neither holds that allegations such as those here are properly disposed of on a motion to dismiss under Rule 12(b)(6).

[14] *See also Tse v. Ventana Med. Sys., Inc.*, 1998 WL 743668, at *8 (D. Del. Sept. 23, 1998) (duty to disclose when "defendants were asking plaintiffs to become equity shareholders in the acquiring corporation[.] Accordingly, as 'insiders,' defendants assumed an affirmative duty to disclose material information."); *In re Zenith Lab'ys Sec. Litig.*, 1993 WL 260683, at *7 (D.N.J. Feb. 11, 1993) (offering "created a duty to disclose any nonpublic information that might be material to someone buying stock[]" under §10(b)).

and its disclosure is necessary to avoid rendering other statements not misleading. *In re Galena Biopharma, Inc. Sec. Litig.*, 336 F. Supp. 3d 378, 392 (D.N.J. 2018) (citing *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1054 (9th Cir. 2014)).[15] The TAC alleges that Defendants' omission of the adhesion failure violated Item 303 because the failure was a known trend, event, or uncertainty that was "reasonably likely" to materially impact DBV's financial condition, as it substantially increased the risk of non-approval. ¶¶266, 273; 17 C.F.R. §229.303.[16] Moreover, the TAC alleges that the omission of the adhesion failure in violation of Item 303 rendered other statements materially misleading, including: Defendants' claims about how the Patch worked (*see* Sec. IV.B.2.a, *supra*); as well as DBV's purported risk disclosures that "[a]n unfavorable outcome in one [or] more trials would be a major setback for our product candidates and us" (¶¶179, 220, 240, 251); Defendants' positive statements about the FDA review and approval process (¶¶229-30, 255); and Defendants' disclosures about the results of the clinical trials (¶¶101, 218). Thus, the omission is actionable. *Galena*, 336 F. Supp. 3d at 392; *Silverstrand Invs. v. AMAG Pharms., Inc.*, 707 F.3d 95, 104-07 (1st Cir. 2013) (failure to disclose serious side effects in drug trial violated Item 303 and stated §10(b) claim for material omissions); *Shah v. Zimmer Biomet Holdings, Inc.*, 348 F. Supp. 3d 821, 837-40 (N.D. Ind. 2018); *Curran v. Freshpet, Inc.*, 2018 WL 394878, at *8 (D.N.J. Jan. 12, 2018).[17]

**Item 105:** In addition, Item 105 required Defendants to disclose the SAP adhesion failure as a material factor that made investment in DBV speculative or risky. 17 C.F.R. §229.105; ¶¶274-75(a).[18]

---

[15] The TAC alleges that DBV was subject to the disclosure requirements of Item 303. ¶¶267-69.

[16] Under the plain language of Items 303/5(d), DBV need not know for sure that the FDA would deny approval based on the adhesion failure. But the failure *at least* constituted an "uncertainty" that was "reasonably likely" to have an adverse impact on the Company, and thus required disclosure.

[17] Plaintiffs do not claim that Defendants' Item 303 violation *automatically* gives rise to §10(b) liability (MTD at 18), but it does give rise to the duty to disclose, and the omission here rendered other statements misleading. The TAC *also* alleges a strong inference that Defendants knew or recklessly disregarded that omitting the SAP adhesion failure risked misleading investors. *See* Sec. V, *infra.*

[18] While the Third Circuit has not expressly ruled on the relationship between Item 105 and §10(b), it has ruled that violations of Item 105 may constitute violations §14(a) of the Exchange Act, which

This case is comparable to *Silverstrand*, which the Third Circuit relied on in *Jaroslawicz v. M&T Bank Corp.*, 962 F.3d 701 (3d Cir. 2020) to find that Item 105 can give rise to a duty to disclose material information and support a claim under the Securities Exchange Act. In *Silverstrand*, "the First Circuit identified plausible allegations that a pharmaceutical company's offering documents failed to adequately convey risks associated with a clinical drug." *Jaroslawicz*, 962 F.3d at 713 (citing *Silverstrand*, 707 F.3d at 108). Because the company in *Silverstrand* "included details about the FDA approval process and the results of clinical trials" and "noted only 'ongoing FDA regulatory requirements' that carry the risk of 'restrictions on our ability to market and sell' and other 'sanctions'" in its offering documents, the failure to disclose that the trial had experienced numerous serious adverse events was misleading in violation of Item 105. *See Jaroslawicz*, 962 F.3d at 713 (describing *Silverstrand*). Applying the reasoning in *Silverstrand*, the *Jaroslawicz* court found that the defendants in that case violated Item 105 for offering "little more than generic statements about the process of regulatory review[,]" when "[they] knew that regulators would be looking into its compliance program….and they knew the failure to obtain regulatory approval would be significant[.]" *Jaroslawicz*, 962 F.3d at 716.

