# EXHIBIT 1

## (Transcript of March 26, 2020 Conference Call)

**S&P Global**
Market Intelligence

# DBV Technologies S.A. ENXTPA:DBV

# Special Call

## Monday, March 16, 2020 9:00 PM GMT

COPYRIGHT © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
spglobal.com/marketintelligence

**1**

# Table of Contents

Call Participants ................................................................................. 3

Presentation ................................................................................. 4

Question and Answer ................................................................................. 6

COPYRIGHT © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved

# Call Participants

## EXECUTIVES

**Daniel Tassé**
*CEO & Director*

**Pharis Mohideen**
*Chief Medical Officer*

**Sara Blum Sherman**
*Senior Director of Investor Relations & Strategy*

## ANALYSTS

**Dae Gon Ha**
*SVB Leerink LLC, Research Division*

**Derek Christian Archila**
*Stifel, Nicolaus & Company, Incorporated, Research Division*

**Graig Suvannavejh**
*Goldman Sachs Group Inc., Research Division*

**Joel Lawrence Beatty**
*Citigroup Inc, Research Division*

**Liisa Ann Bayko**
*JMP Securities LLC, Research Division*

**Tazeen Ahmad**
*BofA Merrill Lynch, Research Division*

**Vikram Purohit**
*Morgan Stanley, Research Division*

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

DBV TECHNOLOGIES S.A. SPECIAL CALL | MAR 18, 2020

# Presentation

**Operator**

Good day, ladies and gentlemen, and welcome to the DBV Technologies Regulatory Update Call. [Operator Instructions] As a reminder, this conference call is being recorded.

I would now like to hand over the conference to your speaker for today, Sara Sherman, Investor Relations at DBV. You may begin.

**Sara Blum Sherman**
*Senior Director of Investor Relations & Strategy*

Thank you, Dilem, and thank you all for joining today's call. Earlier today, we issued a press release providing a regulatory update for Viaskin Peanut, our lead product candidate for the treatment of peanut-allergic children 4 to 11 years of age. The press release is available on our website at dbv-technologies.com as well as on the SEC website.

Joining me on the call today are our CEO, Daniel Tassé; and our CMO, Pharis Mohideen. Daniel will deliver remarks, and then we'll open up the call for Q&A.

I would like to note that during our call today, we will make a number of statements that are forward-looking, including but not limited to the company's timing on its BLA review for Viaskin Peanut as well as other corporate and financial updates. These forward-looking statements involve risks and uncertainties. Actual financial results could materially differ from these forward-looking statements as a result of any such risks.

For a detailed description of applicable risks and uncertainties, you're encouraged to review the company's most recently filed annual and current report and other official corporate documents filed with the Securities and Exchange Commission and the French AMF, such as press releases.

At this time, I'll turn the call over to Daniel Tassé. Daniel?

**Daniel Tassé**
*CEO & Director*

Thank you, Sara, and thank you, everyone, for joining today's call. Let me begin by summarizing the news that we announced today. Today, we issued a press release announcing that FDA has informed us that during its ongoing review of the BLA for investigational Viaskin Peanut, it has identified new questions regarding efficacy, including the impact of patch-site adhesion on efficacy. As a result, the Allergenic Products Advisory Committee meeting, or APAC, to discuss our BLA will no longer take place as scheduled on May 15, 2020.

Now you may be asking what is the sequence of events that led us here, so let me give some details. Over the past week, we have been in constant dialogue with the FDA regarding COVID-19 to understand any impact to our BLA timelines for inspections and full review. For additional color, late Friday, March 13, we received a nonspecific e-mail indicating concerns with the BLA that may impact the advisory committee meeting date, but the e-mail was lacking in any details and clarity. We were pleased with the FDA making themselves available to speak with us today and to provide additional clarity during our discussion.