Similarly here, DBV knew the FDA would be paying close attention to the adhesion rate in deciding whether to approve the Patch (*see* Sec. II.B.1 & n.8, *supra*), and misled investors with "details about the FDA process and the results of clinical trials" (¶¶156, 168). Defendants knew that the study failed the SAP adhesion criteria (¶260), and instead of disclosing the adhesion failure and attendant risks, noted only *potential* risks of "unfavorable outcome[s]" in the trials (¶¶179, 220, 251) and general risks of non-approval (*e.g.* MTD at 16; Sec. IV.B.3, *infra*).

---

governs false or misleading statements or omissions in proxies. *See Jaroslawicz*, at 712-16, *cert. denied*, 141 S. Ct. 1284 (2021). While the *Jaroslawicz* court limited its holding to "the standards of Section 14(a) and its regulations" (*id.* at 711, n.10), it should be noted that "any claims brought under the 1934 Act" are subject to the pleading standards of the PSLRA if they sound in fraud. *See California Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 144-45 (3d Cir. 2004). Further, as with Item 303, Plaintiffs do not argue that an Item 105 violation *alone* creates §10(b) liability. Plaintiffs allege other statements rendered false by the Item 105 omission, as well as scienter.

### 3. DBV's Purported Study-Related Risk Warnings Were Misleading

Defendants argue the PSLRA safe harbor applies to Plaintiffs' adhesion-related claims (MTD at 24), but the omission of the adhesion failure is not protected. *Freshpet*, 2018 WL 394878, at *4 (collecting cases). Defendants argue that DBV warned investors "repeatedly and clearly" about the risk of non-approval (MTD at 16), but they cite only generic warnings that do not insulate them from liability where they concealed material risk posed by the adhesion failure. For example, all of DBV's 20-Fs during the Class Period warned that "[a]n unfavorable outcome in one of more trials would be a major setback for our product candidates and for us." ¶¶179, 220, 240, 251. The 2017 20-F warned that "[o]ur development activities…*may* be delayed…*if*" the data collected "*fail[ed] to adhere to clinical protocols*, [or] *regulatory requirements*,…." Defs. Ex. 6 at 2302. These 'warnings' were misleading because Defendants failed to disclose that DBV had *already suffered* an "unfavorable outcome" in the PEPITES trial and had *already failed* "to adhere to clinical protocols [or] regulatory requirements", to wit, the Patch failed to meet the prespecified 90% adhesion criteria. *In re Viropharma Inc. Sec. Litig.*, 21 F. Supp.3d 458, 471 (E.D. Pa. 2014) (warning of potential risks misleading if the "risks…had already come to pass."); *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004).

### B. The TAC Alleges Actionable Misstatements About DBV's Manufacturing

### 1. Defendants Affirmatively Misrepresented DBV's CMC Readiness

On February 22, 2018, DBV's COO claimed that "we've been able to actually bring everything up to speed in order to scale up" manufacturing the Patch and "*we are ready to launch that drug*." ¶160. DBV's February 23, 2018, presentation highlighted "[f]ully scalable, launch-ready manufacturing capabilities in place…." ¶165. On June 13, 2018, Mesa touted DBV's "unique engineering capabilities that allow us to…develop [the] patches…with *high replicability, with homogenous repartition of the API's, making it very easy for us to make those very scalable in a commercial setting*." ¶180. On September 13, 2018, Mesa assured that "all of those key challenges [of the BLA] that were important

17

for DBV, we've tackled." ¶184. On October 2, 2018, when asked if DBV could consistently produce the "exact same patch," Mesa assured that "because it's highly technicalized…it's actually pretty replicable" and "from the manufacturing standpoint, I think we're there." ¶186.

These assurances were false and misleading. As CW1 detailed, far from launch-ready, DBV's machinery frequently became clogged and could not consistently produce the Patch with the exact 250µg dose. ¶¶121, 128, 137, 140, 144, 154-55. The TAC contains specific additional details regarding CW1's basis for knowledge and first-hand discussions with high-level DBV executives. ¶¶125-26, 129, 133-37. CW2 and CW3 corroborate CW1's account of the problems and confirm that they persisted into 2018. ¶¶149-51, 154-55. DBV's December 2018 withdrawal of the BLA, citing insufficient "data on manufacturing and quality controls," confirms that DBV had not remedied the problems prior to submitting the BLA, rendering Defendants' statements touting DBV's CMC readiness misleading.[19]

Defendants' attempt to recast these allegations as fraud by hindsight fails. MTD at 5. These allegations do not turn on whether and when the FDA questioned DBV's CMC readiness. They concern DBV's significant manufacturing problems of which Defendants were aware when they misleadingly represented that DBV was "ready to launch."[20] That these problems ultimately led DBV