Based on their questions and comments, we are dialoguing with the FDA regarding the potential submission of additional information on efficacy as well as the impact of adhesion from our clinical program as well as the PEOPLE data, as you know, the long-term results from the 3-year open-label extension study to our pivotal PEPITES trial, which we believe will answer their questions as part of the ongoing BLA review. We believe this information that we have on file should address these new questions on the clinical data as part of FDA's ongoing BLA review. However, we can provide no assurance that will be the case.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Importantly, during the pre-BLA meeting and subsequent discussions, the FDA did not raise any concerns regarding efficacy related to patch adhesion. So this is a new development in our ongoing dialogue that we will work to address.

At this time, we have received no additional information regarding the timeline of the BLA review. And to the company's knowledge, the target action date of August 5, 2020, remains unchanged at this time. However, any additional information that we provide to the FDA may constitute a major amendment to the BLA and could extend the target action date. We look forward to continuing to engage with the agency and will seek to resolve their questions as quickly as possible.

We continue to believe in the clinical benefits observed in Viaskin Peanut clinical trials, and we'll work closely with the FDA to bring Viaskin Peanut to children ages 4 to 11 as quickly as possible.

I would be remiss not to mention the ongoing COVID-19 outbreak and the potential implications. We are closely monitoring the situation and, obviously, doing our part to help ensure the safety and well-being of our employees, our partners and the patients we serve. From a business continuity perspective, and as you know we are manufacturing a patch for eventual launch, we have not identified any critical component that would impact our ability to manufacture the product. All ongoing clinical trials are continuing, but we have asked clinical trial sites to instill some best practices related to COVID-19 and are working on virtual options and delays as necessary to ensure the safety of these patients, their families and the investigators.
Now with that, operator, I'd like to open the call for Q&A.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Question and Answer

**Operator**

[Operator Instructions] I show our first question comes from Derek Archila from Stifel.

**Derek Christian Archila**
*Stifel, Nicolaus & Company, Incorporated, Research Division*

Just a few from us here. First, Daniel, I wonder if you could provide any more specifics around the efficacy questions raised by the FDA. Didn't know if this had anything to do with the confidence interval issue or any other issues may be raised that would require new additional clinical studies. I guess, right now, as it sits today in terms of best- and worst-case scenarios, what are you kind of thinking in terms of like timing? Again, I know you're not going to provide anything official. But again, what's kind of the best-case scenario in terms of you just sitting in [ the data that you already have ] versus having to potentially run again maybe a clinical study or safety study? Maybe you can kind of help us out there. And I have one follow-up.

**Daniel Tassé**
*CEO & Director*

That's fine. Derek, let me answer, hopefully, every element of your question. If not, please ask me to answer whatever I might be missing here.

So no, the answer to your first question, this has nothing to do with the 15% confidence interval. The questions from the agency have to do with the potential impact on efficacy of patch adhesion and patch attachment. Again, something that we have looked at closely since we have the products, we very much believe that patch adhesion is not a factor in clinical outcome and are looking forward to engaging with the agency on discussing exactly that.

Just keep in mind that the 3-year data, the PEOPLE data, becomes particularly impactful here potentially, showing, as you've seen, ongoing improvement in efficacy and pretty good, pretty remarkable clinical response over 3 years, which obviously we would not achieve if the kids were not adhering to therapy and complying and had sufficient patch adhesion.

I hopefully have answered your question. If there's anything else I've missed, Derek, please ask.

**Derek Christian Archila**
*Stifel, Nicolaus & Company, Incorporated, Research Division*

Just in terms of the timing and best- and the worst-case scenarios. So again, like the patch adhesion, it seems like you are saying you have the data. But worst-case scenario where you'd have to run some sort of study, would you have to do another full clinical program? Or is this something that can do -- be done in a shorter study?