---

[19] *See Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 261-63 (3d Cir. 2009) (corroborative nature of CW statements weighed towards reliability of the sources); *Rihn v. Acadia Pharm. Inc.*, 2016 WL 5076147, at *6 (S.D. Cal. Sept. 19, 2016) (statement that company was "on track" to submit NDA actionable where defendants led investors to believe all appropriate steps had been taken to ensure the NDA was ready but had insufficient basis to support suggestion that necessary infrastructure for commercial-scale operations was in place); *Freshpet, Inc.*, 2018 WL 394878, at *4-5 (statement that "[w]e are also pleased with our initial test of Freshpet's new baked product" actionable because "defendants knew...that [the company] was facing substantial obstacles that would impede growth...[including] alleged manufacturing problems."); *Odeh v. Immunomedics, Inc.*, 2020 WL 4381924, at *6 (D.N.J. July 31, 2020) (CEO's statement that he was "very pleased with the overall status and quality and could confirm that all critical work streams for FDA approval, including...manufacturing validation runs, were yielding positive results" actionable where company was aware that a data breach could jeopardize BLA filing).

[20] For this reason, Defendants' reliance on *In re Discovery Lab'ys Sec. Litig.*, 2007 WL 789432, *2 (E.D. Pa. Mar. 15, 2007) is misplaced. There, the statement that "all steps required for production of cGMP material have been completed" was not actionable where the complaint failed to allege contrary facts "known to defendants at the time of the statements." Here, the TAC alleges Defendants knew about DBV's serious CMC problems at the time they claimed the Patch was ready to launch.

to withdraw the BLA does not show fraud by hindsight, but rather proves loss causation.

Nor is there a disconnect between Plaintiffs' theory (that DBV experienced CMC problems) and DBV's stated reason for withdrawing the BLA (insufficient CMC data). MTD 21, 23; Tr. at 32-33. Defendants ignore Plaintiffs' allegation that DBV's press release announcing the BLA withdrawal misleadingly downplayed the reasons for the withdrawal as merely needing to provide more "detail" on the CMC data. Moreover, Defendants' admissions during the December 19, 2018 conference call concede more broadly that the reason for the withdrawal "all had to do with CMC and manufacturing" and "many elements of CMC." ¶¶196, 199. In any event, Defendants' distinction is without a difference. As the TAC alleges, defective manufacturing of the Patch will translate into insufficient *data* supporting an adequate manufacturing process. ¶129; *see also* ¶¶255-56. There is no "disconnect."[21]

Furthermore, Defendants' misstatements were not inactionable statements of generic optimism or opinions (MTD at 24); they were statements of present fact about DBV's manufacturing.[22] Nor does Defendants' passing reference to the PSLRA safe harbor (MTD at 24) insulate them. The challenged statements about the Patch's CMC readiness were not forward-looking,[23] and thus not subject to the PSLRA safe harbor. *Freshpet*, 2018 WL 394878, at *5.

Finally, even if Defendants' statements concerning CMC readiness were forward-looking—they were not—they would not be protected because they were not accompanied by meaningful

---

[21] Defendants argue that the FDA never "took any action or even raised any concerns" regarding DBV's manufacturing (MTD at 23), but that is contradicted by not only the December 2018 BLA withdrawal, which according to Tasse involved "many elements of CMC" (¶¶196, 199), but also the fact that the FDA *still* had concerns about DBV's CMC when it issued the CRL in August 2020. ¶263.

[22] *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 428, 465 (S.D.N.Y. 2013) (Statements "ensuring 'on-time, on-target and **ready-to-launch**' technology" were not vague, forward-looking statements of optimism or puffery, but "involved the representation of existing facts"); *Rihn*, 2016 WL 5076147, at *6-*7 ("when Defendants represented that the NDA was 'on track' to be submitted by March 31, 2015, without mentioning that no meaningful assessment of the manufacturing and quality assurance systems had been conducted, Defendants created an impression of a state of affairs that differed in a material way from the one that actually existed" not "vague statements of optimism").

[23] *E.g.*, ¶160 ("we **are ready** to launch"); ¶164 ("Fully scalable, **launch-ready manufacturing capabilities in place**"); ¶180 ("**we have** unique engineering capabilities…**with high replicability**").

cautionary language. DBV's purported warning in its 2017 20-F that "we *may* encounter difficulties in the production of Viaskin patches" (MTD at 20) was misleading because DBV was *already* encountering such difficulties. *City of Omaha Police and Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379 (S.D.N.Y. 2020). Moreover, Defendants "warnings" are themselves contradictory: *compare* "[w]e have not built commercial-scale manufacturing" *with* "we completed development of a commercial-scale version of our electrospray manufacturing…, in the first half of 2017[.]" MTD at 20. Where Defendants repeatedly assured investors that DBV's manufacturing process *was* fully developed, "scaled up," and "ready to launch," they cannot evade liability for misleading investors by hiding behind misleading and contradictory "warnings." *In re Prudential Secs. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("cautionary language does not protect material misrepresentations or omissions when defendants knew they were false when made").