**Daniel Tassé**
*CEO & Director*

We don't believe we need to run any clinical data, to be quite clear. There was no such indication or discussions with the FDA. The question is -- the question -- we believe we can answer their questions with further analysis of the clinical data we already have from our clinical program. So you can imagine, Derek, we have data on many stratas here from efficacy adverse events, patch adhesion, treatment compliance, patient age that we can analyze and cut in every way, and we believe we can satisfactorily answer the FDA's questions without generating incremental data.

**Derek Christian Archila**
*Stifel, Nicolaus & Company, Incorporated, Research Division*

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

Got it. And just my follow-up. So again, if you have the data, is there a reason why it wasn't part of the BLA package prior to the submission? Or what was the reason why it wasn't included?

**Pharis Mohideen**
*Chief Medical Officer*

Derek, this is Pharis. As you know, with any BLA or NDA, you have tons of subcuts and subgroups and slicing and dicing data, and you can't submit everything within the BLA. There's just too much. So you just focus on the core elements. But obviously, we've done a lot of work on this, and so we do have the data available, and that is what we will submit to them.

**Operator**

Our next question comes from Joseph Schwartz from SVB Leerink.

**Dae Gon Ha**
*SVB Leerink LLC, Research Division*

This is Dae Gon dialing in for Joe. So just to, I guess, follow up on Derek's question earlier. When you said there were a couple of questions, that's plural. So I just wanted to make sure, were all those plural questions regarding the patch adhesion and the attachment?

And I guess, to your answer to Derek's question regarding the PEOPLE data may be submitted and that could constitute a major amendment, just trying to wrap my head around why that, I guess, information couldn't be conferred from your Phase II OLFUS-VIPES data, which is also an extensive data. And then I have a follow-up.

**Daniel Tassé**
*CEO & Director*

Yes, that's fair. So I used the plural because we were having a conversation with the agency. So there's been no e-mail from the agency outlining what their questions are. So I used the plural to characterize it was a conversation with them around the need for supplemental information around patch adhesion as it leads to efficacy. And we believe that the PEOPLE data is -- besides the fact we can analyze further our existing data to answer the questions, but we think we can augment it also with the 3-year data given the fact that we've seen the ongoing improvement in efficacy achieved with good treatment compliance in the real-life usage of the product in an open-label trial to consolidate our response here. And the Phase II OLFUS data was not as robust a number of patients as what we have with PEOPLE.

Anything you want to add there, Pharis?

**Pharis Mohideen**
*Chief Medical Officer*

No.

**Daniel Tassé**
*CEO & Director*

Does that answer your question now, Joe -- Dae Gon?

**Dae Gon Ha**
*SVB Leerink LLC, Research Division*

Yes. Yes, it does. So my follow-up is with regards to the withdrawal of APAC meeting. So I'm not really familiar with the history here. But I guess, if we can see maybe in the past precedents when the FDA has withdrawn the committee meeting, what's generally been sort of the preceding issue? And I guess, you said that, at this time, you don't necessarily see the date of August, the target action date, necessarily changing. But I guess, if you can expand on that, what gives you confidence that assuming you don't submit the PEOPLE data and that it doesn't constitute a major amendment, what gives you confidence that it still is August target action date?

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Daniel Tassé**
*CEO & Director*

Well, we have confidence in the simple fact that it was not discussed today that the action date would slip in our discussion with the agency, just to start with that here. But if we choose to add data and the agency assesses that as being significant, they have every right, as you know, to consider it to be a major amendment and extend the clock. So what we stated in the press release and what I said earlier on was nothing more than stating the as is with the agency. We are not aware that August 5 has slipped, but we do understand that it could slip if they consider the supplemental data to be a major amendment. Is that helpful?

**Dae Gon Ha**
*SVB Leerink LLC, Research Division*

No, okay. Yes, yes. Got it.

**Operator**

Our next question comes from Tazeen Ahmad from BoA.

**Tazeen Ahmad**
*BofA Merrill Lynch, Research Division*

Daniel, if could you just give us a little bit more color on why you think the 3-year data or the open-label extension data that you have in-house would be sufficient to address the specifics around the adhesion questions that the agency has asked you. And then I have a follow-up.