### 2. Defendants Had a Duty to Disclose the CMC Problems Under Items 303 and 105 of Regulation S-K and as Sellers in the March 2018 Offering

**Item 303:** DBV's inability to consistently manufacture the Patch was a "known trend" or "uncertainty" under Item 303 that mandated disclosure in DBV's 2017 20-F and its March 2018 Offering materials. ¶266; 17 C.F.R. §229.303. DBV's omission of the manufacturing problems rendered the claims in its 2017 20-F that it had a "fully developed" manufacturing process that was "highly scalable" and "complies with cGMP requirements" (¶166) materially misleading, and thus actionable under §10(b). *Freshpet*, 2018 WL 394878, at *8 (omission of manufacturing problems in registration statement violated Item 303 and supported §10(b) claim).[24]

**Item 105:** DBV's March 2018 Offering (¶¶173-74) triggered an Item 105 duty to disclose that

---

[24] *See also Twin Master Fund, Ltd. v. Akorn, Inc.*, 2020 WL 564222, at *7 (N.D. Ill. Feb. 5, 2020) ("Akorn's noncompliance with FDA data integrity standards was a 'known trend,'" the omission of which violated §10(b)); *Zimmer*, 348 F. Supp. 3d at 837-40 (alleged violation of Item 303 for failure to disclose internal audits that "uncovered the very [manufacturing] problems which eventually (and inevitably) led to [FDA] regulatory action" stated a §10(b) claim).

it could not uniformly produce the Patch at scale, a CMC requirement, which materially increased the risk of non-approval and made investment in DBV speculative or risky. ¶275(b); 17 C.F.R. §229.105. Instead of disclosing this risk, DBV's March 2018 Offering materials incorporated the misleading claims that the manufacturing process was "fully developed" and "highly scalable." ¶¶175, 166. The Offering also included the generic warning that "there can be no assurance that the procedures currently used to manufacture our product candidates will work at a scale which is adequate for commercial needs and we may encounter difficulties in the production of Viaskin patches." MTD at 20. This and similar "warnings" were misleading because Defendants *knew* that DBV was then-unable to consistently manufacture the Patch at scale and DBV was *already* experiencing production difficulties. *Immunomedics*, 2020 WL 4381924, at \*6 ("A company may be liable under Section 10(b) for misleading investors when it describes as hypothetical a risk that has already come to fruition").

**Insider Sales:** Finally, as sellers in DBV's March 2018 Offering, Defendants had an affirmative duty to disclose the material CMC problems, which certainly would have affected investors' judgment. *Fisker*, 2015 WL 6039690, at \*15; *Oran*, 226 F.3d at 285-86; *Tse*, 1998 WL 743668, at \*8. The omission is actionable under §10(b). *Id.* When the FDA first identified the CMC problems (MTD at 5-6) is not relevant to this claim, as Defendants had an affirmative duty to disclose the problems that were known to *them* regardless of when the problems were raised by the FDA.

## V.     THE TAC ALLEGES SCIENTER

### A.     The CW Allegations Demonstrate Defendants' Contemporaneous Knowledge Of DBV's CMC And Quality Control Problems Prior To December 19, 2018

In assessing the sufficiency of a CW's statement, the Third Circuit counsels weighing six factors: [1] "the detail provided by the confidential sources, [2] the sources' basis of knowledge, [3] the reliability of the sources, [4] the corroborative nature of other facts alleged, including from other sources, [5] the coherence and plausibility of the allegations, and [6] similar indicia." *Avaya*, 564 F.3d at 263. As in *Avaya*, the TAC here "appropriately describe[s] the positions formerly held by each of

21

[the confidential] sources as well as the basis of the sources' personal knowledge[.]"*Id.*; ¶¶121-155.

Specifically, the TAC fills in the blanks the Court found lacking for CW1,[25] detailing: *who* he reported to (¶123), *who* CW1 discussed the production issues with and thus *who* was aware of these issues (¶¶133-135), *what* CW1 worked on (¶¶1121-125), *when* he visited the manufacturing facility in December 2016 (¶¶123, 126), *what* he observed with spray nozzles frequently clogging Patch and lax quality control procedures ((¶¶128, 134-141), and *where and when* CW1 met with Behamou (¶125). CW1 further details that the production issues were well-known to DBV employees and executives including Ehouarn, Benhamou's "right hand," who said DBV was "behind schedule." ¶¶133, 135, 137, 144.[26]

Moreover, the information the CWs provide is corroborative of one another. CW2 details multiple visits to DBV's French manufacturing facility between April and February 2018 where CW2 observed DBV's problems in implementing and scaling its novel technology, which were not remedied at the time of CW2's departure from DBV in February 2018. ¶¶149-51, 153. CW3 further corroborates the accounts of problems with DBV's electrospray technology from February 2019 to May 2019, and, specifically, the problems with the spray nozzles becoming clogged and inability to consistently spray the proper 250μg dose as the reason for the December 2018 BLA withdrawal. ¶154.