**Daniel Tassé**
*CEO & Director*

Yes, we believe that -- or Pharis, do you want to take this one? The -- there's 2 elements. The analysis we have of our 1-year data, we believe, would address their concern, and we can add to that the fact that we would not have had the ongoing efficacy improvement from baseline to year 1 to year 3 if the patches were falling off all the time, quite simply to oversimplify the agency's very understandable question here. So we don't believe that PEOPLE data is the answer. It would be complementary to the further analysis of the data we have on hand.

**Tazeen Ahmad**
*BofA Merrill Lynch, Research Division*

Okay. And as it relates to the number of patients continuing on study at the end of year 1 and then at the end of year 2, how would that be impactful in convincing the agency about any adhesion issues, meaning why wouldn't they ask you if any of the patients that chose not to continue on in the study for open-label may not have had some issues, for example, with patch adhesion?

**Daniel Tassé**
*CEO & Director*

Yes, it's an important question. We did document the reasons for dropout. As you know, except for the food challenge, which some patients chose not to take because it's not a pleasant experience, the dropout rate we had through years 2 and years 3 was roughly 7% or 8% per year. It was documented why patients dropped out, and discomfort with the patch was not the leading reason.

**Pharis Mohideen**
*Chief Medical Officer*

Yes, I'd just add compliance. We know compliance is really high with the product. It's very easy to use, very simple application regimens. And so that's not really the concern or the issue.

**Tazeen Ahmad**
*BofA Merrill Lynch, Research Division*

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

DBV TECHNOLOGIES S.A. SPECIAL CALL | MAR 18, 2020

Okay. And maybe a last question is, had you submitted any of the longer-term data to the agency? I know your original plan might not have been to include that as part of the initial review, but given that you've had some of this data in-house, had any of that gone to the agency already?

**Daniel Tassé**
*CEO & Director*

No, we had shared the data with the agency, the press release out of professional courtesy as I think we've said publicly. But we had no intention of adding the 3-year data unless it was necessary. Our plan was to submit that as a supplemental BLA. Now our plans here might have changed if we believe the data is going to be helpful in answering the agency's questions. And to be clear, that dialogue between us and the agency is ongoing.

**Operator**

Our next question comes from Liisa Bayko from JMP Securities.

**Liisa Ann Bayko**
*JMP Securities LLC, Research Division*

Can you -- I guess I don't understand what we're talking about here. What is patch site adhesion related to efficacy? What is the specific question FDA has?

**Daniel Tassé**
*CEO & Director*

Yes, let me -- that's -- let me summarize for you what has been sort of the dimensions of this year. So there was a 90% adhesion rate. So adhesion means the patch is scored 0, 1, 2, 3, 4. So 0 or 1 means the patch has stayed on or just the corner sort of was lifting up a bit; 2 or 3 means the patch was lifting or falling off. So the adhesion rate that was prespecified by the FDA based on their transdermal patch experience was that 90% adhesion rate was required. The adhesion rate in PEPITES was below the prespecified 90% from both placebo and active arms.

Now the mean duration of application times for patches with incomplete adhesion was within a protocol specification of 24 plus-or-minus 4 hours for both placebo and active arm. We also know that the main reason for the adhesion issues was scratching, what the kids would -- did essentially to address what was the pruritus and skin irritation that has been well documented with the product here. So this is a dynamic phenomenon by patients.

And then we did a subgroup analysis that showed that similar clinical benefits in subjects reporting patch adhesion issues, subjects with no more than 10% patches that were at 2 or 3 compared to the general study population suggested no substantial impact on clinical efficacy. That has always been our comfort with that data. And to be clear, patch adhesion was not correlated to application time, subject age, IgE or IgG4 profile. So to give you all the detail of what the data was meant to be.

**Liisa Ann Bayko**
*JMP Securities LLC, Research Division*

That's very helpful. I have to read my notes over again, probably [ answer this myself ] later on.