Combined with DBV withdrawing its BLA based on "CMC and manufacturing" and "many elements of CMC" (¶¶196, 199), as well as the fact that the FDA still continued to cite CMC concerns when it issued the CRL on August 4, 2020 (¶263), the CW allegations about DBV's ongoing inability to consistently produce the Patch are certainly "coheren[t] and plausib[le]." *Avaya*, 564 F.3d at 263. Considered together, the allegations support a strong inference that Defendants recklessly or intentionally concealed known CMC problems and affirmatively misrepresented the Patch's launch-

---

[25] *E.g.*, Tr. at 26 ("tell me what she saw, when she saw it…. What did she see? What did she base it on? Did it end at August of '17? When did she see it?").

[26] Ehouarn's knowledge is imputed to DBV. *Howard v. Arconic Inc.*, WL 2561895, at *22 (W.D. Pa. June 23, 2021) (knowledge of manager at French manufacturing facility imputed to corporate defendant).

readiness. *See Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *23 (D.N.J. July 27, 2018) (CWs allegations credited and weighed towards a strong inference of reckless behavior).[27] This inference is at least as compelling as Defendants' proffered inference—that they were somehow unaware of the material CMC problems or that the FDA just needed to fill in some missing CMC data.

Finally, Defendants argue that scienter is lacking because they "did not know of FDA concerns about manufacturing data or patch adhesion before the FDA raised them," MTD at 25, but Plaintiffs do not allege that Defendants violated §10(b) by failing to predict the FDA's concerns. Rather, Defendants ran afoul of §10(b) and Rule 10b-5 when they concealed the underlying material problems with CMC and Patch adhesion and misrepresented the Patch's manufacturing readiness. *See In re Innocoll Holdings Public Ltd. Co. Sec. Litig.*, 2020 WL 1479128, at *8 (E.D. Pa. Mar, 25, 2020) ("When the facts known to a person place him on notice of a risk, he cannot ignore the facts and plead ignorance of the risk.") (citing *Avaya*, 564 F.3d at 270). "[T]he fact that the defendants published statements [about the Patch's manufacturing readiness] when they knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002).[28]

---

[27] Defendants suggest CW1's allegations should be discounted because CW1 left DBV before the Class Period. MTD at 21-22. But the Third Circuit and others consistently reject this argument, particularly where (as here) other information during the Class Period corroborates the pre-Class Period accounts. *See Avaya*, 564 F.3d at 260, 266 (upholding allegations based on CWs who worked at the company prior to class period); *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017) (even CWs "not at [the company] during the Class Period" can nevertheless support a claim where, as here, they "had personal knowledge of executive-level management's real-time access" to company information showing falsity); *Roberts v. Zuora, Inc.*, 2020 WL 2042244, at *11 (N.D. Cal. Apr. 28, 2020) ("That none of the CWs was employed at [the company] during the entire Class Period does not [ ] render their statements unreliable as a matter of law"). Defendants' cited authority holds no different. *See* MTD at 21-22, citing *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, n.11 (3d Cir. 2013) ("we recognize that in *Avaya* we approvingly cited to our earlier opinion in *In re Merck & Co., Inc. Securities Litigation* in which we noted: 'Both post-class-period data and pre-class data could be used to confirm what a defendant should have known during the class period because any information that sheds light on whether class period statements were false or materially misleading is relevant.'") (citations omitted).

[28] *See also*, *Immunomedics*, 2020 WL 4381924, at *7 (scienter alleged where defendants "knew about the seriousness of the [problem], yet issued public statements that failed to disclose that event and its

23

### B. Defendants Knew or Recklessly Disregarded that Their Failure to Disclose the Patch's Adhesion Failure Risked Materially Misleading Investors

It is undisputed that Defendants knew the Patch did not meet the FDA's pre-specified adhesion rate in clinical tests. Defendants also concede that, for an omissions case, "the key question is […] whether the defendants knew or should have known that their failure to disclose those facts presented a danger of misleading buyers or sellers." MTD at 24 (quoting *Fire & Police Pension Ass'n of Colorado v. Abiomed, Inc.*, 778 F.3d 228, 245 (1st Cir. 2015)). Here, concealing that the Patch failed to stick as DBV intended and as the FDA required certainly presented a danger of misleading investors. While Defendants contend they believed that the Patch adhesion rate was immaterial, and thus not worthy disclosure, it is a far more compelling inference that Defendants were aware that concealing the adhesion failure posed a danger of misleading investors as to the true risks surrounding FDA approval.

The clear terms of the SAP required Defendants to monitor, assess, and score Patch site adhesion. ¶¶106, 108. The reason DBV was required to track adhesion data, and to demonstrate a 90% adhesion rate, is clear: adhesion directly affected efficacy. If the Patch did not stick consistently, DBV and the FDA would not be able to control the amount of API study participants were exposed to, and thus would not be able to reliably assess the efficacy of the Patch. ¶129.[29]

By no later than December 2016, Defendants were well aware that the Patch had significant

---

potential impact on the FDA approval process."); *Freshpet*, 2018 WL 394878, at *5 ("Plaintiffs properly allege scienter based on Defendants' conscious decision to omit presently known facts."); *Monk v. Johnson & Johnson*, 2011 WL 6339824, at *8 (D.N.J. Dec. 19, 2011) ("defendants' knowledge of facts or access to information contradicting their public statements" alleges scienter).