**Daniel Tassé**
*CEO & Director*

But it's fine, yes.

**Liisa Ann Bayko**
*JMP Securities LLC, Research Division*

Does that imply if there's more scratching, you'd think there'd be more scratching on the treatment arm. So did you see more, I guess, adhesion failures or whatever you want to call it in one arm than the other? And was that the treatment arm? Is that part of the issue? Or...

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Pharis Mohideen**
*Chief Medical Officer*

Yes. We think that it's definitely related to local site irritation and scratching. And as I mentioned to Derek, we have a lot of data with different subcuts and [ locks ] that we can supply to the agency.

As you know, for these BLAs, you're giving them the big picture, and they have to come back and ask a lot of different questions, and we have that data ready to go. They did not have specific questions. It was very high-level comments from them.

**Liisa Ann Bayko**
*JMP Securities LLC, Research Division*

Okay. And was the patch screened...

**Daniel Tassé**
*CEO & Director*

As you know, it was also -- go ahead.

**Liisa Ann Bayko**
*JMP Securities LLC, Research Division*

Yes, go ahead.

**Daniel Tassé**
*CEO & Director*

I would say, though, keep in mind also that most of the protein comes off the patch within 12 hours also. So we are aiming for 24 plus-or-minus 4 hours. But the fact is that a patch falling off in the second half of the day, in principle, should be of no consequence, and we believe the clinical data supports that.

**Liisa Ann Bayko**
*JMP Securities LLC, Research Division*

And can you remind us, were there any changes made to the patch during the Phase III study?

**Daniel Tassé**
*CEO & Director*

Between Phase II and Phase III, and Phase III in commercial, there is no fundamental changes to the patch. There's just accommodation to make it a bit easier to peel the paper topper from 2 to 3 and, obviously, place for commercial labeling on the commercial product. But fundamentally, it's the very same patch.

**Liisa Ann Bayko**
*JMP Securities LLC, Research Division*

Okay. So that had no impact on the adhesion, that change?

**Daniel Tassé**
*CEO & Director*

Correct. Correct.

**Liisa Ann Bayko**
*JMP Securities LLC, Research Division*

Okay. Okay. And is that really the only issue? Because you said like, amongst other things, so just back to that question, are there other -- is it just 2 that need to be addressed? Or is it really all about this adhesion?

**Daniel Tassé**

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

*CEO & Director*

It's the intersection of adhesion and efficacy is what we've heard in our conversation with the agency today.

**Liisa Ann Bayko**
*JMP Securities LLC, Research Division*

Okay. And when would you prepare to submit your response to them?

**Daniel Tassé**
*CEO & Director*

Yes, we're planning to submit to the agency within a few days on what would be the content of what would come as a supplemental answer to their questions. And then the agency will have to assess, obviously, the size of that package. But what we want is continue dialogue with them by describing to them what we wish to send them so that there's clear expectation on both sides of what they will get and what it means for us.

**Operator**

Our next question comes from Joel Beatty from Citi.

**Joel Lawrence Beatty**
*Citigroup Inc, Research Division*

Can you help put in context what are FDA's concerns regarding adhesion? Because I suppose you could argue that if some patients have really good adhesion and other times there's not as good adhesion, if they're working in both cases, then it's an efficacious product in either case and better than placebo. So just a little more context on the importance of that.

**Daniel Tassé**
*CEO & Director*

Again, there was no specific question shared by the agency, just comments on a telephone call. And to, again, to answer your question in the most straightforward way, we have seen in our subgroup analysis that patients who had patches attaching more than other patients did not have impact -- or substantial impact on clinical efficacy. So that's the general theme to what is our response to the agency. But we'll be providing a lot more detail cut many different ways as to satisfy their questions.

**Joel Lawrence Beatty**
*Citigroup Inc, Research Division*

Great. And then do you anticipate that an AdCom will be needed at some point before approval?