[29] Plaintiffs' expert, Dr. Philip Lavin, a clinical trial, biostatistics and FDA regulatory expert, further details why adhesion is so critical in a TDS like the Patch. TDS products which do not maintain consistent and uniform skin adhesion during the labeled wear period can experience various degrees of detachment, undermining the product's efficacy. ¶89. If a TDS is partially detached for instance, the rate and extent of drug absorption may be uncertain. ¶89. As such, it is a requirement that the entire surface area of a TDS remains consistently and uniformly adhered to a patient's skin. ¶88. Dr. Lavin states that TDS manufacturers like DBV are aware that failure to meet the adhesion specifications set forth in the Guidance and in the SAP makes FDA approval highly unlikely. ¶94.

24

adhesion problems, when they sought FDA authorization to use Tegaderm "to prevent possible patch adhesion issues[.]" ¶108. On February 2, 2017, the FDA cancelled the use of Tegaderm "[f]ollowing a comment from the FDA[.]" ¶108-09. The FDA's decision to stop the use of Tegaderm signifies that the agency was focused on Patch adhesion. ¶109. The study Protocol and SAP's pre-specified adhesion rate makes clear that the FDA was *always* concerned about the impact of adhesion on efficacy. *See* Sec. II.B.1 & n.8, *supra*; *see also* ¶¶87-90 (2018 FDA guidance on adhesion).[30] Knowing the FDA had pre-specified a 90% adhesion rate, that the FDA was not permitting the use of Tegaderm to meet the adhesion requirement, and the obvious relationship between adhesion and efficacy, Defendants knew or recklessly disregarded that concealing the Patch's failure to meet the FDA-required 90% adhesion rate presented a danger of misleading investors.

None of Defendants' arguments negates that inference. First, Defendants' factual assertion that 90% adhesion was not a requirement (MTD at 8-9) is directly contradicted by the SAP (¶¶104-106) and Tasse's March 16, 2020 admission that it was a pre-specified requirement and that DBV failed it. ¶93. This alone is sufficient to allege that Defendants knew the 90% adhesion rate was a "prespecified" "requirement" of the FDA. Defendants' counter-narrative today is certainly not *more* compelling than what DBV and FDA agreed in the SAP and what Tasse admitted publicly.

Second, Defendants argue they did not risk misleading investors because the adhesion failure had no impact on efficacy, citing Tasse's statement that "we did a subgroup analysis that showed that similar clinical benefits in subjects reporting patch adhesion issues, ***subjects with no more than 10% patches that were 2 or 3 compared to the general study population*** *suggested no substantial impact* on clinical efficacy." MTD at 13-14. Defendants misconstrue Tasse's statement. What Tasse's

---

[30] Defendants' argument that the FDA's acceptance of the BLA for filing in October 2018 suggests that the FDA was not concerned about the adhesion failure is wrong. MTD at 11. Accepting a filing for review simply means that all information required to be included in the application is present; it does not mean that the FDA reviewed the data results for compliance with the SAP. ¶¶17, 76

statement actually referred to was subjects who reported adhesion issues but "with no more than 10% of patches that were 2 or 3 compared to the general study population…." ¶260. In other words, subjects who reported some adhesion issues but nonetheless had 90% of Patches scored at a 1 or 2 at the time of removal—*i.e.*, subjects whose adhesion ***did*** comport with the SAP adhesion requirement— "suggested no substantial impact on clinical efficacy." *Id.* Moreover, Defendants omit the end of his quote, where Tasse admits to the obvious: the FDA was concerned about "***the intersection of adhesion and efficacy***[.]" ¶260; *see also* ¶257 (3/16/20 press release announcing FDA "questions regarding efficacy, including the impact of patch-site adhesion"). Adhesion and efficacy are not tenuously related; there is a direct line. Defendants certainly risked misleading investors when they concealed the Patch failed to meet the FDA's pre-specified adhesion rate.

While Defendants may have *hoped* the FDA would overlook the failure and approve the Patch, their failure to disclose that substantial risk to investors was *at least* extremely reckless. *Tomaszewski*, 482 F. Supp. 3d at 333 (allegations that company seeking FDA approval of drug candidate was struggling to survive and changing course would have cost time and money give rise to "cogent and compelling inference" that defendants "took—and lost—a calculated gamble.").[31]

### C.       DBV's Reliance on Serial Fundraising Further Supports Scienter

DBV generated no revenue and was entirely dependent on capital raises to fund its operations (¶29), lending strong support to the inference that Defendants intentionally misrepresented DBV's CMC readiness and concealed the adhesion failure.[32] *Immunomedics*, 2020 WL 4381924, at *8 (given

---

[31] *See also Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) ("The fact that a gamble—concealing bad news in the hope that it will be overtaken by good news—fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble. It is like embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they are discovered to be missing"); *Indiana Public Retirement System v. SAIC, Inc.*, 818 F.3d 85, 97 (2d Cir. 2016) (finding "cogent and at least as compelling" inference that defendants might have believed that "the benefits of concealment might have exceeded the costs").