**Daniel Tassé**
*CEO & Director*

Yes, we -- I don't have an answer to that. It's a question for the FDA. We would have to assume that if they required an AdCom originally, the fact that the AdCom date has changed does not mean that an AdCom would not be necessary. But that being said, that's a discussion we did not have with the agency.

**Joel Lawrence Beatty**
*Citigroup Inc, Research Division*

Got it. And I believe in response to the previous questions, you had mentioned that it may take just a few days or so to submit the data to address these questions. So I guess with that in mind, any thoughts on why the AdCom date may have changed? Because if you're able to submit in a few days, that seems to be well in advance of the AdCom.

**Daniel Tassé**
*CEO & Director*

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

DBV TECHNOLOGIES S.A. SPECIAL CALL  |  MAR 16, 2020

I want to make sure that I'm clear when I say we're going to summit in a few days. What we will do is share with the agency the content of what we plan on submitting and have a discussion with them on whether or not it's sufficient or insufficient. So what we will share with them is the means to continue the dialogue on what their requirements are to answer questions that were, again, expressed to us verbally. So they're a little -- they're still a little vague to us. So we don't know how much time we'd need to make a submission. We do know that in a few days, we can put in front of them how we're thinking about the submission.

**Joel Lawrence Beatty**
*Citigroup Inc, Research Division*

Got it. And then, I guess, last question. In the prepared remarks, the COVID-19 was mentioned. So I just want to clarify if the change in AdCom seems to be related to these questions on efficacy or related to COVID-19.

**Daniel Tassé**
*CEO & Director*

We don't know the answer to that. That would be a question for the agency to answer. Given what we're all living, it's fair to assume that it's a factor in the agency decisions. But to be clear, our discussion with them today was around the clinical dimension we described.

**Operator**

Our next question comes from Graig Suvannavejh from Goldman Sachs.

**Graig Suvannavejh**
*Goldman Sachs Group Inc., Research Division*

I just have one main question, and maybe it's not so much related to the issues of the news today but just a broader macro perspective. Obviously, COVID-19 is having an impact, not only on some stock prices, but on companies' ability to kind of think about commercialization. And I know you guys are kind of still in a precommercialization phase, but without visibility on how long this could potentially go on and what the impact for patients to get to allergists, maybe if you could provide your perspective of what you think that impact could be, again, given our limited visibility into what the future may have in store. And maybe what could be helpful is to maybe provide a little compare and contrast as to how the interaction for your product profile in terms of patients needing to see their doctors might be versus the competitive product that just announced today that they have treated their first patients.

**Daniel Tassé**
*CEO & Director*

Yes, the impact of COVID-19 and the uncertainty that it has brought to the marketplace is something that we're going to just manage with great conservatism. What I mean by that is we're in a position where we have sufficient cash to run our operations into Q1 of next year, assuming that we make all of the aggressive and stepwise investments that would come with commercialization. So obviously, a lot of that spend is elastic. If the situation needs to slip because either the review takes longer or the market dynamics are not such where it's wise to launch a product at this point in time, we have the ability to make sure that we're very, very smart with our shareholders' monies and are good stewards of it so that we build up our expenditure in a way that is timely to be able to best launch given the macro dynamics around us. So does that answer your question, Graig?

**Graig Suvannavejh**
*Goldman Sachs Group Inc., Research Division*

That does on the first part. And then just maybe if you could comment just on how intensive -- we should all know this, but just as a reminder, like how intensive your product is from patients being able to see their physicians and kind of the need to see them often versus the Palforzia product.

**Daniel Tassé**

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

*CEO & Director*

Yes, there is no doubt that, everything else being equal, the objective of reducing social distance and reducing social contact makes a product that requires fewer physician visits to be more attractive than one that requires more physician visits. So if we compare the profile of the 2 products, given the environment we are in, we think the profile is certainly preferable for patients. But I think the most important point in all of this is what we're going to make sure most is that patients are safe, do the right thing by, obviously, what is their tolerance for risk, and we're fully supportive of that. Did I answer your question, Graig?