[32] Attempting to remedy the adhesion problem would have required DBV to either redesign the Patch

long history of operating losses, the financing from equity offering was critical to company's success and thus supported scienter); *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1029 (N.D. Cal. 2020) ("allegation of motivation to inflate stock price in order to conduct a successful secondary public offering and obtain much-needed operating capital was motive evidence...stronger than the generic 'desire to raise capital' which can be attributed to every company"); *Skiadas v. Acer Therapeutics, Inc.*, 2020 WL 3268495, at * 11 (S.D.N.Y. June 16, 2020) (inference of scienter "bolstered by the fact that Defendants admitted in their SEC filings that they needed to raise funds for Acer to remain viable").

### D.      The Suspicious Timing of Benhamou's Resignation Supports Scienter

On November 16, 2018—just one month after submission of the BLA and weeks before its withdrawal—DBV announced that Benhamou (who co-founded DBV, as CEO was responsible for the BLA, and who had been working on development of the Patch for over ten years), would resign as CEO. ¶193. He assumed a non-executive role on the Board, from which he resigned fewer than four months later, on March 5, 2019. *Id.* DBV gave no reason for his departure. ¶282. Defendants installed Tasse to deflect and to claim plausible deniability of knowledge of the CMC problems— which is exactly what he did. ¶198, 202. These facts add to the strong inference of scienter. *See W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, 2015 WL 3755218, at *17 (E.D. Pa. June 16, 2015) ("resignation of key executives, including the President and COO responsible for implementing new regulations, bolsters the evidence of conscious or reckless behavior."); *In re Par Pharm. Sec. Litig.*, 2009 WL 3234273, at *8-10 (D.N.J. Sep. 30, 2009).

### E.      Defendants' Misleading Responses to Analyst Questions Supports Scienter

Misleading responses to analysts' questions are "powerful evidence" of scienter. *In re Urb. Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 653 (E.D. Pa. 2015) (Perhaps "'the most powerful

---

or use a different adhesive—both of which would require a new trial, cause substantial delay, and be extremely expensive. ¶¶21, 143. While DBV acknowledged to study participants that an adhesive fix was needed (¶114), Defendants never told *investors* that DBV was working on a "better" adhesive.

evidence of scienter is the content and context' of the statements made by [Defendants], which were made 'in response to...analysts' questions.'") (quoting *Avaya*, 564 F.3d at 269); *Papa*, 2018 WL 3601229, at *21 ("In the context of specific inquiries...defendants' omission of actual circumstances that were contrary to their answers presents 'an obvious risk of misleading investors.'").

On September 13, 2018, when DBV was pointedly asked about its manufacturing capabilities and "any sort of CMC issues," the Company touted its French manufacturing facility, assured it had appropriate "capacity" and "quantities for launch," and Mesa confirmed that any "key [CMC] challenges" had been "tackled," while omitting the production problems. ¶184. In response to analyst inquiry on October 2, 2018 asking if DBV could consistently produce the "exact same patch," Mesa assured that it could, explaining that "because it's highly technicalized,…it's actually pretty replicable." ¶186. These misleading responses to analysts questions specifically assuring as to DBV's CMC readiness support scienter. *Urban Outfitters*, 103 F. Supp. 3d at 653.

### F. The Core Operations Doctrine Supports Scienter

The Patch was unquestionably DBV's core operation, bolstering the strong inference of scienter associated with Defendants' misrepresentations of the Patch's CMC readiness and omission of the adhesion failure. *In re Navient Corp. Sec. Litig.*, 2019 WL 7288881, at *11 (D.N.J. Dec. 30, 2019) (core operations supported scienter where the subject of alleged fraud comprised 82.8% of company's revenue); *Immunomedics*, 2020 WL 4381924, at *8 (core operations supported strong inference of scienter); *Carmignac Gestion, S.A. v. Perrigo Co. PLC*, 2019 WL 3451523, at *16 (D.N.J. July 31, 2019) ("…Perrigo's generic drug division comprised 22% of its consolidated net sales in the 2015 fiscal year. Analysts identified 'intensifying competition and lower pricing' as among Perrigo's chief risks during the relevant period …. the Court accordingly finds the core operation inference applicable here.").