**Graig Suvannavejh**
*Goldman Sachs Group Inc., Research Division*

It does.

**Pharis Mohideen**
*Chief Medical Officer*

The only thing I'd add to that, Graig, is maybe if you think about something like anaphylaxis and having an event in this condition in the state of where we are, you sort of don't want to be going into an emergency room that's jam-packed. And so the profiles are quite different. I don't need to get into that, but that's something to consider also other than just the office visit to get the therapy started.

**Operator**

[Operator Instructions] I show our next question comes from Vikram Purohit from Morgan Stanley.

**Vikram Purohit**
*Morgan Stanley, Research Division*

So I guess I have one on the logistics side of things. So you mentioned that you don't anticipate generating new clinical data for the additional submission that the FDA's request has prompted. But you also noted that whatever you do submit could constitute a major amendment. So could you kind of help us characterize, understanding it's still early days in your thinking about the response, kind of what levels of submission would constitute a major amendment that could push back the target action date? And what kind of a submission, based on the existing data, would not push that time line back?

**Daniel Tassé**
*CEO & Director*

Yes, that's a fundamental question. But the answer to that would be the result of a dialogue with the agency that we have ongoing right now. So it's the agency, obviously, that decides whether or not the supplemental data is a major amendment, which is why we want to use the fact that we have a good access to them and a good working relationship to see what could be provided and if it's sufficient to answer the question. And if we need more data, then we understand the possibility that it would be received as a major amendment.

But the boundaries by which a response would be part of BLA review or seen as a supplemental with a clock stop, those boundaries have not been established on our dialogue with the agency but is pretty much at the core of that ongoing dialogue. I hope that answers your question.

**Vikram Purohit**
*Morgan Stanley, Research Division*

Yes, that's helpful. And I know that you're not guiding to any timelines yet. But just kind of based on your experience with precedent cases and even outside of that, following your initial submission, kind of how do you expect the cadence of back and forth to go between, let's say, now and the summer? And the heart of that question really is kind of when can we expect to learn more materially about how timelines may look for the BLA and its processing throughout the year?

**Daniel Tassé**
*CEO & Director*

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Yes. I can't answer your -- the first half of your question, obviously, until we have come to agreement with the agency. I can certainly assure you, though, that if the time line slips or if there's anything of substance around our response to the agency, we will communicate that to the markets. So I cannot speculate nor do I wish to speculate. But obviously, the answer to your question very likely will be of importance to the markets and will be shared.

**Operator**

I show no further questions in the queue. And at this time, I would like to turn the call over to Daniel Tassé, CEO, for closing remarks.

**Daniel Tassé**
*CEO & Director*

Thanks, Dilem, and thanks, everyone. Again, we wish to reiterate our commitment to bringing Viaskin Peanut to patients as soon as possible and our commitment to all of our stakeholders in keeping you informed as we navigate this process and remain very much engaged with the FDA. Now we understand these are difficult times. Our division at the agency, the allergenic product division, is also the division that is responsible, as you know, for regulating vaccines. And there's a lot happening around us right now. And this is, obviously, a very serious health situation.

We also appreciate that the agency will have their resources deployed, not only on Viaskin Peanut, but other applications also, and we certainly are empathetic to that. We also extend our sympathies to people and communities, obviously, who are very much touched by this outbreak.

We have always committed to being very transparent with the market. We'll continue doing so as we learn more here. And I thank everyone for joining us today and ask that you all please stay safe.

**Operator**
Ladies and gentlemen, thank you for participating in today's conference call. This concludes the program. You may all disconnect. Good day.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**DBV TECHNOLOGIES S.A. SPECIAL CALL | MAR 30, 2020**

Copyright © 2020 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2020 S&P Global Market Intelligence.