### VI. <u>THE TAC ALLEGES LOSS CAUSATION</u>

"Loss causation is a causal connection between the material misrepresentation or omission

28

and the loss suffered." *Urban Outfitters*, 103 F. Supp. 3d at 655. It can be alleged by a corrective disclosure or the materialization of a concealed risk that causes a price decline. *Id.* at 657. Under either approach, "the exposure of the alleged fraud need not occur in a single, all-encompassing corrective disclosure; instead, the truth can be revealed through a series of partial corrective disclosures." *Id.* at 655-56. Plaintiffs allege three corrective disclosures or materializations of risk: (1) on December 19, 2018, DBV withdrew the BLA citing "insufficient data on manufacturing procedures and quality controls," followed by a 60% price drop (¶¶190-91); (2) on March 16, 2020, DBV revealed the adhesion rate failure and that the FDA "identified questions regarding efficacy, including the impact of patch-site adhesion," followed by a 52% price drop (¶¶257-5837); and (3) on August 4, 2020, DBV announced that the FDA issued a CRL, citing "concerns regarding the impact of patch-site adhesion on efficacy" and the need for "a new human factor study," followed by a 37% price drop (¶¶263-64). These allegations provide Defendants with ample notice of "a causal connection between the material misrepresentation and the loss" and sufficiently allege loss causation. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005).

Defendants argue that Plaintiffs fail to plead a corrective disclosure relating to the alleged CMC misrepresentations and omissions (MTD at 28), but the December 19, 2018 disclosure relates *directly* to DBV's manufacturing. The TAC alleges that "the defendant misrepresented or omitted the very facts"—*i.e.*, facts about DBV's manufacturing and quality control of the Patch—"that were a substantial factor in causing the plaintiff's economic loss." *McCabe v. Ernst & Young, LLP.*, 494 F.3d 418, 426 (3d Cir. 2007); *Vanderhoef v. China Auto Logistics Inc.*, 2020 WL 5105243, at *4 (D.N.J. Aug. 31, 2020) ("A corrective disclosure only needs to relate to the same subject as the misrepresentation and there is no requirement that the disclosure mirror the earlier misrepresentation.").

Defendants also argue that loss causation fails for any claim past February 21, 2020, but they do not explain the purported significance of that date. MTD at 28 (Sec. IV). The only news alleged to

have been revealed on February 21, 2020 was DBV's announcement that the FDA advisory committee meeting for the Patch would occur on May 15, 2020. ¶30. Plaintiffs do not allege this to be corrective of any prior misstatement or omission; in other words, artificial inflation caused by Defendants' prior misstatements and omissions of the Patch's adhesion failure continued to exist past February 21, 2020.

Finally, expanding the Class Period to the August 4, 2020 announcement of the CRL does not result in Plaintiffs "repudiating" the allegations in the SAC regarding the partial disclosures about adhesion on March 16, 2020. MTD at 29. While the March 16, 2020 news revealed the adhesion failure and attendant increased risk that the FDA would not approve the Patch, the FDA's *actual* decision to issue a CRL denying approval is *certainly* "new" adhesion-related news. *In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 364 (S.D.N.Y. 2009) ("For an event to qualify as a materialization of the risk, it need only disclose part of the truth that was previously concealed by the fraud.").

## VII. THE TAC ALLEGES DEFENDANTS' LIABILITY UNDER §20(a)

To state a claim under §20(a), Plaintiffs must allege a violation of the Exchange Act, that the Individual Defendants were control persons of the corporation, and that they were "culpable participant[s] in the fraud." *Immunomedics*, 2020 WL 4381924, at *8. As set forth above, Plaintiffs allege a predicate §10(b) violation. Ignoring the TAC's allegations, Defendants superficially argue that Plaintiffs failed to plead Defendants were culpable participants in the alleged fraud. MTD at 30. As detailed above, Defendants are wrong. Plaintiffs sufficiently allege §20(a) claims.

## VIII. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied.

Dated: February 11, 2022                  Respectfully submitted,

                                          **THE ROSEN LAW FIRM, P.A.**

                                          By: */s/Laurence M. Rosen*
                                          Laurence M. Rosen
                                          One Gateway Center, Suite 2600
                                          Newark, NJ 07102
                                          Tel: (973) 313-1887
                                          Fax: (973) 833-0399
                                          Email: lrosen@rosenlegal.com

                                          Sara Fuks (admitted *pro hac vice*)
                                          275 Madison Avenue, 40th Floor
                                          New York, NY 10016
                                          Tel: (212) 686-1060
                                          Email: sfuks@rosenlegal.com

                                          **GLANCY PRONGAY & MURRAY LLP**
                                          Kara M. Wolke, Esq. (admitted *pro hac vice*)
                                          1925 Century Park East, Suite 2100
                                          Los Angeles, CA 90067
                                          Telephone: (310) 201-9150
                                          Email: kwolke@glancylaw.com

                                          *Co-Lead Counsel for Lead Plaintiffs*
                                          *and the Putative Class*

## CERTIFICATE OF SERVICE

I certify that on February 11, 2022, I electronically filed the foregoing document with the Court for the U.S. District Court for the District of New Jersey, using the electronic case filing system of the court, which sent notification of such filing to all CM/ECF participants.

By: /s/ Laurence M. Rosen
Laurence M. Rosen

*Attorney for Plaintiffs*